UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

VALERIE FLORES,

Plaintiff,

v. 1:26-CV-0123 (AMN/ML)

ADA JAMES PLACE, also known as Passages,

Defendant.

---

APPEARANCES: OF COUNSEL:

Valerie Flores
Plaintiff, *Pro Se*
Post Office Box 1110 ACP 5749
Albany, New York 12201

MIROSLAV LOVRIC, United States Magistrate Judge

**ORDER and REPORT-RECOMMENDATION**

Plaintiff Valerie Flores ("Plaintiff") filed this *pro se* complaint against Defendant Ada James Place ("Defendant") alleging violations of her rights. (Dkt. No. 1.) Plaintiff did not pay the filing fee and seeks leave to proceed *in forma pauperis* ("IFP"). (Dkt. No. 15.) For the reasons set forth below, I (1) grant Plaintiff's second amended IFP application, and (2) recommend that the Complaint be dismissed in its entirety without leave to amend.

## I. BACKGROUND

Construed as liberally[1] as possible, the Complaint alleges violations of Plaintiff's rights by Defendant. (*See generally* Dkt. No. 1.)

More specifically, the Complaint alleges that at an unspecified time she spoke on the phone with an individual named "Kayla" who "denied" Plaintiff without a reason. (Dkt. No. 1 at 5.) Plaintiff alleges that the next day she spoke with a female who was "rude" and denied Plaintiff access to speak to the "director." (*Id.*) Plaintiff alleges that she was denied services despite being on an address confidentiality program and thus, she was discriminated against "due to being a member of several protective classes." (Dkt. No. 1 at 5.) Based on these factual allegations, Plaintiff appears to assert (1) a claim pursuant to 15 U.S.C. § 1692(d), and (2) a claim of harassment. (Dkt. No. 1 at 3; Dkt. No. 1, Attach. 1.) As relief, Plaintiff seeks $40,000 in damages. (Dkt. No. 1 at 4; Dkt. No. 1, Attach. 1.)

## II. PLAINTIFF'S SECOND AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1).[2] After reviewing Plaintiff's second

---

[1] The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2] The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing

amended IFP application (Dkt. No. 15), the Court finds that Plaintiff meets this standard.[3] Therefore, Plaintiff's second amended application to proceed IFP is granted.[4]

## III. LEGAL STANDARD FOR REVIEW OF THE COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

---

financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

[3] Plaintiff is a prolific filer; she is cautioned that proceeding IFP is a privilege, not an unqualified right. The continued filing of frivolous lawsuits may result in the denial of a request to proceed IFP in an action.

[4] Plaintiff is reminded that, although her IFP application has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe her pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed for two reasons.

First, even construed with the "special solicitude" afforded to *pro se* pleadings, *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006), the Complaint is woefully lacking factual allegations sufficient to plausibly suggest any cause of action. Plaintiff appears to assert that at some unspecified time, two individuals were rude to her over the phone and thus, she has been discriminated against. (*See generally* Dkt. No. 1.) Moreover, the Complaint alleges that one of the individuals who was rude to her on the phone is named Kayla and there is

a Kayla who works at a post office "who might be involved in delayed mail issues." (Dkt. No. 1 at 5.) These attenuated and fanciful allegations are wholly incredible "whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). "Plaintiff's beliefs – however strongly [s]he may hold them – are not facts." *Morren v. New York Univ.*, 20-CV-10802, 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

The undersigned finds that "because Plaintiff does not provide any plausible factual support for her claims, they rise to the level of irrational and must be dismissed as frivolous." *Moore v. Georgia*, 24-CV-5545, 2024 WL 4149959, at *3 (S.D.N.Y. Sept. 11, 2024) (citing *Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2002) (summary order) (internal citations omitted) (holding that "the district court did not err in *sua sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal fusion centers and the New York State Intelligence Center, which put a digital marker on him in order to collect his personal data and harass him")); *accord Moore v. Fox News*, 24-CV-5470, 2024 WL 4635337, at *3 (S.D.N.Y. Oct. 30, 2024).

As a result, I recommend that Plaintiff's Complaint be dismissed as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).

Second, in the alternative, I recommend that the Complaint be dismissed for failure to state a claim upon which relief may be granted.

To state a claim under the Fair Debt Collection Practices Act ("FDCPA") pursuant to 15 U.S.C. § 1692, "a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the

statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA." *Felberbaum v. Sequium Asset Solutions*, 21-CV-9513, 2023 WL 167559, at *3 (S.D.N.Y. Jan. 11, 2023) (citing *Cohen v. Ditech Fin. LLC*, 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y. Mar. 24, 2017)). The Complaint fails to allege facts plausibly suggesting that (1) Plaintiff is a person who was the object of efforts to collect a consumer debt, (2) Defendant is a debt collector, or (3) that Defendant engaged in an act or omission in violation of the FDCPA. (*See generally* Dkt. No. 1); *Komatsu v. Urban Pathways, Inc.*, 22-CV-9080, 2023 WL 419699, at *9 (S.D.N.Y. Jan. 26, 2023) (citing 15 U.S.C. 1692e) ("In cases where the FDCPA applies, it prohibits deceptive and misleading practices by 'debt collectors.'"). As a result, I recommend that Plaintiff's FDCPA claim be dismissed for failure to state a claim upon which relief may be granted.

To the extent that the Complaint is construed as alleging a discrimination claim, it fails to state a claim upon which relief may be granted. "Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Board of Trustees of Northern Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016); *see Karunakaran v. Borough of Manhattan Cmty. Coll.*, 18-CV-10723, 2022 WL 902370, at *3 (S.D.N.Y. Mar. 28, 2022) (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)) ("Although a plaintiff is not required to plead facts proving each element of a prima facie case of discrimination at the pleading stage, her allegations must provide 'plausible support' for a 'minimal inference' that the [defendant] was motivated by discriminatory intent."); *Canady v. Union 1199/SEIU*, 527 F. Supp. 3d 515, 516 (W.D.N.Y. 2021) ("simply falling into a protected category is not enough"); *Perry v. County*

*of Westchester*, 06-CV-3000, 2008 WL 11438085, at *17 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff's membership in a protected class in and of itself does not establish discriminatory animus").

Having found that Plaintiff's federal claims are subject to dismissal, I recommend that the Court decline to exercise jurisdiction over any state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").[5]

As a result, I recommend, in the alternative, that the Complaint be dismissed for failure to state a claim upon which relief may be granted.

## V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint

---

[5] In the alternative, New York does not recognize private causes of action for harassment and abuse, hence, I recommend that those claims be dismissed. *Graham v. UMG Recordings, Inc.*, 806 F. Supp. 3d 454, 476 (S.D.N.Y. 2025) ("New York does not recognize a civil cause of action for harassment."); *Jones v. L3 Harris*, 730 F. Supp. 3d 26, 29 (W.D.N.Y. 2024) (citing *Robinson v. Williams*, 22-CV-0982, 2023 WL 3352758, at *9 (N.D.N.Y. Jan. 12, 2023) (Lovric, M.J.), *adopted* 2023 WL 2986825 (N.D.N.Y. Apr. 18, 2023)) ("It is well-settled that 'there is no private cause of action for stalking or general harm.'").

gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[6]

Here, a better pleading could not cure the deficiencies identified with Plaintiff's claims because there is "no indication in the Complaint that Plaintiff's allegations against Defendant[] involve any debt, debt collectors, or debt collection practices. Together with the finding that Plaintiff's Complaint is frivolous and nonsensical, . . . weighs heavily in favor of concluding that any opportunity to amend would be futile." *Flores v. Smith*, 25-CV-1838, 2026 WL 2606630, at *3 (N.D.N.Y. Sept. 3, 2026) (Nardacci, J.) (internal citation omitted). As a result, I recommend that the Court decline to grant Plaintiff leave to amend.

---

6 *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

PLAINTIFF IS ADVISED THAT SHE SHOULD NOT SEEK TO FILE A MOTION TO AMEND HER COMPLAINT UNTIL UNITED STATES DISTRICT JUDGE NARDACCI RULES ON THIS COURT'S RECOMMENDATIONS WITH RESPECT TO PLAINTIFF'S COMPLAINT. ANY AMENDED COMPLAINT OR MOTION TO AMEND BEFORE JUDGE NARDACCI'S DECISION WITH RESPECT TO THIS COURT'S RECOMMENDATIONS WILL BE STRICKEN AS PREMATURE AND WILL NOT BE CONSIDERED BY THE COURT. As noted below, however, Plaintiff may file objections to this Court's recommendations.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's second amended application to proceed *in forma pauperis* (Dkt. No. 15) is **GRANTED**; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED in its entirety without leave to amend** pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[7]

[7] The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September 9, 2026
Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

[8] If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional Facility; Joseph Williams, Warden, Lincoln Work–Release Center; Francis J. Herman, Senior Parole Officer Interstate Bureau; T. Stanford, Senior Parole Officer; Deborah Stewart, Parole Officer; John Doe # 1, Parole Agent, Watertown Correctional Facility; John Doe # 2, Parole Agent, Lincoln Work Release Center; Susan Bishop, Director of Interstate Compact, South Carolina; Cecil Magee, Parole Officer, South Carolina; Frank Barton, Parole Officer, South Carolina; John McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

***1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12, 1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

***2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo* determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

no clear error on the face of the record in order to accept the recommendation").

***3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

***4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

***5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

**DISCUSSION**

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See* *LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See* *Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

***6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

***7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

**CONCLUSION**

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

## Footnotes

1 I note, however, that the report-recommendation would survive even *de novo* review.

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1134723
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Aaron COHEN, on behalf of himself and all others similarly situated, Plaintiff,
v.
DITECH FINANCIAL LLC, and Rosicki, Rosicki & Associates, P.C., Defendants.

15-CV-6828
|
Signed 03/24/2017

**Attorneys and Law Firms**

LAW OFFICES OF SHIMSHON WEXLER, PC, BY: Shimshon Wexler, Esq., 315 W. Ponce de Leon Ave., Suite 250, Decatur, Georgia 30030, Attorney for Plaintiff.

BALLARD SPAHR LLP, BY: Justin Angelo, Esq., 919 Third Avenue, Floor 37, New York, New York 10022, Attorneys for Defendant Ditech Financial LLC.

RIVKIN RADLER, LLP, BY: Carol A. Lastorino, Esq., 926 RXR Plaza, Uniondale, New York 11556, Attorneys for Defendant Rosicki, Rosicki & Associates, P.C.

MEMORANDUM AND ORDER

LEONARD D. WEXLER, UNITED STATES DISTRICT JUDGE

***1** Plaintiff Aaron Cohen ("Cohen" or "Plaintiff") commenced this action, on behalf of himself and as a putative class action, alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.,* by defendants Ditech Financial LLC ("Ditech") and Rosicki, Rosicki & Associates, P.C. ("Rosicki"). Specifically, he seeks statutory damages, attorneys' fees, and costs for violations to § 1692e and § 1692g(a)(2) of the FDCPA. Currently before the Court are each defendant's motion to dismiss pursuant Rule 12 (b)(6) of the Federal Rules of Civil Procedure. *See* Rosicki Motion, Docket Entry ("DE") [24]; Ditech Motion, DE [29]. For the reasons set forth herein, both motions are granted and the complaint is dismissed.

## I. BACKGROUND

### A. Factual Allegations and State Foreclosure Action [1]

On or about August 11, 2005, Cohen incurred a debt in the form of a mortgage loan. Complaint, DE [1], ¶ 15. The mortgage was assigned on more than one occasion, the last assignment occurring on June 10, 2013 to Green Tree Servicing LLC ("Green Tree"). *See* Foreclosure Complaint ¶ 4, Declaration of Carol A. Lastorino ("Lastorino Decl."), Ex. B, DE [25]. On March 11, 2015, Green Tree commenced a foreclosure proceeding in state court (the "Foreclosure Action") upon Plaintiff's default on his mortgage payments in 2009. *See* Foreclosure Compl. ¶ 7. After the foreclosure action was filed, Green Tree changed its name to Ditech. [2]

After the foreclosure complaint was filed, Plaintiff received two additional documents in furtherance of the Foreclosure Action: a Certificate of Merit Pursuant to CPLR 3012-b ("Certificate") and a request for judicial intervention ("RJI"). Compl. ¶ 23. The Certificate is dated March 11, 2015, bears the same caption as the Foreclosure Complaint, and certifies that plaintiff Green Tree "is the creditor entitled to enforce rights" under the pertinent documents. Certificate ¶2, Lastorino Decl. Ex. C. The RJI uses the same caption as the Foreclosure Complaint, indicates that the nature of the action is a Real Property—Mortgage Foreclosure, and purports to seek a "Residential Mortgage Foreclosure Settlement Conference." Lastorino Decl. Ex. D. Green Tree is designated as the Plaintiff, but there is no language identifying it as the "creditor."

***2** In the Foreclosure Action, Green Tree seeks *inter alia* that the mortgaged premises be sold, that plaintiff be paid monies owed from the proceeds of the sale, and that Aaron Cohen "be adjudged to pay any deficiency which may remain." Foreclosure Compl., Wherefore Cl.

### B. Complaint in This Action

The complaint in the case before this Court alleges a single cause of action for violations of two sections of the FDCPA. Under § 1692e, "[a] debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Section 1692g provides in pertinent part as follows:

> (a) Within five days after the initial communication with a consumer in connection with the collection of any debt, a debt collector shall, unless the following information is contained in the initial communication or the consumer has paid the debt, send the consumer a written notice containing

...

(2) the name of the creditor to whom the debt is owed

15 U.S.C. § 1692g(a)(2).

The basis of Plaintiff's complaint is that the creditor to whom the debt was owed at the time of the filing of the foreclosure complaint was Fannie Mae, not Green Tree. Compl. ¶¶ 21-22. Plaintiff claims that defendants violated § 1692e in that they "falsely stated that Green Tree Loan Servicing LLC was the creditor to whom the Plaintiff's debt ... was owed when, in fact, Green Tree Servicing, LLC was not the creditor to whom the Plaintiff's debt ... was owed." Compl. ¶ 31. In addition, after making an "initial communication," neither Rosicki nor Green Tree advised Plaintiff of the "correct name of the creditor to whom the debt is owed." Compl. ¶ 33.

## II. LEGAL STANDARDS

Defendants seek dismissal of the action pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The standards for analyzing a motion to dismiss are well-established. The court must accept the factual allegations in the complaints as true and draw all reasonable inferences in favor of the plaintiff. *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 113 (2d Cir. 2013) (citations omitted). The court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.' " *Hayden v. Paterson,* 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S at 678 (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007)).

The determination of "whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S at 679. A pleading that does nothing more than recite bare legal conclusions, however, is insufficient to "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678-679; *see also* *Twombly,* 550 U.S. at 555 (holding that a "formulaic recitation "formulaic recitation of cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level."). While Rule 8 does not require "detailed factual allegations," it does require more than an "unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly,* 550 U.S. at 555).

## III. DISCUSSION

***3** The FDCPA was enacted "with the aim of eliminating abusive practices in the debt collection industry." *Jacobson v. Healthcare Fin. Servs., Inc.,* 516 F.3d 85, 89 (2d Cir. 2008) (quoting 15 U.S.C. § 1692e). This legislation and its history "emphasize the intent of Congress to address the previously common and severe problem of abusive debt collection practices and to protect unsophisticated consumers from unscrupulous debt collection tactics." *Ehrich v. Credit Prot. Ass'n, L.P.,* 891 F. Supp. 2d 414, 415 (E.D.N.Y. 2012) (citations omitted). The FDCPA "focuses on regulating interactions between 'debt collectors' and 'consumers.' " *Ellis v. Solomon and Solomon, P.C.,* 591 F.3d 130, 134 (2d Cir. 2010). To establish a claim under the FDCPA, a plaintiff must establish that: (1) he is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a "debt collector"; and (3) the defendant has engaged in some act or omission in violation of the FDCPA's requirements. *See Scaturro v. Northland Grp., Inc.,* 16-cv-1314, 2017 WL 415900, at * (E.D.N.Y. Jan. 9, 2017).

The threshold question here is whether the communications at issue, filings during a foreclosure action, constitute an attempt to collect a debt within the meaning of the FDCPA. The FDCPA defines "debt" as "any obligation or alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." 15 U.S.C. § 1692a(5). While the note is a debt, the mortgage " 'is a type of security interest with real property as the collateral,' that a lender can take if a debtor does not fulfill a payment obligation; it 'is not a promise to pay a debt.' " *Hill v. DLJ Mortg. Capital, Inc.,* 15-CV-3083, 2016 WL 5818540, at *7 (E.D.N.Y. Sept. 30, 2016) (quoting *Reese v. Ellis, Painter, Ratterree & Adams, LLP,* 678 F.3d 1211, 1216 (11th Cir. 2012)). In other words, "[t]he note represents the primary personal obligation of the mortgagor, and the mortgage is merely the security for such obligation." *Copp v. Sands Point Marina, Inc.,* 17 N.Y.2d 291, 293, 217 N.E.2d 654, 270 N.Y.S.2d 599 (1966).

In recognition of this distinction, a holder of a note secured by a mortgage has two remedies under New York law: "one at law in a suit on the debt as evidenced by the note, the other

in equity to foreclose the mortgage." *Copp,* 17 N.Y.2d at 293; *see also Westnau Land Corp. v. U.S. Small Bus. Admin.,* 1 F.3d 112, 115 (2d Cir. 1993) ("under New York law, a creditor is required to elect between the remedies of an action for money damages on a debt or an equitable action to foreclose a mortgage that secures the debt."); *Wells Fargo Bank, N.A. v. Goans,* 136 A.D.3d 709, 24 N.Y.S.3d 386 (2d Dep't N.Y. App. Div. 2016) ("Where a creditor holds both a debt instrument and a mortgage which is given to secure the debt, the creditor may elect either to sue at law to recover on the debt, or to sue in equity to foreclose on the mortgage."). It is also clear that under New York law, a mortgage foreclosure is an equitable remedy and an action seeking that relief is equitable in nature. *See 4 B's Realty 1530 CR39, LLC v. Toscano,* 818 F. Supp. 2d 654, 659 (E.D.N.Y. 2011); *see also Notey v. Darien Constr. Corp.,* 41 N.Y.2d 1055, 364 N.E.2d 833, 396 N.Y.S.2d 169 (1977) ("An action to foreclose a mortgage is, of course, in equity").

Courts in this Circuit that have considered whether actions taken within a foreclosure action constitute debt collection "have held that 'the enforcement of a security interest through foreclosure proceedings that do not seek monetary judgments against debtors is not debt collection for purposes of the FDCPA.' " *Hill,* 2016 WL 5818540, at *7 (quoting *Boyd v. J.E. Robert Co.,* No. 05-CV-2455, 2013 WL 5436969, at *9 (E.D.N.Y. Sept. 27, 2013), *aff'd on other grounds,* 765 F.3d 123 (2d Cir. 2014)). This Court agrees with this reasoning. Here, Green Tree elected to commence an action to foreclose on the mortgage and the "communications" at issue were made in the context of enforcing its security interest. As such, there was no attempt to enforce a debt actionable under the FDCPA.

***4** Plaintiff argues that the Foreclosure Action does seek a money judgment on the "debt" because it seeks a deficiency judgment against Cohen in the event that the proceeds of the sale of the mortgaged property are insufficient to satisfy the amount owed. Article 13 of the Real Property Actions and Proceedings Law ("RPAPL") governs actions to foreclose a mortgage in New York. It expressly provides that a final judgment in a foreclosure action may include a deficiency judgment against the person liable for the debt secured by the mortgage "of the whole residue, or so much thereof as the court may determine to be just and equitable, of the debt remaining unsatisfied, after a sale of the mortgaged property and the application of the proceeds." RPAPL § 1371(1). Plaintiff cites no case law to support the inference that this provision somehow affects the nature of the Foreclosure Action or changes it from an equitable proceeding to one at law. Indeed, such a result would violate New York's election of remedies framework. *See Boyd v. Jarvis,* 74 A.D.2d 937, 937, 426 N.Y.S.2d 142 (3rd Dep't 1980) (rejecting plaintiffs' attempt to commence a second action at law and noting that as they had elected to proceed in equity by seeking foreclosure, they should have sought a deficiency judgment in the foreclosure action); *see also Wyoming Cty. Bank & Trust Co. v. Kiley,* 75 A.D.2d 477, 481, 430 N.Y.S.2d 900, 903 (4th Dep't 1980) ("when a mortgage-secured creditor commences an equitable action to foreclose its mortgage, the action does not result in a 'money judgment' ").

In any event, under the facts presented in this case, the Court finds that the purposes of the FDCPA are not furthered by continuation of this action. Acknowledging the procedures and protections available in bankruptcy court, the Second Circuit has noted that given that "the FDCPA's purpose is to protect unsophisticated consumers from unscrupulous debt collectors, that purpose is not implicated when a debtor is instead protected by the court system and its officers." *Simmons v. Roundup Funding, LLC,* 622 F.3d 93, (2d Cir. 2010) (internal quotation and citation omitted). Applying the same reasoning, a District Court in Connecticut analyzed Connecticut law and determined that "mortgagors in a foreclosure proceeding likewise do not need protection from abusive collection methods that are covered under the FDCPA because the state foreclosure process is highly regulated and court controlled." *Derisme v. Hunt Leibert Jacobson P.C.,* 880 F. Supp. 2d 311, 327 (D. Conn. 2012). The same rationale is applicable to foreclosure proceedings in New York courts.

In the aftermath of the mortgage foreclosure crisis, New York passed the Foreclosure Prevention and Responsible Lending Act which strengthened and added protections for borrowers in jeopardy of losing their homes. Stronger notice provisions were implemented, covering a variety of circumstances and intending to protect borrowers. *See* RPAPL § 1303 (requiring "Help for Homeowners in Foreclosure" notice); RPAPL § 1304 (requiring additional notices in connection with subprime or non-traditional home loans); RPAPL § 1320 (requiring a special summons in actions to foreclose a mortgage on private residences). Certain filings with the Superintendent of Financial Services are also required. *See* RPAPL § 1306. The parties are now required to participate in mandatory, court-supervised settlement proceedings at which they Eire required to "negotiate in good faith to reach a mutually agreeable resolution, including but not limited to a loan modification, short sale, deed in lieu of

foreclosure or any other loss mitigation, if possible." RPAPL § 3408. The New York court system can amply protect borrowers from any allegedly unscrupulous actions taken in the foreclosure proceeding. Accordingly, the purposes of the FDCPA are not implicated, especially where all the allegedly impermissible conduct occurred within the context of the foreclosure proceeding.

**IV. CONCLUSION**

Both Defendants' motions to dismiss are granted, and the case is closed.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1134723

## Footnotes

1 The facts are taken from the Complaint and from documents related to the state court foreclosure action. *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.,* 758 F. Supp. 2d 153, 158 n.4 (E.D.N.Y. 2010) (In deciding a motion to dismiss, the Court may, in addition to the complaint, consider documents incorporated by reference into the complaint as well as "documents submitted by the parties which are matters of public record or which are deemed included in the Complaint."), *aff'd,* 443 Fed.Appx. 582 (2d Cir. 2011).

2 Ditech notes that Green Tree changed its name to Ditech effective August 31, 2015, *see* Ditech Memorandum of Law in Support at n.1, DE [30], a change acknowledged by Plaintiff in the complaint. *See* Compl. ¶ 18 ("Green Tree (which is now Ditech) ...").

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 167559
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lazar FELBERBAUM, Plaintiff,
v.
SEQUIUM ASSET SOLUTIONS and
LVNV Funding LLC, Defendants.

21-cv-9513 (NSR)
|
Signed January 11, 2023

**Attorneys and Law Firms**

Eliyahu R. Babad, Stein Saks, PLLC, Hackensack, NJ, for Plaintiff.

Brendan Hoffman Little, Lippes Mathias LLP, Buffalo, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

***1** Plaintiff Lazar Felberbaum ("Plaintiff") commenced the instant action against Defendants Sequium Asset Solutions, LLC ("Defendant Sequium") and LVNV Funding LLC ("Defendant LVNV") (collectively, "Defendants") alleging claims arising under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* ("FDCPA"). (Complaint ("Compl.") (ECF No. 1).) Before the Court is Defendants' motion pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. For the following reasons, Defendants' motion is GRANTED, and Plaintiff's Complaint is dismissed.

## BACKGROUND

The following facts are derived from the Complaint and are accepted as true for the purposes of this motion except as otherwise noted.

Plaintiff is a New York resident who "allegedly" incurred a debt to non-party Citibank, N.A. ("Citibank"), which arose primarily out of personal credit transactions. (Compl. at ¶¶ 7, 16.) The debt became "deliquen[t]" on January 15, 2009. (*Id.* at Ex. A.) Defendant LVNV later purchased this delinquent debt and contracted with Defendant Sequium to collect the debt originally owed to Citibank and now owed to Defendant LVNV. (*Id.* at ¶¶ 19, 23.)

On or around December 4, 2020, Defendants sent Plaintiff a collection letter (the "Letter") regarding the alleged debt, which read as follows:

> This notice is being sent to you by a collection agency. Please be advised that LVNV Funding LLC, the Current Creditor-Debt Purchaser, has purchased the account referenced above. Our records further indicate that the judgment that was awarded on 12/13/2013 remains unresolved. This is the date on which the balance became due.
>
> (*Id.* at ¶ 24, Ex. A.)

The judgment referenced in the Letter totaled $27,212.94. (*Id.* at ¶ 25, Ex. A.) The Letter stated a "Total Due" in the amount of $27,212.94 (*id.* at ¶ 26.), but the Letter did not state whether interest was accruing on this amount (*id.* at ¶¶ 27–29.). In the Letter, Defendants offered to settle the existing debt for 65% of the "Total Due." (*Id.* at ¶ 45.) Defendants, however, did not (1) include a deadline by which Plaintiff had to accept the offer or (2) otherwise state that the offer would expire at a later unspecified date. (*Id.* at ¶¶ 46–47.)

Plaintiff alleges the "amount stated as due is ... false, deceptive, misleading, and unfair." (*Id.* at ¶ 39.) In particular, Plaintiff asserts that Defendants did not disclose that interest was accruing on the balance at the New York post-judgment rate of "nine per centum per annum." (*Id.* at ¶ 31.) As a result, the actual amount due was $49,051.33.[1] (*Id.* at ¶ 33.) Plaintiff further avers that Defendants would "not have allowed Plaintiff to accept the settlement offer at any time" and would "refuse to honor the offer" should Plaintiff accept. (*Id.* at ¶¶ 49, 57.) The offer, alleges Plaintiff, was "illusory" and "merely a collection tactic" "to coerce" Plaintiff into paying the debt or to "sow ... confusion." (*Id.* at ¶ 62–63.)

***2** Defendants answered the Complaint (ECF Nos. 9 & 11) and now move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF No. 19.)

Defendants also move to strike Plaintiff's sur-reply (ECF No. 24), which Plaintiff styled as a "Notice of Supplemental Authority" and filed in opposition to Defendants' Rule 12(c) motion (ECF No. 23-1). Although Plaintiff did not seek leave

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

to file a sur-reply, *see* Rule 3(B) of this Court's Individual Practices in Civil Cases, this Court nonetheless DENIES Defendant's Motion to Strike Plaintiff's Sur-Reply and deems Plaintiff's sur-reply papers accepted for the purposes of adjudicating the present Rule 12(c) motion.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(c), "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).[2] "To survive a Rule 12(c) motion, the complaint must contain sufficient factual matter to 'state a claim to relief that is plausible on its face.' " *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The standard for analyzing a motion for judgment on the pleadings under Rule 12(c) is identical to the standard for a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *see also* Fed. R. Civ. P. 12(b)(6).

Under Rule 12(b)(6), the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Likewise, "where a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 146–47 (2d Cir. 2011). In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## DISCUSSION

***3** The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692e. To achieve this, the FDCPA imposes, "among other things, certain notice and timing requirements on efforts by 'debt collectors' to recover outstanding obligations." *Goldstein v. Hutton, Ingram, Yuzek, Gainen, Carroll & Bertolotti*, 374 F.3d 56, 58 (2d Cir. 2004). Section 1692k of the FDCPA provides that "any debt collector who fails to comply with any provision of [the FDCPA] with respect to any person is liable to such person...." 15 U.S.C. § 1692k.

Moreover, a single violation is sufficient to establish liability under the FDCPA. *Wiener v. Bloomfield*, 901 F. Supp. 771, 778 (S.D.N.Y. 1995) (citing *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir. 1993)). "The court considers the frequency or number of violations only in calculating damages." *Id.* (citing 15 U.S.C. § 1692k(b)(1)). "The court may not, however, regardless of the number of violations, impose more than the $1,000 statutory penalty provided for actions such as these in the absence of actual damages." *Id.* (citing 15 U.S.C. § 1692k(a)(2)(A)).

To state a claim under the FDCPA, a plaintiff must demonstrate that: (1) the plaintiff is a person who was the object of efforts to collect a consumer debt; (2) the defendant is a debt collector as defined in the statute; and (3) the defendant has engaged in an act or omission in violation of the FDCPA.[3] *See Cohen v. Ditech Fin. LLC*, 15-CV-6828, 2017 WL 1134723, at *3 (E.D.N.Y. Mar. 24, 2017). Plaintiff alleges that Defendants violated Sections 1692e, 1692e(2), e(10), 1692f, and 1692g of the FDCPA. *See* Compl. ¶¶ 79–93. For the reasons articulated below, the Court dismisses all of Plaintiff's claims.

Section 1692e of the FDCPA prohibits a debt collector from making a "false, deceptive, or misleading representation." 15 U.S.C. § 1692e. In particular, Section 1692e(2) prohibits "the false representation of the character, amount, or legal status

of any debt," and Section 1692e(10) prohibits the "use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." "It is well established that the FDCPA imposes strict liability on debt collectors," meaning that Plaintiff "need not prove that the prohibited conduct was intentional." *Lee v. Kucker & Bruh, LLP*, 958 F. Supp. 2d 524, 528 (S.D.N.Y. 2013); *Ellis v. Solomon & Solomon, P.C.*, 591 F.3d 130, 135 (2d Cir. 2010) ("To recover damages under the FDCPA, a consumer does not need to show intentional conduct on the part of the debt collector."); *Russell v. Equifax A.R.S.*, 74 F.3d 30, 33 (2d Cir. 1996) ("Because the Act imposes strict liability, a consumer need not show intentional conduct by the debt collector to be entitled to damages.").

In the Second Circuit, two principles of statutory construction guide courts' assessments of alleged violations of Section 1692e: (1) the FDCPA is liberally construed to effectuate its purpose of consumer protection, and (2) collection notices are analyzed from the perspective of the "least sophisticated consumer." *Taylor v. Fin. Recovery Servs.*, 886 F.3d 212, 214 (2d Cir. 2018) (internal citation omitted). The least sophisticated consumer test is an objective one that "pays no attention to the circumstances of the particular debtor in question." *Easterling v. Collecto, Inc.*, 692 F.3d 229, 234 (2d Cir. 2012). Despite the name, the least sophisticated consumer is not wholly unsophisticated; they are "presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." *Kolbasyuk v. Capital Mgmt. Servs. LP*, 918 F.3d 236, 239 (2d Cir. 2019) (internal quotations and citation omitted). Applying the standard of the least sophisticated consumer, a debt collector's representation is misleading or deceptive "if it is 'open to more than one reasonable interpretation, at least one of which is inaccurate.' " *Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72, 75 (2d Cir. 2016) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1319 (2d Cir. 1993)). There is also a materiality requirement, where courts focus on "whether the false statement would frustrate a consumer's ability to intelligently choose his or her response." *Cohen v. Rosicki, Rosicki & Assocs., P.C.*, 897 F.3d 75, 86 (2d Cir. 2018) ("[M]ere technical falsehoods that mislead no one are immaterial and consequently not actionable under § 1692e.") (internal quotations and citations omitted).

***4** Before this Court is a narrow question: whether a debt collector violates the FDCPA when it fails to state that the interest clock is (or is not) running when offering to settle a debt for a sum certain. The Second Circuit recently addressed an identical question, holding that "debtors faced with a settlement offer are not misled by the failure to disclose that interest is accruing because ... payment of the amount indicated in a collection notice would extinguish the debt." *Cortez v. Forster & Garbus, LLP*, 999 F.3d 151, 155 (2d Cir. 2021). In so doing, the Second Circuit concluded "a settlement offer need not enumerate the consequences of failing to meet its deadline or rejecting it outright so long as it clearly and accurately informs a debtor that payment of a specified sum by a specified date will satisfy the debt." *Id.* at 156. At first glance, the Second Circuit's reasoning in *Cortez* appears to control the result in the instant case; here, as in *Cortez*, Defendants offered to settle the debt for a percentage of the amount shown as due and owing. If Plaintiff availed himself of Defendants' settlement offer, his "payment ... would extinguish the debt." *Id.* at 155.

In his sur-reply, Plaintiff argues *Cortez* is inapplicable because the offer letter at issue in *Cortez* included a *specific* date by which the debtor needed to avail himself of the offer. (ECF No. 23-1 at 1–2.) In effect, including a specific date in the offer notified the debtor as to how long the offer would remain open. By not including a specific date in the Letter, Plaintiff contends the Defendants were employing a "coercive collection tactic" in which Defendants would "not honor" Plaintiff's acceptance of their offer. (*Id.* at 2.) Plaintiff alleges as much in the Complaint, asserting that Defendants would not have honored Plaintiff's acceptance of their settlement offer in 1, 5, 10, 20, or 50 years. (Compl. at ¶¶ 49–54.) In other words, Plaintiff is concerned he will pay the settlement amount and then later find out Defendants (or their successors) have pocketed the payment without discharging Plaintiff's debt. (*See id.* at ¶¶ 57–63.) Plaintiff concludes Defendants' offer is "illusory" (id. at ¶ 62), and thus the Letter "violates the FDCPA." (ECF No. 23-1 at 2; *see generally* Compl.)

Plaintiff is incorrect. The Second Circuit in *Cortez* did not establish a bright line rule that every settlement offer must include a specific deadline for acceptance. The *Cortez* Court was not concerned with whether the offer included a specific acceptance date; instead, it was concerned with whether the settlement offer would mislead a debtor because "the offer set forth a payment deadline *but failed to disclose whether interest or fees would accrue if payment were tendered after the deadline*." *Cortez*, 999 F.3d at 156 (emphasis added). Ultimately, the Court reasoned that a settlement offer "need not enumerate" post-deadline interest and fees so long as the offer "clearly and accurately informs a debtor that payment

of a specified sum by a specified date will satisfy the debt." *Id.* Put differently, so long as the offer has not lapsed and a debtor is entitled to pay a specified sum to satisfy a debt, a debt collector is not bound to "anticipate every potential collateral consequence that could arise in connection with the payment or nonpayment of a debt." *See id.*; *Avila v. Riexinger & Assocs.*, LLC, 817 F.3d 72, 77 (2d Cir. 2016) ("We hold that a debt collector will not be subject to liability under Section 1692e for failing to disclose that the consumer's balance may increase due to interest and fees if the collection notice ... clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date."); *Altman v. J.C. Christensen & Assocs., Inc.*, 786 F.3d 191, 194 (2d Cir. 2015) ("The Letter at issue here plainly states that the percentage saved is 'on your outstanding account balance.' The fact that a debtor may then have to pay tax on the amount saved is simply not deceptive in the context of what the savings are on a debtor's outstanding account balance.") (internal quotations omitted); *see also Taylor v. Fin. Recovery Servs., Inc.*, 886 F.3d 212, 215 (2d Cir. 2018) ("Construing the FDCPA in light of its consumer protection purpose, we hold that a collection notice that fails to disclose that interest and fees are not currently accruing on a debt is not misleading within the meaning of Section 1692e.").

***5** Here, Defendants' offer remains open, and as a result, Defendants have no present duty to inform Plaintiff of the amount of interest due on the account.[4] Plaintiff does not allege the settlement offer is closed at present. Instead, Plaintiff speculates that Defendants, who "retain[ ] the right to rescind the settlement offer at any time," "would not have allowed Plaintiff to accept the settlement offer." (Compl. at ¶¶ 48–61.) Plaintiff's allegations, however, are speculative and incorrect as a matter of law. Should Plaintiff accept Defendants' offer by paying the specified sum, Defendants cannot then revoke their offer.[5] *See Altman v. Zwicker & Assocs., P.C.*, No. 20 CV 6622 (VB), 2021 WL 3774120, at *4 (S.D.N.Y. Aug. 25, 2021) ("In other words, defendant could not have withdrawn the offer of sending an application if the consumer paid the allegedly outstanding debt without communicating such withdrawal to the consumer."). Until such time as Plaintiff accepts Defendants' offer by paying the specified sum, Defendants may revoke the offer, but only if they first give unambiguous notice of revocation to Plaintiff. *See, e.g., Cumis Ins. Soc., Inc. v. Citibank*, N.A., 921 F. Supp. 1100, 1106 (S.D.N.Y. 1996) ("A revocation is a clear manifestation of an intent not to perform, and once communicated to the offeree, terminates the offeree's power to accept the offer.") (citing Restatement (Second) of Contracts § 42 (1981)). Because Defendants cannot revoke the offer without first giving Plaintiff notice of their intent to do so, the Letter is not misleading. In fact, the Letter "clearly states that the holder of the debt will accept payment of the amount set forth in full satisfaction of the debt if payment is made by a specified date,"—here any date prior to Defendants giving notice of their intent to revoke the offer. *See Avila*, 817 F.3d at 77; *see also Weiss v. Sequium Asset Sols., LLC*, No. 21-CV-218(EK)(TAM), 2022 WL 1046260, at *3 (E.D.N.Y. Apr. 7, 2022) ("Indeed, the open-ended offer from the Defendants was more generous to [Plaintiff] than the defined expiration in *Cortez*, in that it gave [Plaintiff] longer than Mr. Cortez was afforded to accept the settlement offer."). In sum, Defendants' offer remains open, and Plaintiff is still entitled to pay $27,212.94—a sum certain—to extinguish all debts associated with his account.

Plaintiff's claim under Section 1692e fails. So too do Plaintiff's claims under Sections 1692f and 1692g. Section 1692f prohibits a debt collector from using "unfair or unconscionable means to collect or attempt any debt." "Unconscionable" here means "shockingly unjust or unfair" or "affronting the sense of justice, decency, or reasonableness." *Gallego v. Northland Group, Inc.*, 814 F.3d 123, 127–28 (2d Cir. 2016). Meanwhile, Section 1692g requires Defendants to state "the amount of the debt." For the reasons stated above, Plaintiff's allegations fail to show Defendants' collection notice containing an open offer—which has remained open for over two years and settles Plaintiff's debt interest-free at a sum certain—is "[s]hockingly unjust or unfair," or "affronting the sense of justice, decency, or reasonableness." *Id.* Accordingly, Defendants' Letter does not violate Section 1692f.

Insofar as Defendants' offer remains open and represents the sum certain owed by Plaintiff to extinguish the debt, Defendants also abide by the requirements of Section 1692g. *See Weiss*, 2022 WL 1046260, at *4 (E.D.N.Y. Apr. 7, 2022) (finding Defendants "comport[ed]" with requirements of Section 1692g where Defendants extended an open offer for Plaintiff to pay a specified amount to extinguish Plaintiff's debt).

## CONCLUSION

***6** For the foregoing reasons, Defendants' motion for judgment on the pleadings is GRANTED. Defendants' motion to strike Plaintiff's sur-reply is DENIED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 167559

## Footnotes

1 This estimated balance represents the accrued interest as of November 17, 2021, when Plaintiff filed the Complaint. (Compl. at ¶ 33.)

2 Defendant Sequium attaches two exhibits to its answer. (*See* ECF Nos. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).) Because Plaintiff had no notice of the exhibits prior to their filing, this Court declines to consider them in adjudicating the present 12(c) motion. *See* *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991) ("Plaintiffs' failure to include matters of which as pleaders *they had notice* and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of forestalling the district court's decision on [a 12(b)(6)] motion.") (emphasis added)).

3 Plaintiff adequately alleges the first two requirements. (*See* Compl. at ¶¶ 8–13, 23.)

4 Defendants' duty to report interest attaches when (1) Defendants revoke the open offer to accept payment of a sum certain to extinguish the debt, and (2) Defendants indeed charge interest on the principal balance. *See* *Avila*, 817 F.3d at 76 ("Because the statement of an amount due, without notice that the amount is already increasing due to accruing interest or other charges, can mislead the least sophisticated consumer into believing that payment of the amount stated will clear her account, we hold that the FDCPA requires debt collectors, when they notify consumers of their account balance, to disclose that the balance may increase due to interest and fees."). In any event, it appears Defendants are estopped from charging interest on the balance-to-date. (*See* ECF No. 9-1 (Declaration of Shaun Ertischek) & 9-2 (Declaration of Patricia Sexton).)

5 Plaintiff alleges Defendant Sequium acts "on behalf of Defendant LVNV." (*See* Compl. at ¶ 23.) As such, Defendant LVNV is bound to honor the contract proposed to Plaintiff by Defendant Sequium on Defendant LVNV's behalf. *See, e.g.,* *Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) ("Under general principles of agency, the authority of an agent is the power of the agent to do an act or to conduct a transaction on account of the principal which, with respect to the principal, he is privileged to do because of the principal's manifestations to him.") (internal quotations omitted).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 902370
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Chitra KARUNAKARAN, Plaintiff,
v.
BOROUGH OF MANHATTAN COMMUNITY COLLEGE, City University of New York, Antonio Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam, Antionette McKain, Robert Diaz, Ian Wentworth, Michael Hutmaker, and Marva Craig, Defendants.

18 Civ. 10723 (ER)
|
Signed 03/28/2022

**Attorneys and Law Firms**

Chitra Karunakaran, New York, NY, Pro Se.

Jack Kevin Shaffer, IRS Office of Chief Counsel, New York, NY, for Defendants Antonio Perez, Sangeeta Bishop, Rifat Salam, Antionette McKain, Robert Diaz, Ian Wentworth, Borough of Manhattan Community College, City University of New York, Karin Wilks, Michael Hutmaker, Marva Craig.

**OPINION AND ORDER**

Ramos, D.J.:

***1** Chitra Karunakaran, who was a Professor at the Borough of Manhattan Community College ("BMCC"), which is part of the City University of New York ("CUNY"), brings this action against CUNY, BMCC, and several current and former employees of BMCC [1] (collectively, the "Defendants"), for violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). *See* Doc. 62. In particular, Karunakaran alleges that Defendants discriminated against her on the basis of her race, national origin, and age, and retaliated against her. *See id.*

Karunakaran, proceeding *pro se*, first filed her complaint on November 15, 2018. *See* Doc. 2. On September 6, 2019, after retaining counsel, Karunakaran filed an amended complaint ("First Amended Complaint" or "FAC"). *See* Doc. 7. Defendants moved to dismiss the FAC on May 7, 2020. *See* Doc. 45. On February 12, 2021, the Court granted Defendants' motion, dismissing Karunakaran's federal claims without prejudice to replead, and declining to exercise supplemental jurisdiction over Karunakaran's NYSHRL and NYCHRL claims. *See* Doc. 55. On March 26 and 27, 2021, Karunakaran's counsel filed letter motions seeking to withdraw. See Docs. 57-58. The Court granted counsel's requests to withdraw. *See* Doc. 59.

On April 30, 2021, Karunakaran, again proceeding *pro se*, filed a second amended complaint ("SAC"). *See* Doc. 62. Defendants now move to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons discussed below, the motion is GRANTED.

## I. BACKGROUND

Karunakaran, a 75-year-old Indian woman, was employed by CUNY at BMCC for approximately 20 years as a professor of psychology and sociology. Doc. 62 ¶¶ 13, 37. Karunakaran alleges that on February 27, 2018, a student (the "Student") in her class became verbally and physically aggressive towards her and disrupted class. *Id.* ¶ 41. Specifically, Karunakaran alleges that the Student told her, "You suck. You don't know anything." *Id.* ¶ 42. According to Karunakaran, the Student repeated these comments on two other occasions. *Id.* Karunakaran argues that the Student's behavior was racially motivated because, when she had previously taught the Student in online classes, the Student had not been disruptive. *Id.* Karunakaran also argues that the Student relied on "prevailing racialized stereotypes ... about Asians" and assumed Karunakaran would remain silent "in the face of her mocking verbal abuse" and would not confront her or call security. *Id.* at 23.

Karunakaran alleges she complained to Defendants about the Student's behavior, and, in particular, that in emails to Defendants, she offered to speak with the Student, suggested that the Student take her class online, and requested that BMCC's Office of Student Affairs remove the Student from her class. *Id.* ¶¶ 42, 43. According to Karunakaran, Defendants did not respond to her emails and did not otherwise intervene to address the Student's behavior. *Id.* Specifically, Karunakaran alleges Defendant Ian Wentworth, who at the time worked in the Office of Student Affairs, took no action in response to the Student's behavior and in so doing allowed the behavior to re-occur. *Id.* ¶ 43.

***2** On March 18, 2018, Karunakaran filed a complaint, titled "A Hostile Work Environment," with Defendant Antonio Perez, who was at the time President of BMCC. *Id.* ¶¶ 18, 49; Doc. 2 at 19. In her complaint, Karunakaran alleged that BMCC maintained a "covert, ad hoc/post hoc mode of organizational dysfunction resulting in a generally unchallenged racialized, ageist hostile work environment for contingent academic labor." Doc. 2 at 19.

Karunakaran alleges that on March 27, 2018, the Student, after learning she had failed the midterm, tried to grab papers and other materials from her and ran from her office. Doc. 62 ¶ 45. Karunakaran alleges she continued to complain to Defendants about the Student's conduct but, as before, they took no action. *Id.* ¶ 46. Karunakaran argues that Defendants, in "completely disregarding their job responsibilities ... and at no point attempting to remedy the ongoing and dangerous situation caused by [the] Student," discriminated against her on the basis of her race, national origin, and age. *Id.* ¶ 47.

Karunakaran also alleges that she participated in various whistleblowing and union activities throughout her tenure, *id.* ¶¶ 40, 52, and lists a number of examples of these activities. *Id.* at 50. Specifically, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through "Peer faculty mentoring;" she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; she complained about Defendants' failure to manage the Student's conduct; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus. *Id.* at 50-51.

On May 11, 2018, Karunakaran was denied reappointment for the Fall 2018 semester. *Id.* ¶¶ 39, 51. Karunakaran argues this denial resulted from discrimination and retaliation on the basis of her race, national origin, and age. *Id.* ¶ 40. Karunakaran alleges that she was replaced by a younger professor with "less age-defined seniority ... [and] possibly without a doctorate...." *Id.* at 39-40.

On August 13, 2018, Karunakaran filed a charge of discrimination with the New York State Division of Human Rights. *Id.* ¶ 3. The charge was subsequently sent to the Equal Employment Opportunity Commission ("EEOC"), and on August 21, 2018, the EEOC issued a Right to Sue letter. *Id.* ¶ 4.

As stated above, Karunakaran filed a *pro se* complaint in this Court on November 15, 2018. Doc. 2. With the assistance of counsel, she filed an FAC on September 6, 2019. Doc. 7. Defendants moved to dismiss the FAC on May 7, 2020, and the Court granted Defendants' motion on February 12, 2021, dismissing Karunakaran's federal claims without prejudice to replead, and declining to exercise supplemental jurisdiction over Karunakaran's NYSHRL and NYCHRL claims. *See* Docs. 45, 55. On April 30, 2021, Karunakaran —again proceeding *pro se*—filed the instant complaint., alleging substantially the same facts she alleged in her FAC.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). However, this requirement does not apply to legal conclusions, bare assertions, or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In order to satisfy the pleading standard set forth in Rule 8, a complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Accordingly, a plaintiff is required to support her claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

***3** "Because [Karunakaran] is a *pro se* litigant, we read h[er] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). When a plaintiff's claims involve civil rights violations, the Court applies this standard "with particular force." *Jackson v. NYS Dep't of Lab.*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). "However, even *pro se* plaintiffs asserting civil right claims cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). Lastly, "[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion." *Walker*, 717 F.3d at 122 n.1.

## III. DISCUSSION

### a. Title VII and ADEA Claims

#### i. Discrimination

Karunakaran alleges that Defendants discriminated against her when they failed to address the Student's behavior and when they denied her reappointment. Doc. 62 ¶¶ 47, 55. Karunakaran also alleges Defendants treated her less favorably than similarly situated co-workers. *Id.* ¶ 55.

Discrimination claims under Title VII or the ADEA are analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). Under the *McDonnell* framework, a plaintiff first must establish a *prima facie* case of discrimination. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-03. If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *Id.* at 804. Ultimately, the plaintiff will be required to prove that the defendant acted with discriminatory motivation. *See Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). At the pleading stage, however, the facts alleged must merely "give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of ... litigation." *Id.* at 311. Thus, the question on a motion to dismiss is whether the plaintiff has adequately pleaded a *prima facie* case.

To establish a *prima facie* case of discrimination under either Title VII or the ADEA, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See Terry v. Ashcroft*, 336 F.3d 128, 137-38 (2d. Cir. 2003). Although a plaintiff is not required to plead facts proving each element of a *prima facie* case of discrimination at the pleading stage, her allegations must provide "plausible support" for a "minimal inference" that the employer was motivated by discriminatory intent." *Littlejohn*, 795 F.3d at 311. Further, those allegations must be fact-specific. *See Grimes v. Fremont General Corp.*, 785 F. Supp. 2d 269, 296 (S.D.N.Y. 2011). Conclusory or naked allegations will not do. *See id.*

Here, as was the case in her first amended complaint, Karunakaran fails to plead allegations that support a minimal inference of discriminatory motivation. As Defendants point out, Karunakaran's SAC "suffers from the same flaws" as her FAC. *See* Doc. 69 at 10. Again, beyond conclusory statements that she was denied reappointment as a result of discrimination, Karunakaran does not allege any specific facts showing that the denial was related to discrimination on the basis of her race, national origin, or age. *See, e.g.*, *Marcus v. Leviton Mfg. Co.*, 661 F. App'x 29, 32-33 (2d Cir. 2016) ("plaintiff must supply sufficient factual material, and not just legal conclusions, to push the misconduct alleged in the pleading beyond he realm of the 'conceivable' to the 'plausible' ").

***4** Beyond this, Karunakaran again does not provide any information about similarly situated employees. When a plaintiff seeks to meet her *prima facie* case by reference to the disparate treatment of an allegedly similarly situated employee, "the plaintiff must show that she shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001). A plaintiff need not show that a comparator was an "*identically* situated employee," just that she was "similarly situated in all *material* respects." *Id.* at 53-4 (quoting *Shumway v. United Parcel Service*, 118 F.3d 60, 64 (2d Cir. 1997)) (emphasis in original). Further, such employee "must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Kearney v. ABN AMRO, Inc.*, 738 F. Supp. 2d. 419, 426 (S.D.N.Y. Sept. 15, 2010) (quoting *McGuinness*, 263 F. 3d at 54) (internal quotation marks omitted). Employment characteristics which can support a finding that two employees are "similarly situated" include "similarities in education, seniority, performance, and specific work duties," *DeJesus v. Starr Technical Risks Agency, Inc.*, 03 Civ. 1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004), and similar requirements for skill, effort, and responsibility for jobs performed "under similar working conditions." *DeJohn v. Wal-Mart Stores E., LP*, 09 Civ. 01315 (GTS), 2013 WL 1180863, at *6 (N.D.N.Y. Mar. 20, 2013).

In the Court's order granting Defendants' first motion to dismiss, the Court noted that Karunakaran's general allegations that she was treated less favorably than certain similarly situated employees were insufficient "without ... additional details about specific events and without ... additional facts that [she] was similarly situated in all material respects to those comparator employees." Doc. 55 at 9-10. While given another opportunity to do so, Karunakaran again does not provide these specifics. Karunakaran merely re-alleges, upon information and belief, that she was replaced by a younger professor. She does not identify or otherwise describe this professor, nor does she provide any facts alleging that she and this professor were similarly situated in any material respect or that she was treated less well than this professor.

In addition, in a purported attempt to remedy the deficiencies in her FAC, Karunakaran explains that *all* her former co-workers are her comparators: "All faculty regardless of appointment, are comparators." Doc. 62 at 17. But, again, she does not explain how she was similarly situated to all faculty members. That they teach the same students, as Karunakaran alleges, is not enough. *See id.* Nor does she offer specific examples of disparate treatment with respect to these co-workers. While Karunakaran generally alleges that her similarly-situated co-workers were not terminated, *id.* ¶ 55, she does not provide any further details.

Karunakaran also alleges that another professor in the psychology department at times let her students leave after only one hour of class, even though the class was meant to run for two and a half hours. Doc. 62 at 59-60. Karunakaran does not identify or describe this alleged comparator, nor does she explain how this professor's choice to let her students leave class early in any way supports an inference of discrimination against her; notably, Karunakaran does not allege that she would not have been allowed to make the same choice. At bottom, none of these allegations can support even a minimal inference that Karunakaran experienced a difference in treatment attributable to discrimination. *See Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 409 (S.D.N.Y. 2014) (dismissing discrimination claims where complaint fails to identify, let alone describe, any purported comparator).

As to her claim that Defendants discriminated against her by failing to address the Student's behavior, Karunakaran does not show how this failure is in any way connected to her race, national origin, or age.

***5** Because, as Defendants argue, Karunakaran does not submit any allegations to support an inference that Defendants' failure to address the Student's behavior and denial of her reappointment were at all motivated by her race, national origin, or age, her federal discrimination claims are dismissed.

### ii. Retaliation Claims

Karunakaran alleges Defendants retaliated against her for her participation in a protected activity. Doc. 62 at 14. Specifically, she alleges Defendants denied her reappointment because of her "persistent participation in lawful union activity" and because of her "whistleblower queries." *Id.* ¶ 40.

Like her discrimination claims, Karunakaran's retaliation claims also are analyzed under the *McDonnell* framework. [2] Under that framework, a plaintiff first must establish a *prima facie* case of retaliation. *McDonnell*, 411 U.S. at 802. Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to offer a legitimate, nonretaliatory reason for its actions. *Id.* at 802–03; *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). If the defendant satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the proffered reason is pretextual. *McDonnell*, 411 U.S. at 804; *Kirkland*, 760 F.3d at 225.

To state a *prima facie* case of retaliation under § 1981, a plaintiff must establish (1) participation in a protected activity; (2) defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action. *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), *aff'd*, 689 F. App'x 670 (2d Cir. 2017).

Here, Karunakaran cannot plausibly allege a protected activity. "A protected activity is one that 'protest[s] or oppose[s] statutorily prohibited discrimination.' " *Kouakou v. Fideliscare New York*, 920 F. Supp. 2d 391, 400 (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566); *Brands-Kousaros v. Banco Di Napoli S.P.A.*, No. 97 Civ. 1673 (DLC), 1997 WL 790748, at *5 (S.D.N.Y. Dec. 23, 1997) ("the protected activity alleged must involve some sort of complaint about a type of discrimination that [a statute] forbids."). While a protected activity generally involves the filing of a formal

complaint of discrimination with an administrative agency, *see* *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59, 65 (2d Cir. 1992), "both formal and informal complaints [are] protected activity...." *Schaper v. Bronx Lebanon Hosp. Ctr.*, 408 F. Supp. 3d 379, 391 (S.D.N.Y. 2019) (citing *Hubbard v. Total Commc'ns, Inc.*, 347 F. App'x 679, 680–81 (2d Cir. 2009)).

Protected complaints generally include "making complaints to management ..., protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Soliman v. Deutsche Bank AG*, No. 03 Civ. 104 (CBM), 2004 WL 1124689, at *12 (S.D.N.Y. May 20, 2004) (citing *Cruz*, 202 F.3d at 566); *see also* *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). An informal complaint may be "nothing more than a simple 'objection voiced to the employer,' ... but at the very least, 'there must be some form of professional indicia of a complaint made against an unlawful activity.' " *Soliman*, 2004 WL 1124689, at *12 (internal citations omitted).

***6** Though Karunakaran repeatedly refers to "union activities" and "whistleblowing" she does not, as Defendants point out, provide any allegations that her union activities or whistleblowing concerned or were related to some statutorily-prohibited discrimination. In particular, Karunakaran alleges that she emailed Perez to encourage him to program every department printer to print double-sided; she asked Perez why online classes could not be taught through "Peer faculty mentoring;" she asked Defendant Sangeeta Bishop whether she could serve on an equity and inclusion task force but was told that adjunct professors were not included; she asked whether faculty needed to include attendance information in their syllabi; and she asked why hard copies of mail had not been delivered to BMCC's uptown campus.[3] Doc. 62 at 50-51. None of these suggestions or questions is a complaint, protest, or objection and, in any event, Karunakaran does not show how any of these activities relates to an unlawful activity, let alone statutorily-prohibited discrimination. As Karunakaran cannot allege a protected activity, her federal retaliation claim is dismissed.

### b. NYSHRL and NYCHRL Claims

A district court may decline to exercise supplemental jurisdiction over state and city law claims when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *see also* *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("[W]hen the federal claims are dismissed the 'state claims should be dismissed as well.' " (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966))). Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. *Kolari v. New York-Presbyterian Hospital*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). The Supreme Court has noted that in a case where all federal claims are eliminated before trial, "the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* (quoting *Cohill*, 484 18 U.S. at 350 n.7). Having dismissed all of Karunakaran's federal claims under Rule 12(b)(6), the Court declines to exercise supplemental jurisdiction over, and dismisses, her state and city law claims.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion to dismiss the SAC is GRANTED with prejudice.

It is SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2022 WL 902370

## Footnotes

1 Antonio Perez, Karin Wilks, Sangeeta Bishop, Rifat Salam, Antoinette McKain, Robert Diaz, Ian Wentworth, Michael Hutmaker, and Marva Craig.


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2 Title VII and the ADEA contain nearly identical provisions forbidding retaliation. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 205 (2d Cir. 2006). Retaliation claims under Title VII and the ADEA therefore are analyzed under the same framework. Dickens v. Hudson Sheraton Corp., LLC, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016), aff'd, 689 F. App'x 670 (2d Cir. 2017); see also Terry, 336 F.3d at 141 (applying the same standards and burdens to claims of retaliation brought under both Title VII and the ADEA).

3 Karunakaran also repeats her allegation—in her FAC—that she engaged in protected activity when she complained to Defendants about the Student's behavior, but the Court in its order granting Defendants' first motion to dismiss found none of those complaints—her informal complaints to Defendants as well as her formal March 18 complaint—amounted to protected activities because they did not concern unlawful activity. *See* Doc. 55 at 11.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 419699
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Towaki KOMATSU, Plaintiff,
v.
URBAN PATHWAYS, INC.; Daniels Norelli Cecere & Tavel PC; Neighborhood Association for Inter-Cultural Affairs, Inc.; The City of New York; Ronald Abad; Steven Banks; Barbara Beirne; Kristen Benjamin-Solis; Martha Calhoun; Sharon Coates; Gary Cohen; Marin Gerber; Allison Gill-Lambert; Anthony M. Gonzalez; Allison Heilbraun; Joni Kletter; Lisa Lombardi; Julio Manjarrez; Nigel Marks; Jeffrey Mosczyc; Andrew Nastachowski; Molly Park; Kishea Paulemont; Pinny Ringel; Harold Rosenthal; Ariana Saunders; Ann Marie Scalia; Frederick Shack; Nancy Southwell; Samuel Spitzberg; Eric Tavel, all sued in their individual and official capacities. Nancy Bannon; Anthony Cannataro; Lyle Frank; Shorab Ibrahim; Gary Jenkins; Lawrence Marks; Maura Noll; Daniel Tietz, all sued in their official capacities, Defendants.

22-CV-9080 (LTS)
|
Signed January 26, 2023

**Attorneys and Law Firms**

Towaki Komatsu, Bronx, NY, Pro Se.

ORDER TO AMEND

LAURA TAYLOR SWAIN, Chief United States District Judge:

***1** Plaintiff, appearing *pro se*, brings this 338-page complaint asserting violations of federal and state law. Specifically, he seeks relief under 42 U.S.C. § 1983; the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692; the civil provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964; and New York State and City law.

By order dated November 22, 2022, the Court granted Plaintiff's request to proceed without prepayment of fees, that is, *in forma pauperis*. For the reasons set forth below, the Court dismisses the claims brought against all of the defendants except the FDCPA claims, which are brought against Defendants Daniels Norelli Cecere & Tavel PC ("DNCT"), Harold Rosenthal, Allison Heilbraun, and Eric Tavel.

**STANDARD OF REVIEW**

The Court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see* Livingston v. Adirondack Beverage Co., 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject-matter jurisdiction. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original). But the "special solicitude" in *pro se* cases, *id*. at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

Moreover, in circumstances where "a court considers whether to withdraw a *pro se* litigant's special status, it should consider not only that litigant's lifetime participation in all forms of civil litigation, but also his experience with the particular procedural setting presented." *Sledge v. Kooi*, 564 F.3d 105, 109 (2d Cir. 2009). Thus, courts may "limit the withdrawal of special status to specific contexts in which the litigant's experience indicates that he may be fairly deemed knowledgeable and experienced." *Id.*

**BACKGROUND**

**A. Plaintiff's Procedural History in This Court**

Plaintiff Towaki Komatsu has brought numerous actions in this court, including an action recently dismissed by the undersigned. *See Komatsu v. The City of New York*, ECF 1:22-CV-0424, 42 (S.D.N.Y. Jan. 3, 2023). That action, as

well as other actions Plaintiff filed in this court, concern Plaintiff's alleged unlawful exclusion from participating in public meetings held by the City of New York. *See, e.g., Komatsu v. The City of New York*, ECF 1:20-CV-7046 (ER) (S.D.N.Y.), *lv denied*, 22-1996 (2d Cir. Dec. 22, 2022) (denying leave to appeal, based on leave-to file sanction, "because the appeals do not depart from Petitioner's 'prior pattern of vexatious filings.' "); *Komatsu v. The City of New York*, ECF 1:18-CV-03698 (LGS) (GWG) (S.D.N.Y. Sept. 27, 2021) (ECF 627) (order involuntarily dismissing suit due to Plaintiff's vexatious conduct, including his repetitive voluminous and irrelevant filings), *aff'd*, 21-2479 (2d Cir. Mar. 1, 2022) ("[T]he appeal is DISMISSED because it 'lacks an arguable basis either in law or in fact.' *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)."). In the 20-CV-7046 action, Plaintiff was ordered to show cause why the action "should not be dismissed pursuant to the Court's inherent power to sanction vexatious litigants and/or failure to comply with court orders." *Id.* (ECF 208, at 4.) That matter has been briefed but to date is unresolved.

***2** Since December 20, 2020, Plaintiff has been subject to a prefiling injunction requiring him to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu,* ECF 1:20-CV-07046 (ER) (ECF 45).

**B. Plaintiff's Prior Litigation Involving Claims Raised in This New Action**

In addition to the litigation Plaintiff has pursued against the City of New York concerning his alleged exclusion from public meetings, Plaintiff also has pursued litigation against individuals employed by the City of New York, the State of New York, and private individuals regarding his lease agreement with Urban Pathways ("Urban"), subsequent state court litigation brought by Urban against Plaintiff, interactions with employees of New York City's Human Resources Administration ("HRA"), and interactions with employees of the New York State Office of Temporary and Disability Assistance ("OTDA"). Before filing this lawsuit, Plaintiff filed a similar action asserting claims against Urban and, as discussed below, naming many of the same defendants named here. *See Komatsu v. City of New York*, ECF 1:20-CV-6510, 2 (S.D.N.Y. Oct. 22, 2020) ("*Komatsu I*"). Accordingly, the Court will first describe the facts alleged in *Komatsu I*, and then turn to the facts alleged in this new action ("*Komatsu II*").

***C. Komatsu I***

**1. Defendants**

On August 14, 2020, Plaintiff filed *Komatsu I*, where he asserted many of the claims that are re-asserted in *Komatsu II* and named many of the same defendants. The first group of defendants includes Urban, described by Plaintiff as "a private entity, business partner of HRA" (ECF 2, at 13), and the following six Urban employees: Frederick Shack, Chief Executive Officer; Lisa Lombardi and Nancy Southwell, Deputy Executive Directors; Ronald Abad, Chief Operating Officer; Kishea Paulemont, Program Director; and Sharon Coates, an employee. Plaintiff also sued DNCT, the law firm representing Urban in its litigation brought against Plaintiff in the Bronx County Housing Court, as well as two of the firm's lawyers, Allison Heilbraun and Eric Tavel.

Plaintiff also sued individuals employed with the City's HRA, including Steven Banks, the former Commissioner; three HRA lawyers, Marin Gerber, Jeffrey Mosczyc, and Ann Marie Scalia; and Kristin Benjamin-Solis, an HRA employee.

The final defendant whom Plaintiff also names in *Komatsu II* is Nancy Bannon, a New York State Supreme Court Justice. [1]

**2. Allegations**

The following facts are taken from the complaint filed in *Komatsu I.* [2]

In 2016, Plaintiff signed a lease with Urban to rent an apartment in the Bronx. Subsequent to Plaintiff's signing the lease, Urban initiated two Housing Court proceedings in the Bronx County Housing Court ("Housing Court"). DNTC represented Urban in these two proceedings.

***3** In January 2017, HRA agreed to pay Plaintiff's storage expenses, incurred at CubeSmart, while Plaintiff resided in his Urban apartment. HRA later contested its agreement to pay for those expenses or to reimburse Plaintiff for the storage expenses he had already paid. Plaintiff litigated that issue in fair hearings before the OTDA, and then in the state courts in proceedings that he initiated under Article 78 of the New York Civil Practice Law and Rules ("Article 78"). On or about January 31, 2018, Defendant Judge Bannon dismissed Plaintiff's initial Article 78 proceeding. Plaintiff brought another proceeding that was pending before Defendant Judge Frank.

In addition to seeking damages, Plaintiff sought various forms of injunctive relief, including orders (1) directing the City of New York and Defendant Mosczyc to provide discovery in Plaintiff's state-court litigation, (2) staying his Housing Court proceedings, or in the alterative, transferring the state court action to this court; (3) directing Judge Bannon to provide an explanation regarding one of her decisions; and (4) directing the City of New York to cease all of its business with Urban.

**3. Litigation History**

On October 22, 2020, the Honorable Louis L. Stanton dismissed the complaint as frivolous, for failure to state a claim on which relief may be granted, for seeking monetary relief from defendants who are immune from such relief, and under the Anti-Injunction Act. *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii); 28 U.S.C. § 2283. Plaintiff appealed the decision, and the United States Court of Appeals for the Second Circuit affirmed. *See Komatsu v. CubeSmart*, No. 20-3676-cv (2d Cir. Dec. 20, 2021) (mandate issued Jan. 31, 2022).

**D. *Komatsu II***

**1. Defendants**

In this new action, Plaintiff brings the same claims, as well as new claims against the following defendants, whom he named in *Komatsu I*: (1) Urban and Urban employees Shack, Lombardi, Abad, Coates, Paulemont, and Southwell; (2) DNCT and DNCT lawyers Heilbraun and Tavel; (3) former Commissioner Banks, HRA employee Benjamin-Solis, and HRA lawyers Gerber, Mosczyc, and Scalia; and (4) Judge Bannon.

Plaintiff also brings new claims against additional defendants, who fall into the following seven categories: (1) additional HRA defendants – Gary Jenkins, HRA's Commissioner; Martha Calhoun, HRA's General Counsel; Allison Gil-Lambert, an HRA lawyer; Barbara Beirne, Deputy Chief Agency Contacting Officer for HRA, who is a lawyer; and Molly Park, an HRA employee; (2) additional Urban defendants - Ariana Saunders, Urban's Chief Compliance Officer, and Andrew Nastachowski and Gary Cohen, Urban employees; (3) the Neighborhood Association for Inter-Cultural Affairs, Inc. ("NAICA") and Julio Manjarrez, a NAICA lawyer, who represented Plaintiff during his Urban litigation in Housing Court; (4) a licensed process server, Anthony Gonzalez, who allegedly did not serve Plaintiff with legal papers; (5) individuals employed with the OTDA - Daniel Tietz, OTDA Commissioner; Nigel Marks and Samuel Spitzberg, OTDA lawyers; and Maura Noll, OTDA Administrative Law Judge; (6) an employee of the Community Affairs Unit of the Mayor's Office, Pinny Ringel; and (7) another DNCT lawyer, Harold Rosenthal.

Finally, Plaintiff names as defendants the following individuals, but only in their official capacities: (1) Anthony Cannotora, Acting Chief Judge of the State of New York; (2) Judge Lyle Frank, New York State Supreme Court; (3) Judge Shorab Ibrahim, Bronx County Housing Court; (4) Gary Jenkins, Commissioner of the New York City Department of Social Services ("DSS"); (5) Lawrence Marks, Chief Administrative Judge of the UCS; and (6) Joni Kletter, Administrative Law Judge and New York City attorney, and employee of former Mayor Bill de Blasio.

**2. Allegations**

**a. Urban and DNCT Defendants**

***4** Plaintiff's allegations against the Urban and DNCT Defendants concern his litigation in Housing Court. He alleges that on August 16, 2019, Urban employee Coates "lied by fraudulently claiming that I owed Urban more than $30,000 in rent for my Urban apartment." (ECF 2, at 76.) "Urban used attorneys for DNCT to illegally commence [two lawsuits] as nonpayment proceedings against me. Due to mootness, [these lawsuits] must be dismissed with prejudice." (*Id.*)

Plaintiff alleges that more recently, on March 3, 2022, Plaintiff informed a representative at the Housing Court that Urban failed to provide him with legal papers; he seeks dismissal of a third action brought by Urban for failure to serve him such papers. He also seeks "a subpoena that would order Urban to provide me the video recordings that were recorded on 3/8/22 both in the lobby and stairwells in my building" to show that Defendant Gonzalez, a process server, did not in fact serve Plaintiff legal papers. (*Id.*)

Plaintiff contends that DNCT lawyers "committed continuing violations against me as they committed wire fraud ... and otherwise violated RICO ... the FDCPA," and New York State statutes. (*Id.* at 77.) He also contends that "Urban, DNCT, and their personnel committed multiple acts of wire fraud against me through legal filings that were filed by attorneys for Urban[.]" (*Id.*)

Finally, Plaintiff claims that the HRA and Urban Defendants are so intertwined as to suggest that Urban is "an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA." (*Id.* at 181.)

**b. HRA Defendants**

Plaintiff's claims against the HRA Defendants concern HRA's alleged involvement in Plaintiff's litigation against Urban, that is: (1) Urban's alleged objection of justice; (2) interference with Plaintiff's ability to obtain counsel; (3) violation of his rights related to receiving discovery material; and (4) alleged fraud on the court by HRA lawyers. The majority of these claims arose on or before August 14, 2020, including nearly all of the claims against Banks and the claims against Benjamin-Solis. These claims include Plaintiff's CubeSmart litigation, which was the subject of Plaintiff's claims against HRA in *Komatsu I*.

With respect to the *pro bono* counsel allegation, Plaintiff asserts that, before former Commissioner Banks "resigned from HRA near the state of 2022 ... he repeatedly told me that he and HRA would" assist Plaintiff in securing *pro bono* counsel. (*Id.*) These efforts, Plaintiff contends, were unsuccessful in part because the HRA Defendants "engag[ed] in illegal acts against me pertaining to public meetings that have been public forums that include town hall meetings, resource fair meetings, and public hearings by illegally preventing [me] from lawfully attending them in the rooms in which members of the public conducted them with Mr. Banks and other personnel[.]" (*Id.*)

The allegations against the HRA lawyers concern their representation of the City during Plaintiff's litigation against the City. These government lawyers include Beirne, Gil-Lambert, Gerber, Mosczyc, and Scalia. The claims against Park concern Park's informing Plaintiff, on September 13, 2022, that Plaintiff would not receive discovery in his OTDA proceeding. (*See id.* at 118.)

**c. OTDA Defendants**

Plaintiff's claims against the OTDA Defendants concern Plaintiff's litigation with the OTDA, over which Judge Bannon presided and in which HRA lawyers represented the City of New York. These incidents occurred in 2017. (*See id.* at 128.) The Defendants involved in the alleged incidents include: OTDA Commissioner Tietz, sued in his official capacity; OTDA lawyers Marks and Spitzberg; and Administrative Law Judge Noll.

**d. Defendants former Commissioner Banks, Pinny Ringel, and Lori Kletter**

***5** Plaintiff's claims against former Commissioner Banks also concern New York City public meetings involving public officials. For example, Plaintiff asserts that "I twice testified ... during City Council public hearings on 9/20/18 and 2/4/19 .... Mr. Banks was present on 2/4/19 while I testified about Mr. Vargas and deliberately turned the screen of my laptop to face Mr. Banks as I played a relevant video in conjunction with and support of my testimony." (*Id.* at 187.)

Those claims brought against Ringel and Kletter also arise rise out of interactions with City officials at public meetings, including on such meeting on November 16, 2021, when Ringel and Kletter "illegally prevented me from having a conversation with Mr. Banks during that meeting right after I talked with Mr. de Blasio during it while he stood next to Mr. [Eric] Adams." (*Id.* at 89.)

**e. NAICA Defendants**

Plaintiff brings legal malpractice claims against NAICA and NAICA lawyer Manjarrez, who represented Plaintiff during one of the proceedings brought by Urban. (*Id.* at 79) ("Mr. Manjarrez confirmed that he was defying a directive that I had issued to him to obtain the video recordings that were recorded on 3/8/22 by video security cameras that are installed in public areas in my building" to prove that Defendant Gonzalez did not serve Plaintiff with legal papers.).

**f. Process Server Gonzalez**

Plaintiff brings claims against a process server who allegedly failed to serve legal papers relating to the Urban litigation. (*Id.* at 76) ("I wasn't served legal papers for Urban3 then by Defendant Anthony Gonzalez who claimed that he serve me legal papers[.]").

**3. Claims**

Plaintiff asserts Section 1983 Claims against: (1) The City of New York; (2) Urban and Urban employees Ronald Abad, Lisa Lombardi, Andrew Nastachowski, Ariana Saunders, Frederick Shack, Nancy Southwell, and Kishea Paulemont; (3) HRA Commissioner Gary Cohen, former HRA Commissioner Steven Banks, HRA lawyers Marin Gerber, Ann Marie Scalia, Jeffrey Mosczyc, and Allison Gill-Lambert, HRA employee Kristen Benjamin-Solis, HRA General Counsel Martha Calhoun, (4) Judges Nancy Bannon, Lyle Frank, Shorab Ibrahim, Joni Kletter, and Maura Noll; (5) OTDA lawyers Nigel Marks and Samuel Spitzberg; (6) HRA employee Molly Park; and (7) Mayor's Office employee Pinny Ringel.

Plaintiff's FDCPA claims are brought against the Urban and DNCT Defendants, that is, (1) Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, Nancy Southwell; and (2) DNCT and DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun.

Plaintiff's RICO claims are brought against City officials, NAIC Defendants, Urban Defendants, and DNCT Defendants.

Plaintiff also asserts various state law claims.

## DISCUSSION

### A. Claims Brought Against State Defendants in Their Official Capacity Are Dismissed Under the Eleventh Amendment

Plaintiff brings claims against Judges Nancy Bannon, Anthony Cannatoro, Lyle Frank, Shorab Ibrahim; Chief Administrative Judge Lawrence Marks; Administrative Law Judge Maura Noll; and Commissioner Daniel Tietz, in their official capacities. In *Komatsu I*, Plaintiff also brought several claims against New York State officials, in their official capacity. In dismissing those claims under the Eleventh Amendment, Judge Stanton explained that the claims brought against these State officials were not permitted under the Eleventh Amendment. *See Komatsu I*, 1:20-CV-6510, 10 (“Accordingly, the Court dismisses Plaintiff's claims under federal law against ... Justice Bannon, Judge Spears, and Defendant Vaughan, in their official capacities, under the doctrine of Eleventh Amendment immunity. 28 U.S.C. § 1915(e)(2)(B)(iii).”). Here, Plaintiff again brings official capacity claims against Judges Bannon, Cannataro, Frank, Ibrahim, Chief Administrative Judge Marks, Administrative Law Judge Noll, and Commissioner Tietz, notwithstanding his prior experience with this specific context. *Sledge*, 564 F.3d at 109. Because these claims are barred under the Eleventh Amendment, the Court dismisses all federal claims brought against these Defendants. 28 U.S.C. § 1915(e)(2)(B)(iii).

### B. Plaintiff's Claims Against Government Attorneys Are Dismissed

***6** Plaintiff's federal claims brought against Defendants Calhoun, Beirne, Gil-Lambert, Mosczyc, Gerber, Scalia, Marks, and Sptizberg arise from those defendants' legal advocacy representing the HRA and OTDA. In *Komatsu I*, Plaintiff brought similar claims against Mosczyc and Gerber, and Judge Stanton dismissed the claims because these two Defendants, as government lawyers, were absolutely immune from the relief Plaintiff sought from them. Undeterred by the dismissal of those claims in *Komatsu I*, Plaintiff continues to seek relief against government attorneys who are his adversaries in his state court litigation. As explained in *Komatsu I*, however, government attorneys are immune from suit under Section 1983 “when functioning as an advocate of the state [or local government] in a way that is intimately associated with the judicial process.” *Mangiafico v. Blumenthal*, 471 F.3d 391, 396 (2d Cir. 2006); *see Barrett v. United States*, 798 F.2d 565, 572–73 (2d Cir.1986) (absolute immunity for government attorney defending state in a civil lawsuit). Accordingly, the Court dismisses Plaintiff's federal claims against the government attorneys because they are immune from such relief. *See* 28 U.S.C. § 1915(e)(2)(B)(iii).

### C. Claims Brought Against HRA Employee Park

The Court also dismissed the claims brought against Park, an HRA employee who allegedly informed Plaintiff that he was not entitled to discovery, because this Defendant is also immune from the relief Plaintiff seeks. Like the HRA lawyers, who are absolutely immune as government advocates, Parks is absolutely immune for damages where her conduct as an HRA employee was “intimately associated with the judicial process.” *Mangiafico*, 471 F.3d at 396. Accordingly, the Court dismisses all claims against this Defendant. 28 U.S.C. § 1915(e)(2)(B)(iii).

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**D. Claims Brought Against Administrative Law Judge Noll**

Plaintiff's claims under federal law against Judge Noll are barred under the doctrine of judicial immunity. Under this doctrine, judges are absolutely immune from suit for claims against them in their individual capacities for damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991) (applying judicial immunity to claims under § 1983); *Deem v. DiMella-Deem*, 941 F.3d 618, 620-21 (2d Cir. 2019) (same as to claims under § 1983 and § 1985), *cert denied*, 140 S. Ct. 2763 (2020). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Id.* at 209. This is because, "[w]ithout insulation from liability, judges would be subject to harassment and intimidation ...." *Young v. Selsky*, 41 F.3d 47, 51 (2d Cir. 1994).

Judicial immunity does not apply when a judge acts outside of his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles*, 502 U.S. at 11-12; *see also Bliven*, 579 F.3d at 209-10 (describing actions that are judicial in nature). But "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff's claims against Judge Noll arise from her actions and decisions in OTDA proceedings, conduct that is well within the scope of judicial duties. Judge Noll is therefore immune from suit as to Plaintiff's claims against her under the doctrine of judicial immunity. The Court dismisses Plaintiff's claims against Judge Noll because Plaintiff seeks monetary relief against a defendant who is immune from such relief, 28 U.S.C. § 1915(e)(2)(B)(iii), and, consequently, as frivolous, 28 U.S.C. § 1915(e)(2)(B)(i). *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011) ("Any claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of [the *in forma pauperis* statute].").

**E. Claims Brought Against Former HRA Commissioner Banks and HRA employee Benjamin-Solis**

**1. Claims that arose before August 10, 2020 against Banks and Benjamin-Solis**

***7** In *Komatsu I*, Plaintiff brought several claims against Banks and Benjamin-Solis that were considered on the merits by Judge Stanton and dismissed for failure to state a claim. *See* § 1915(e)(2)(B)(ii). In *Komatsu II*, Plaintiff brings the same claims against these Defendants, as well as new claims arising from the same conduct, that is, Plaintiff's litigation with HRA. These claims are barred under the doctrine of claim preclusion. [3]

Under the doctrine of claim preclusion, also known as "*res judicata*," a litigant may not bring a new case that includes claims or defenses that were or could have been raised in an earlier case in which the same parties were involved if that case resulted in a judgment on the merits. *Brown v. Felsen*, 442 U.S. 127, 131 (1979). Claim preclusion "prevents parties from raising issues that could have been raised and decided in a prior action – even if they were not actually litigated." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594, 206 L. Ed. 2d 893 (2020).

Claim preclusion generally applies if: "(1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *In re Motors Liquidation Co.*, 943 F.3d 125, 130 (2d Cir. 2019) (citation and internal quotation marks omitted).

To determine if a claim could have been raised in an earlier action, courts look to whether the present claim arises out of the same transaction or series of transactions asserted in the earlier action, *see Pike v. Freeman,* 266 F.3d 78, 91 (2d Cir. 2001), or, in other words, whether facts essential to the second suit were present in the first suit, *NLRB v. United Techs. Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983). "A party cannot avoid the preclusive effect *of res judicata* by asserting a new theory or a different remedy." *Brown Media Corp. v. K&L Gates, LLP*, 854 F.3d 150, 157 (2d Cir. 2017) (internal quotation marks and citation omitted).

All of Plaintiff's claims brought against Benjamin-Solis, and some of the claims brought against Banks, accrued before Plaintiff filed *Komatsu I.* Further, all of the claims brought against Benjamin-Solis and some of the claims brought against Banks in *Komatsu II* arise from the same series of transactions as the claims asserted against them in *Komatsu I.* Because Plaintiff did bring those claims, or could have brought those claims in *Komatsu I*, those claims are barred under the doctrine of claim preclusion.

**2. Claims against Banks that accrued after August 14, 2020**

Plaintiff brings new claims against Banks regarding his interactions with Banks at public meetings. Plaintiff is barred from bringing new claims against City officials regarding incidents occurring at public meetings, unless he receives permission to do so. Because Plaintiff did not seek permission to file new claims against these individuals, as discussed below in Section J, those claims are dismissed without prejudice.

***8** With respect to Bank's alleged interference with Plaintiff's retaining *pro bono* counsel, Plaintiff does not suggest a violation of a constitutional right. The Sixth Amendment, which provides a right to counsel in criminal cases, "does not govern civil cases." *Turner v. Rogers*, 564 U.S. 431, 441 (2011). Thus, to the extent Banks interfered with Plaintiff's retaining counsel, such interference does not implicate Plaintiff's rights under the United States Constitution. Accordingly, the claims against Banks concerning *pro bono* counsel are dismissed for failure to state a claim.

**F. The City of New York and HRA Commissioner Jenkins**

The Court dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, who is sued in his official capacity. When a plaintiff sues a municipality under Section 1983, it is not enough for the plaintiff to allege that one of the municipality's employees or agents engaged in some wrongdoing. The plaintiff must show that the municipality itself caused the violation of the plaintiff's rights. *See Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("A municipality or other local government may be liable under this section [1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation.") (quoting *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 692 (1978)); *Cash v. Cnty. of Erie,* 654 F.3d 324, 333 (2d Cir. 2011).

To state a Section 1983 claim against a municipality, the plaintiff must allege facts showing (1) the existence of a municipal policy, custom, or practice, and (2) that the policy, custom, or practice caused the violation of the plaintiff's constitutional rights. *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012); *see Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (internal citations omitted).

Plaintiff alleges no facts showing that the City of New York violated any of his federal constitutional or statutory rights because of one of the City's policies, customs, or practices. The Court therefore dismisses Plaintiff's claims under federal law against the City of New York and Commissioner Jenkins, sued in his official capacity, for failure to state a claim on which relief may be granted.

**G. Section 1983 Claims Brought Against Private Defendants**

Plaintiff brings Section 1983 claims against private individuals and entities, also named in *Komatsu I*, that is: Urban, Abad, Coates, Lombardi, Paulemont, Shack, and Southwell. Judge Stanton dismissed these claims for failure to state a claim because Plaintiff failed to show that any conduct by these private individuals could be considered state action. Now, Plaintiff reasserts similar claims against these same private individuals and also names additional private individuals, not named in *Komatsu I*, that is: Saunders, Nastachowski, and Cohen. Plaintiff still does not show, however, that these defendants' conduct can be considered state action. Thus, for the reasons set forth in Judge Stanton's order, dismissing the Section 1983 claims against the private individuals, the Court dismisses Plaintiff's claims against the individual defendants named in this action for failure to state a claim.

**H. Claims Under Civil RICO**

Plaintiff asserts that Defendants have conspired against him, in violation of the civil provision of RICO. Plaintiff brought similar claims in *Komatsu I*, and Judge Stanton dismissed those claims because Plaintiff failed to show that Defendants engaged in any activity that would support any claim under civil RICO. In this action, Plaintiff also fails to state any facts suggesting a RICO violation. The Court therefore dismisses Plaintiff's claims under civil RICO for failure to state a claim on which relief may be granted. *See* § 1915(e)(2)(B)(ii).

**I. Claims Under the Fair Debt Collection Practices Act ("FDCPA")**

***9** Plaintiff brings claims against the Urban and DNCT Defendants, asserting that they violated the FDCPA. He alleges that they falsely claimed in court that Plaintiff owed rent. He relies on a district court decision, in which a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

consumer sued a law firm that was a debt collector. *Lee v. Kucker & Bruh*, LLP, 958 F. Supp. 2d 524, 526 (S.D.N.Y. 2013) ("Defendant K & B is a law firm that primarily represents landlords in New York City. K & B is a debt collector as defined by the FDCPA.").

The FDCPA applies to consumer debt "arising out of ... transaction[s] ... primarily for personal, family, or household purposes." 15 U.S.C. § 1692a(5); *Polanco v. NCO Portfolio Mgmt., Inc.*, 930 F. Supp. 2d 547, 551 (S.D.N.Y. 2013) ("[T]he FDCPA is triggered when the obligation is a debt arising out of a consumer transaction"). In cases where the FDCPA applies, it prohibits deceptive and misleading practices by "debt collectors." 15 U.S.C. § 1692e. A debt collector is defined in Section 1692a(6) as: (1) a person whose principal purpose is to collect debts; (2) a person who regularly collects debts owed to another; or (3) a person who collects its own debts, using a name other than its own as if it were a debt collector. *See also Henson v. Santander Consumer USA, Inc.*, 137 S. Ct. 1718 (2017) (holding that entities that regularly purchase debts originated by someone else and then seek to collect those debts for their own account are not necessarily debt collectors subject to the FDCPA).

Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Conduct in violation of the statute includes, among other examples and without limitation, using violence or the threat of violence or other criminal means; using obscene or profane language "the natural consequence of which is to abuse the hearer or reader"; publishing a list of consumers who refuse to pay debts; or "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with the intent to annoy, abuse, or harass" the person called. 15 U.S.C. § 1692d.

Plaintiff's claims against the Urban Defendants fails to state claims upon which relief may be granted because Plaintiff does not state facts suggesting that they are debt collectors. His claims against the DNCT Defendants, however, may state claims, if he can show that these defendants engaged in harassing conduct with respect to the alleged debt owed to Urban.

As discussed below, the Court grants Plaintiff leave to file an amended complaint as to his FDCPA claims against DNCT and the DNCT lawyers Harold Rosenthal, Eric Tavel, and Allison Heilbraun. His FDCPA claims brought against Urban and Urban employees Ronald Abad, Sharon Coates, Lisa Lombardi, Kishea Paulemont, Ariana Saunders, Frederick Shack, and Nancy Southwell are dismissed for failure to state a claim upon which relief may be granted.

**J. Claims Against former Commissioner Banks, Pinny Ringel, and Lori Kletter**

Plaintiff's claims against former Commissioner Banks, Ringel and Kletter, that arise out of alleged conduct by New York City officials at public meetings, fall within the scope of Judge Ramos's order requiring Plaintiff to seek permission to file "any new action in this Court against the City of New York, city officials, and members of the NYPD regarding their alleged involvement in preventing him from attending public meetings with the Mayor." *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45). These claims are therefore dismissed without prejudice because Plaintiff has not obtained permission to bring these claims against these defendants.

**K. Claims Under State Law**

***10** A district court may decline to exercise supplemental jurisdiction over claims under state law when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Generally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction ...." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). At this stage, it is premature to determine whether the Court will decline to exercise its supplemental jurisdiction over any claims under state law that Plaintiff is asserting. *See Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise.' " (quoting *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997))).

**LEAVE TO AMEND**

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). The Court, having dismissed all of the claims brought against the DNCT Defendants except the FDCPA claims, finds that it would be futile to grant

him leave to amend the non-FDCPA claims. Accordingly, the Court grants Plaintiff leave to file an amended complaint to assert his FDCPA claims against the DNCT Defendants. The amended complaint must only name the DNCT Defendants and only assert the FDCPA claims, and it may not exceed 20 pages. These limitations are imposed based on Plaintiff's litigation history in this court, where he reasserts the same claims against the same defendants following dismissal of such claims on the merits. The page-limitation is imposed because Plaintiff's pleadings, both in this action and prior actions, do not comply with Rule 8's requirement that his complaint consist of short and plain statements. *See* Fed. R. Civ. P. 8(a).

Should Plaintiff submit an amended complaint that fails to comply with these requirements, the Court will direct the Clerk of Court to return Plaintiff's pleading and will provide him one more opportunity to submit an amended complaint that does not exceed 20 pages, names DNCT Defendants, and asserts FDCPA claims. If he fails to comply with the requirements a second time, the Court will dismiss the action for failure to comply with the Court's order.

## CONCLUSION

The Court dismisses Plaintiff's federal claims brought against Urban Pathways, Inc., Neighborhood Association For Inter-Cultural Affairs, Inc., The City Of New York, Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Ariana Saundersm, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Nancy Bannon, Anthony Cannataro, Lyle Frank, Shorab Ibrahim, Gary Jenkins, Lawrence Marks, Maura Noll, and Daniel Tietz, as frivolous, for failure to state a claim on which relief may be granted, and for seeking monetary relief from defendants that are immune from such relief. *See* 28 U.S.C. § 1915(e)(B)(i)-(iii).

Those claims brought against Steve Banks, Penny Ringel, and Lorri Kletter that arise out of public meetings are dismissed without prejudice, pursuant to the prefiling injunction issued in *Komatsu*, ECF 1:20-CV-07046 (ER) (ECF 45).

The Court grants Plaintiff leave to file an amended complaint that complies with the standards set forth above.

***11** Plaintiff must submit the amended complaint, which may not exceed 20 pages, to this Court's Pro Se Intake Unit within sixty days of the date of this order, caption the document as an "Amended Complaint," and label the document with docket number 22-CV-9080 (LTS).

An Amended Complaint form is attached to this order. No summons will issue at this time. If Plaintiff fails to comply within the time allowed, and he cannot show good cause to excuse such failure, the complaint will be dismissed for failure to state a claim upon which relief may be granted.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See* *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

SO ORDERED.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Write the full name of each plaintiff.

____CV__________
(Include case number if one has been assigned)

-against-

AMENDED

COMPLAINT

Do you want a jury trial?
☐ Yes ☐ No

Write the full name of each defendant. If you need more space, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed above must be identical to those contained in Section II.

**NOTICE**

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

Rev. 2/10/17

## I. BASIS FOR JURISDICTION

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation, and the amount in controversy is more than $75,000, is a diversity case. In a diversity case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal-court jurisdiction in your case?

☐ Federal Question

☐ Diversity of Citizenship

### A. If you checked Federal Question

Which of your federal constitutional or federal statutory rights have been violated?

### B. If you checked Diversity of Citizenship

#### 1. Citizenship of the parties

Of what State is each party a citizen?

The plaintiff , ______________________, is a citizen of the State of
(Plaintiff's name)

______________________
(State in which the person resides and intends to remain.)

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

______________________.

If more than one plaintiff is named in the complaint, attach additional pages providing information for each additional plaintiff.

Page 2

If the defendant is an individual:

The defendant, ______________________, is a citizen of the State of
(Defendant's name)

______________________

or, if not lawfully admitted for permanent residence in the United States, a citizen or subject of the foreign state of

______________________.

If the defendant is a corporation:

The defendant, ______________________, is incorporated under the laws of

the State of ______________________

and has its principal place of business in the State of ______________________

or is incorporated under the laws of (foreign state) ______________________

and has its principal place of business in ______________________.

If more than one defendant is named in the complaint, attach additional pages providing information for each additional defendant.

## II. PARTIES

### A. Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

First Name | Middle Initial | Last Name

Street Address

County, City | State | Zip Code

Telephone Number | Email Address (if available)

Page 3

B. Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. Attach additional pages if needed.

Defendant 1:

First Name Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City State Zip Code

Defendant 2:

First Name Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City State Zip Code

Defendant 3:

First Name Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City State Zip Code

Page 4

Defendant 4:

First Name Last Name

Current Job Title (or other identifying information)

Current Work Address (or other address where defendant may be served)

County, City State Zip Code

III. STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

FACTS:

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and what each defendant personally did or failed to do that harmed you. Attach additional pages if needed.

Page 5

INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

IV. RELIEF

State briefly what money damages or other relief you want the court to order.

Page 6

V. PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

Dated Plaintiff's Signature

First Name Middle Initial Last Name

Street Address

County, City State Zip Code

Telephone Number Email Address (if available)

I have read the Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☐ Yes ☐ No

If you do consent to receive documents electronically, submit the completed form with your complaint. If you do not consent, please do not attach the form.

Page 7

**All Citations**

Not Reported in Fed. Supp., 2023 WL 419699

## Footnotes

1 Plaintiff named the following defendants in *Komatsu I* but not in *Komatsu II:* Marilyn Andzeski, Urban management agent; Molly McCracken, an employee with Services for the Underserved, Inc.; Avraham Schmeidler, an HRA employee; Wendell Vaughan, a law clerk; the New York State Office off Court Administration; the New York State Unified Court System; and Judge Brenda Spears, from the Bronx County Housing Court.

2 The allegations from *Komatsu I*, described in this order, relate to the allegations set forth in *Komatsu II*, and do not include each allegation set forth in *Komatsu I.*

3 Although claim preclusion is an affirmative defense to be pleaded in a defendant's answer, *see* Fed. R. Civ. P. 8(c), the Court may, on its own initiative, raise the issue. *See, e.g.*, *Grieve v. Tamerin*, 269 F.3d 149, 154 (2d Cir. 2001) (affirming district court's dismissal on grounds of issue preclusion even though defendant failed to plead that defense, and noting that "principles of preclusion involve" not only "the rights and interests of the parties," but also "important interests of the public and the courts in avoiding repetitive litigation and potentially inconsistent decisions").

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4635337
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charisse S. MOORE, Plaintiff,
v.
FOX NEWS, et al., Defendants.

24-CV-5470 (JPO)
|
Signed October 30, 2024

**Attorneys and Law Firms**

Charisse S. Moore, New York NY, Pro Se.

OPINION AND ORDER

J. PAUL OETKEN, United States District Judge:

***1** Plaintiff Charisse S. Moore, proceeding *pro se*, brings this action against Defendants Fox News and Ryanne Duffie Saucier, invoking the Court's federal question jurisdiction. By order dated August 12, 2024, Chief Judge Laura Taylor Swain granted Moore's request to proceed *in forma pauperis*, that is, without prepayment of fees. On September 20, 2024, the Court accepted assignment of this action as related to *Moore v. Stripe*, No. 24-CV-2799 (JPO). For the reasons that follow, the complaint is dismissed.

**I. Background**

The following facts are drawn from Plaintiff's Complaint (ECF No. 1 ("Compl.")), and documents integral to it, *see Sira v. Morton*, 380 F.3d 57, 67 (2d Cir.2004), and are presumed true for purposes of this opinion. All reasonable inferences are drawn in Plaintiff's favor. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Moore alleges that Defendants are responsible for, *inter alia*, "federal hate crimes," "interstate stalking," and "human trafficking." (Compl. at 2 (capitalization omitted).) In the fact section of the complaint, Moore writes, "[p]lease see attached" (*id.* at 5), referring to 69 pages of documents, some of which she appears to have prepared herself. In the interest of judicial economy, the Court will not endeavor to faithfully reproduce every allegation contained in those documents in this opinion, but rather offers a representative sample.

The core of Moore's complaint concerns the deterioration of her friendship of "10+ years" with Ms. Saucier and her family (*id.* at 30), apparently beginning when Saucier pressured Moore to visit her home for Thanksgiving in 2020 (*see, e.g.*, *id.* at 22). Following that request, Moore claims that Saucier behaved toward her in a manner she found unsettling. For example, sometime in 2021, Saucier allegedly "asked [Moore] if she could look at [Moore's] financials"—a request that left Moore "stunned and intrigued." (*Id.* at 23.) Moore alleges that Saucier made uncomfortable comments "on Judaism" including "stating 'get her, she is Jewish!' out of nowhere." (*Id.* at 24 (emphasis omitted).) Later, she claims that Saucier "sent [her] text messages when [she] moved to Smyrna, Georgia, that if [she] ever needed anything to please feel free to reach out." (*Id.* at 54.) In August 2021, Moore spoke with Saucier about Saucier's "joining the Fox News team and how Fox News has changed." (*Id.* at 55.) In November 2021, Moore "[s]pent the night at ... [the] Saucier[s'] house at Ryanne's insistence." (*Id.* at 55.)

Over time, Ms. Moore alleges, the relationship deteriorated further. Moore "strongly believe[s] that," on February 9, 2022, "[Saucier] recorded [her] therapy session." (*Id.* at 30.) On February 17, 2022, Saucier allegedly "contacted the Cobb County Police Department to perform a 'wellness check' on [her], due to the fact that [she] did not return [her] phone calls, voicemails and/or emails." (*Id.* at 31.) Moore then "blocked ... Saucier's phone number[ ] and email address[ ], as of January/February 2022," and left town to "visit [her] cousin ... in Charlotte, North Carolina." (*Id.*)

***2** After moving to North Carolina, Ms. Moore alleges that "there were HIDDEN CAMERAS installed in [her] apartment" (*id.* at 38 (capitalization in original)), that Saucier hired a "Mickey Mouse impersonator" (*id.* at 56), that unidentified men "watched [her] take a shower" (*id.* at 57), that a "white woman with blonde hair and a little Poodle stared at me in the elevator and did not say a word" (*id.*), and that she was "[d]oxxed while paying for Dolce & Gabanna [*sic*]" because "[t]he cashier asked for [her] phone number and screamed [it] across the entire store" (*id.* at 58).

Based on these and other events, Moore alleges that she is "the victim of a multi-year stalking scheme." (*Id.* at 10.) She alleges that this stalking scheme is, in part, being perpetrated by the "British Monarchy" and lists among her "[p]otential [s]talkers" the Saucier family, various members of Moore's own family, and the Canadian pop musician Claire

Elise (also known as "Grimes"). (*Id.* at 67.) In September 2023, she alleges, while at the Disney Yacht Club Resort in Orlando, "[t]he British Monarchy and British Monarchy alliance stalkers had [her] curtsy in the shower for six (6) hours with the brain hijacking Unauthorized Non-Consented experiment ... and said that [there] would be whippings for not curtsying correctly." (*Id.* at 72.)

Moore's complaint also contains several profanity-laced comments about Defendants. For example, she states: "Sitting with my legs crossed deploys Dan Saucier[1] to spit in my vagina, because it does not align with British Monarchy unknown rules and regulations—that I am not a part of!" (*id.* at 68), and accuses the members of the Saucier family of being "obsessed with Charisse S. Moore's vagina" (*id.*).

## II. Legal Standard

The Court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see also Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits: to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2).

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992) (holding that a "finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston*, 141 F.3d at 437 ("An action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory.") (quotation marks and citation omitted).

## III. Discussion

***3** Even construing Moore's pleadings with the "special solicitude" due to *pro se* parties, *Triestman*, 470 F.3d at 475, the Court concludes that the allegations do not plausibly allege an actionable violation of her rights. The Court must not dismiss a complaint simply because the facts alleged appear to be "unlikely," *Denton*, 504 U.S. at 33, but a finding of factual frivolousness is warranted when the facts alleged are "clearly baseless," "fanciful," "fantastic," "delusional" or "wholly incredible," "whether or not there are judicially noticeable facts available to contradict them." *Id.* at 32-33; *see also Livingston*, 141 F.3d at 437. "Plaintiff's beliefs —however strongly [s]he may hold them—are not facts." *Morren v. N.Y. Univ.*, No. 20-CV-10802, 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

The Court finds that, because Plaintiff does not provide any plausible factual support for her claims of stalking, they rise to the level of the irrational and must be dismissed as frivolous. *See Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (summary order) (holding that "the district court did not err in *sua sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal 'fusion centers' and the New York State Intelligence Center, which put a 'digital marker' on him in order to collect his personal data and harass him").

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Here, Moore's allegations are "vague" and "incomprehensible," and the Court cannot discern any claims that are not "frivolous on their face." *Cf. Salahuddin*, 861 F.2d at 43. Because the defects in Moore's complaint cannot be cured, the Court declines to grant her leave to amend. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

## IV. Warning

Plaintiff has filed multiple suits with claims similar to those brought in this action, some of which also name

the same defendants. *See, e.g.*, *Moore v. Stripe*, No. 24-CV-2799 (S.D.N.Y. Apr. 11, 2024) (suing Stripe, Inc. based in part on the same underlying stalking allegations); *Moore v. KPMG*, No. 24-CV-5471 (S.D.N.Y. July 15, 2024) (claims of interstate stalking); *Moore v. Scenic Prods.*, No. 24-CV-5413 (S.D.N.Y. July 11, 2024) (same); *Moore v. Georgia*, No. 24-CV-5545 (S.D.N.Y. July 18, 2024) (same); *Moore v. Vanderbilt Univ.*, No. 24-CV-5533 (S.D.N.Y. July 17, 2024) (same).

Plaintiff is warned that, should she file future actions in this court that are duplicative or frivolous, the Court may enter an order barring her from filing new actions *in forma pauperis* unless she receives permission from the Court to do so. *See* 28 U.S.C. § 1651.

**V. Conclusion**

Plaintiff's complaint is hereby dismissed with prejudice as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i).

The Court warns Plaintiff that, should she file future actions in this court that are frivolous or duplicative, the Court may enter an order barring her from filing new actions *in forma pauperis* unless she receives permission from the Court. *See* 28 U.S.C. § 1651.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See* *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

***4** SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4635337

## Footnotes

1 Presumably Dan Saucier is Ryanne Saucier's husband. (*See, e.g.*, Compl. at 23 (referring to Ryanne and Dan Saucier's child); *id.* at 55 (stating that the couple lives together).)

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 4149959
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Charisse Samantha MOORE, Plaintiff,
v.
State of GEORGIA, et al., Defendants.

24-CV-5545 (LTS)
|
Signed September 5, 2024
|
Filed September 11, 2024

**Attorneys and Law Firms**

Charisse Samantha Moore, New York, NY, Pro Se.

ORDER OF DISMISSAL

LAURA TAYLOR SWAIN, Chief United States District Judge:

***1** Plaintiff, acting *pro se*, brought this complaint invoking the Court's federal question jurisdiction. By order dated July 23, 2024, the Court granted Plaintiff's request to proceed *in forma pauperis*, that is, without prepayment of fees. On August 26, 2024, Plaintiff filed an amended complaint. For the reasons set forth below, the Court dismisses the amended complaint.

**STANDARD OF REVIEW**

The Court must dismiss an *in forma pauperis* complaint, or any portion of the complaint, that is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998). The Court must also dismiss a complaint when the Court lacks subject matter jurisdiction of the claims raised. *See* Fed. R. Civ. P. 12(h)(3).

While the law mandates dismissal on any of these grounds, the Court is obliged to construe *pro se* pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and citations omitted) (emphasis in original). But the "special solicitude" in *pro se* cases, *id.* at 475 (citation omitted), has its limits – to state a claim, *pro se* pleadings still must comply with Rule 8 of the Federal Rules of Civil Procedure, which requires a complaint to make a short and plain statement showing that the pleader is entitled to relief.

A claim is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 324-25 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992) (holding that "finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless ...; or (2) the claim is based on an indisputably meritless legal theory.") (internal quotation marks and citation omitted).

**BACKGROUND**

In her initial complaint, Plaintiff states that she is seeking "a broader conversation on stalking and how mental health practitioners can help their clients through the process." (ECF 1 at 8.) She also seeks damages from the States of Georgia and North Carolina. Plaintiff sues Georgia Secretary of State Brad Raffensperger and North Carolina Secretary of State Elaine Marshall; Tara Duffie, a psychiatric mental health nurse at Vanderbilt University; Ingrid Jones, a psychiatric mental health counselor from Broward College in Florida; and Ryanne Saucier of Scenic Productions and Cable Network. [1]

***2** Plaintiff invokes the Court's federal question doctrine and states that her claims involve "interstate stalking," and "human trafficking." (*Id.* at 2.) She also cites 18 U.S.C. § 249, and the Hate Crime Prevention Act. She states that her claims arose in Georgia, North Carolina, California, New York, and Ireland, beginning in 2021.

The complaint is 144 pages long. Plaintiff describes reports that she has filed with the Federal Bureau of Investigation (FBI) regarding "multi-year Interstate Stalking." (*Id.* at 10.) Plaintiff alleges, for example:

OF SIGNIFICANT IMPORTANCE:

In 2022, my Apple MacBook Air was hacked with documents of concern related to stalkers, to include but not limited to: Growth_2022.04 Document - Where I identified [ ] as a and her husband as a [ ], . These were my personal thoughts and briefly listed within a Microsoft Word document on my Apple MacBook Air.

"Covert Narcissist disguised as altruism" - Taylor Swift, Anti-Hero

Ryanne Duffie Saucier's favorite artist is Taylor Swift

NOTE: Ryanne Duffie Saucier and Dan Saucier were adamant about building a relationship with Laura Norton and Mayor Derek Norton, for unknown reasons.

(*Id.* at 53.)

Plaintiff further alleges:

Jax, My Maltipoo was attacked due to stalking

Banfield Pet Hospital in Charlotte, North Carolina

Bond Vet

Urgent Vet

Unauthorized Non-Consented Dossier creation of Charisse S. Moore based on Psychology, Business, Technology,

Medical information to leverage Economic Espionage for stalkers

(*Id.*)

Plaintiff describes various incidents:

**Thursday, February 17, 2022:** Ryanne Duffie Saucier and Dan Saucier contacted the Cobb County Police Department to perform a "wellness check" on me, due to the fact that I did not return their phone calls, voicemails and/or emails [.] The Responding Officer to the wellness check was Officer Glen C. Meyer - Cobb County, GA.

**Note:** I blocked both Ryanne Duffie Saucier and Dan Saucier's phone numbers and email addresses, as of January/ February 2022.

**Note:** Officer Glen C. Meyer, Cobb County Police Department, was very nice and provided his personal cell phone number, as he is familiar with Domestic Violence cases. We spoke for more than 30 minutes in mid-February 2022 during the wellness check and he strongly encouraged and watched me send an email to Dan (Daniel) Saucier regarding the lack of response to his and Ryanne's calls.

**February 19, 2022:** Due to the issues with Dan Saucier and Ryanne Duffie Saucier, I went to visit my cousin Andre Gilgeous in Charlotte, North Carolina.

(*Id.* at 61.)

On August 26, 2024, Plaintiff filed an amended complaint. In the caption of the amended complaint, Plaintiff names the States of Georgia and North Carolina, Scenic Cable Network & Productions, and Vanderbilt University. In the body of the amended complaint, Plaintiff lists numerous additional defendants, including North Carolina Governor Roy Cooper, Fulton County District Attorney Fani Willis, Georgia Governor Brian Kemp, Elon Musk, and many others. Plaintiff indicates that her claims arose from 2018 to the present, throughout the United States, and in the United Kingdom and Guatemala. Plaintiff brings claims for "interstate stalking as part of the Violence Against Women Act (VAWA)," "Conspiracy Against Rights, 18 U.S.C. § 241, as part of Hate Crimes," "criminal interference with right to fair housing," and more.

## DISCUSSION

***3** Even when the Court construes Plaintiff's pleadings with the "special solicitude" due to *pro se* pleadings, *Triestman*, 470 F.3d at 475, the Court finds that the allegations do not plausibly allege a violation of Plaintiff's rights. The Court must not dismiss a complaint simply because the facts alleged appear to be "unlikely," *Denton*, 504 U.S. at 33, but a finding of factual frivolousness is warranted when the facts alleged are "clearly baseless," "fanciful," "fantastic," "delusional" or wholly incredible, "whether or not there are judicially noticeable facts available to contradict them." *Id.* at 32-33; *see Livingston*, 141 F.3d at 437. "Plaintiff's beliefs – however strongly [s]he may hold them – are not facts." *Morren v. New York Univ.*, No. 20-CV-10802 (JPO) (OTW), 2022 WL 1666918, at *18 (S.D.N.Y. Apr. 29, 2022) (citation omitted), *report and recommendation adopted*, 2022 WL 1665013 (S.D.N.Y. May 25, 2022).

The Court finds that, because Plaintiff does not provide any plausible factual support for her claims of stalking, they rise to the level of the irrational and must be dismissed as frivolous.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

*See Kraft v. City of New York*, 823 F. App'x 62, 64 (2d Cir. 2020) (summary order) (holding that "the district court did not err in *sua sponte* dismissing the complaint as frivolous," based on the plaintiff's allegations that he had "been the subject of 24-hour, multi-jurisdictional surveillance by federal 'fusion centers' and the New York State Intelligence Center, which put a 'digital marker' on him in order to collect his personal data and harass him").

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to cure its defects but leave to amend is not required where it would be futile. *See Hill v. Curcione*, 657 F.3d 116, 123-24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988). Because the defects in Plaintiff's amended complaint cannot be cured with further amendment, the Court declines to grant Plaintiff leave to amend and dismisses the action as frivolous. *See* 28 U.S.C. § 1915(e)(2)(B)(i).

**WARNING**

Plaintiff has filed multiple suits with claims similar to those brought in this action, some of which also name the same defendants. *See, e.g.*, *Moore v. Vanderbilt Univ.*, No. 1:24-CV-5533, 1 (S.D.N.Y. filed June 17, 2024) (suing Ryanne Duffie Saucier); *Moore v. Scenic Productions*, No. 1:24-CV-05413, 1 (S.D.N.Y. July 11, 2024) (suing Ryanne Duffie Saucier); *Moore v. KPMG*, No. 1:24-CV-05471, 1 (S.D.N.Y. filed July 15, 2024) (claims of interstate stalking); *Moore v. Fox News*, No. 1:24-CV-05470, 1 (S.D.N.Y. July 15, 2024) (suing Ryanne Duffie Saucier).

Plaintiff is warned that, should she file future actions in this court that are duplicative or frivolous, the Court may enter an order barring her from filing new actions *in forma pauperis* unless she receives permission from the court to file a new civil action. *See* 28 U.S.C. § 1651.

**CONCLUSION**

Plaintiff's amended complaint is dismissed as frivolous under 28 U.S.C. § 1915(e)(2)(B)(i).

The Court warns Plaintiff that, should she file future actions in this court that are frivolous or duplicative, the Court may enter an order barring her from filing new actions *in forma pauperis*, unless she receives permission from the court to file the new civil action. *See* 28 U.S.C. § 1651.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court directs the Clerk of Court to enter judgment in this action.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4149959

## Footnotes

1 Plaintiff references her recent cases against some of the same defendants. *See Moore v. Vanderbilt Univ.*, No. 1:24-CV-5533, 1 (S.D.N.Y. filed June 17, 2024) (suing Ryanne Saucier, Elon Musk, and others); *Moore v. Scenic Prods.*, No. 1:24-CV-05413, 1 (S.D.N.Y. July 11, 2024) (suing Ryanne Saucier and others).

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1666918
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,
v.
NEW YORK UNIVERSITY,
UCATS Local 3882, Defendants.

No. 20-CV-10802 (JPO) (OTW)
|
Signed 04/29/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree Deakins, New York, NY, for Defendant New York University.

Gregory Ainsley, Robert T. Reilly, Serge Ambroise, Ambroise Law, Rachel Sonia Paster, Cohen, Weiss and Simon LLP, New York, NY, for Defendant Ucats Local 3882.

**REPORT AND RECOMMENDATION**

ONA T. WANG, United States Magistrate Judge:

***1 To the Honorable J. PAUL OETKEN, United States District Judge:**

**I. INTRODUCTION**

Plaintiff Darwyn M. Morren brings this action against the defendants, New York University ("NYU"), and UCATS Local 3882 ("UCATS"). (ECF 2). Plaintiff alleges that: (1) Defendants discriminated against Plaintiff on the basis of race and national origin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, the New York City Human Rights Law ("NYCHRL"), and the New York State Human Rights Law ("NYSHRL"); (2) Defendants discriminated against Plaintiff under the Americans with Disabilities Act ("ADA"), the NYCHRL, and the NYSHRL; (3) Defendants violated the Family and Medical Leave Act of 1993; (4) NYU breached a contract by terminating him; (5) UCATS breached the Collective Bargaining Agreement ("CBA") with NYU by failing to submit grievances on his behalf; (6) UCATS breached their duty of fair representation to Plaintiff (ECF 2, ECF 25); (7) Defendants conspired to deprive Plaintiff of equal protection under 42 U.S.C. § 1985 (ECF 25); (8) Defendants violated Plaintiff's Civil Rights under Civil Rights Law § 79-n (ECF 25); and (9) negligent infliction of emotional distress against both Defendants. (ECF 25). Plaintiff seeks "compensatory damages in the sum of $100,000,000 [f]or emotional and psychological distress. [P]lus any punitive damages which is exclusive of the $100,000,000 demand." (Am. Compl. 6).

**II. PROCEDURAL HISTORY**

Plaintiff filed a Charge with the U.S. Equal Employment Opportunity Commission ("EEOC") on August 25, 2020. (ECF 2). Plaintiff alleges that he received his Rights of Notice to Sue from the EEOC, dated September 21, 2020, on September 28, 2020. (ECF 2).

On December 18, 2020, Plaintiff filed his *pro se* Complaint against Defendants NYU and UCATS. (ECF 2). The Honorable John P. Cronan referred this case to me for General Pretrial Management and Dispositive Motion on April 14, 2021. [1] (ECF 15). Plaintiff filed his First Amended Complaint on June 4, 2021, which adds additional details, but no additional claims. (ECF 25 (hereinafter "Am. Compl.")). On June 9, 2021, the parties agreed to a briefing schedule for Defendants' motions to dismiss the Amended Complaint. (ECF 29, 33). Plaintiff requested a 31-day extension of the briefing schedule because of health concerns, which I granted on July 7, 2021. (ECF 37, 38). The day Defendants' submissions were due (August 9, 2021), Plaintiff attempted to amend his First Amended Complaint, without the Court's leave and without Defendants' consent. (ECF 40, 43). I denied this request as untimely. [2] (ECF 43).

Defendants filed their respective Motions to Dismiss on August 9, 2021, in accordance with the amended briefing schedule. (ECF 46, 48). Ten days later, Plaintiff sought another extension to file his opposition, which I granted. [3] (ECF 55, 60). Plaintiff filed his opposition on October 7, 2021, and Defendants filed their replies on October 28, 2021. (ECF 65, 68, 70).

**III. FACTUAL BACKGROUND [4]**

***2** Plaintiff identifies as an "Afro-Caribbean male (black/ [A]frican descent), of Trinidadian [n]ational [o]rigin" with ADHD. (Am. Compl. 22). [5] He began working at NYU's Bobst Library in November 2016 as an "ADRSS" (Access Delivery Resource Sharing Services) assistant. (Am. Compl. at 22). His job responsibilities included "various

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

administrative tasks in the library, including checking out, shelving, unshelving, and stacking books; creating and managing patrons' accounts; working in the course reserves section amongst other responsibilities." (Am. Compl. 23 at ¶ 1). Upon starting work, Plaintiff joined UCATS, where Linda Wambaugh was his union representative. (Am. Compl. 23 at ¶ 2). NYU terminated Plaintiff's employment effective on December 13, 2019. (Am. Compl. 33 at ¶ 49).

***1. Plaintiff is Assigned a Less Convenient Work Schedule.***

Plaintiff reported to several individuals when he worked at NYU. (Am. Compl. at 23 ¶ 1). His immediate supervisor was Patricia Warrington. (Am. Compl. 23 at ¶ 1). Plaintiff and Warrington both reported to the circulation manager, Deborah Caesar, who was later replaced by Frances Rodriguez. (Am. Compl. 23 at ¶ 1).

In December 2016, Plaintiff met with "management"[6] and was told that he "exceeded expectations" in performance and attendance. (Am. Compl. 23 at ¶ 3). At this meeting, Plaintiff complained that two coworkers were "affecting teamwork/ morale," and were "ma[king] [the workplace] a hostile work environment."[7] (Am. Compl. 23 at ¶ 3). "Management" responded by telling Plaintiff, "don't worry about it, and just worry about yourself."[8] (Am. Compl. 23 at ¶ 3).

Around December 2016 or January 2017, Gary Speizale, Plaintiff's coworker, complained about the shift schedule. (Am. Compl. 23 at ¶ 4). Plaintiff alleges that, as a result, Plaintiff's schedule was changed so that he no longer had consecutive days off, while his coworkers, including Speziale, did. (Am. Compl. 23 at ¶ 4). Plaintiff complained to Warrington, Caesar, and Rodriguez that the new schedule was unfair, but "they" told Plaintiff that the schedule was based on seniority, and Plaintiff had the "least amount of seniority" among his coworkers because he was "the most recent hire." (Am. Compl. 23 at ¶ 4). Plaintiff complained to Wambaugh about the schedule, explaining that he was not the most recent hire, but she also said that Speizale was senior to Plaintiff.[9] (Am. Compl. 23–24 at ¶ 4). The Union did not file a grievance on Plaintiff's behalf.[10] (Am. Compl. 24 at ¶ 4).

***2. Plaintiff is Reprimanded for Taking a Previously-Scheduled Trip to a "Religious Festival."***

***3** Plaintiff told his employer "[b]efore [he] [s]tarted employment" in November 2016 that he had plans to attend an annual "Cultural and Religious Festival/carnival [sic]" in Trinidad. (Am. Compl. 24 at ¶ 6). Before he began working, Plaintiff alleges that he was told that he could attend this event, and that he would be paid during his absence.[11] (Am. Compl. 24 at ¶ 6). Then, in February 2017, days before attending the "Cultural and Religious Festival/carnival in Trinidad," "they" told Plaintiff that he would not be paid for the time off he was taking.[12] (Am. Compl. 24 at ¶ 6). Plaintiff went to the festival, but "was accused of misusing sick time" and upon his return, was told that he would be terminated. (Am. Compl. 24 at ¶ 8). "[Plaintiff] explained that [he] was only doing what Rodriguez told [him] to do, and that in any event, [he] had a doctor's note." (Am. Compl. 24 at ¶ 8). Ultimately, Plaintiff was not "disciplined." (Am. Compl. 24 at ¶ 8).

Plaintiff also alleges that in July 2019, he requested time off for his vacation to Trinidad in February 2020, which Rodriguez denied. (Am. Compl. 15). Plaintiff alleges that Caesar had approved Plaintiff's request the past three years (which is inconsistent with his earlier allegations). (Am. Compl. 15). Plaintiff halved the vacation days he initially requested and later cancelled his flight because with fewer days, the cost was higher. (Am. Compl. 15).

***3. Plaintiff's Probation is Extended.***

In February 2017, Plaintiff complained to NYU and UCATS "that [his] probation period had been extended." (Am. Compl. 24 at ¶ 7). Caeser and Rodriguez told Plaintiff that the extension was because of his "performance issues." (Am. Compl. 24 at ¶ 7). Plaintiff was unaware of any performance issues because he had allegedly been told "numerous of times [sic] that [he] performed [his] job duties beyond expectations and [his] attendance was perfect, unlike others on probation and ... their probation wasn't extended." (Am. Compl. 24 at ¶ 7). Plaintiff also complained about his "coworkers not getting along with one another" at this time. (Am. Compl. 24 at ¶ 7). In response, Rodriguez told Plaintiff, "You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around." (Am. Compl. 24 at ¶ 7). Plaintiff alleges that at the time, Warrington added, "Why don't you just go back to Trinidad to live since you['re] always complaining about what we do here?" (Am. Compl. 15). When Plaintiff told Wambaugh about this interaction, she told him that "the Employer would have fired [him]," and

only had not because Plaintiff "had ADHD, [and] they did not want any complaints." [13] (Am. Compl. 24 at ¶ 7). Plaintiff ultimately completed his probationary period in April 2017. (Am. Compl. 24 at ¶ 7).

### *4. Plaintiff Grows Increasingly Suspicious of His Coworkers and Others.*

***4** Plaintiff alleges that one to two months into his employment (in December 2016 or January 2017), Plaintiff "complained numerous times about coworkers making false statements and claims in order to get [him] fired and sabotage [his probation]." (Am. Compl. 24 at ¶ 5). Between 2017 and 2018, Plaintiff "repeatedly complained to Caesar that Rodriguez" was trying to get him "disciplined or fired." (Am. Compl. 24 at ¶ 8). Caesar's response was that Plaintiff should "not worry about it." (Am. Compl. 24 at ¶ 8). Plaintiff does not state who else, if anyone, tried to get him fired or what statements Rodriguez or others made.

On three occasions between late 2018 and April 1, 2019, Plaintiff complained to Rodriguez and Caesar that "some full-time coworkers seemed to be manipulating students and student-workers to do illegal things, who worked in the library, to look at [him] and treat [him] in a different or suspicious way." (Am. Compl. 25 at ¶¶ 10–12). Plaintiff also complained about Chris Crowe, a Union Representative (who also allegedly lived with Speizale), engaging in this behavior. (Am. Compl. 25 at ¶ 11). Plaintiff further complained that on multiple occasions he was being "stalked" by coworkers and students, and mistreated by students, staff, and professors. (Am. Compl. 25 at ¶ 13). This included allegations that: (1) "students came into the library and pointed and laughed at [Plaintiff]"; (2) students "were recording [Plaintiff]"; and (3) a student bumped into him and another student recorded the incident, "almost as if to catch [Plaintiff] doing something to the student who bumped [him]." (Am. Compl. 25 at ¶ 13). Plaintiff verbally reiterated these complaints to Rodriguez and Caesar for the next two months. (Am. Compl. 25 at ¶ 14). Rodriguez and Caesar did not escalate the complaints; rather, Caesar called Plaintiff "paranoid." (Am. Compl. 25 at ¶ 14). Plaintiff also complained to Wambaugh, who told Plaintiff that there was "no grievance[s] that could be filed about [his] coworkers, students, and professors doing this to [him]." (Am. Compl. 25 at ¶ 14).

At some unspecified time, Plaintiff alleges that he complained to Wambaugh about his coworkers stalking him, sabotaging his work, and making derogatory comments to him. In response, Wambaugh allegedly said, "they just don't like you" and "they don't have to be nice to you." (Am. Compl. 9). Wambaugh did not file a grievance about Plaintiff's complaint. (Am. Compl. 9).

Plaintiff filed formal written complaints about the above actions in June and July 2019 to Rodriguez and Caesar, which complaints were then forwarded to Human Resources ("HR"). (Am. Compl. 25–26 at ¶ 15). Plaintiff did not feel comfortable discussing the matter with HR, however, because he "believed[d] that management was involved in the mistreatment." (Am. Compl. 26 at ¶ 15). Around this time, Plaintiff also complained to Wambaugh that: (1) a new student coworker was stalking Plaintiff; and (2) Caesar was dating a coworker who was harassing Plaintiff. [14] (Am. Compl. 26 at ¶¶ 16, 17). Wambaugh said that the Union could not file a grievance about the stalking, and that the Union and NYU knew about Caesar's relationship, but "there was nothing that could be done." (Am. Compl. 26 at ¶¶ 16, 17). A few weeks later, Rodriguez took over Caesar's role as circulation manager and Caesar began working in HR. (Am. Compl. 26 at ¶ 18).

"At around the same time," Plaintiff alleges "that [his] electronic devices and personal, NYU email accounts and other accounts had been hacked by the Employer." [15] (Am. Compl. 26 at ¶ 19). Plaintiff believes he was hacked because on one occasion Plaintiff could not log into his NYU email, and on another occasion, he "learned that an NYU VPN had been created with [his] work ID and password" when he was not at work. (Am. Compl. 26 at ¶ 19).

***5** After moving apartments in July 2019, Plaintiff alleges that NYU was sending people to stalk his whereabouts. [16] (Am. Compl. 26–27 at ¶ 20). In response to Plaintiff's complaints about this behavior, Warrington told Plaintiff "that [he] was paranoid," and Wambaugh "asked [Plaintiff] what this had to do with the Union." (Am. Compl. 27 at ¶ 20). Wambaugh did not file a grievance. (Am. Compl. 27 at ¶ 20). Plaintiff alleges, however, that after he complained about the stalking, "the Employer changed [his] address in its system back to [his] old address in the Bronx" even though he "never gave them [his] Queens address, but [he] ha[s] mailings from the Union [a]nd NYU with [his] Queens [a]ddress." (Am. Compl. 27 at ¶ 21).

At some unspecified time, Plaintiff told Rodriguez that he was having sleeping issues. (Am. Compl. 28 at ¶ 26). Plaintiff then


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

alleges that in July or August 2019, Rodriguez recommended that Plaintiff receive treatment from his psychiatrist regarding his sleeping issues. [17] (Am. Compl. 38 at ¶ 72).

### 5. *Plaintiff Arrives at Work Late and Takes Time Off.*

On September 30, 2019, Rodriguez told Plaintiff that he noticed Plaintiff had been "late a couple times" and warned Plaintiff that if it continued he would be "disciplined." (Am. Compl. 27 at ¶ 23). Plaintiff responded that he "always got to the desk on time, as per [his] schedule, to deal with library patrons," but Rodriguez said that "didn't matter." (Am. Compl. 27 at ¶ 23). Plaintiff told Rodriguez "that other employees had more late arrivals than [he] did, [and] were not disciplined," but Rodriguez "told [Plaintiff] not to worry about other workers." (Am. Compl. 27 at ¶ 23). Plaintiff expressed to Rodriguez that he was "going through a lot," including that he was being stalked to and from work, his devices were being hacked, and he was "traumatized by the harassment at work." [18] (Am. Compl. 27 at ¶ 23). Rodriguez suggested that Plaintiff apply for FMLA leave. [19] (Am. Compl. 27 at ¶ 23). Plaintiff alleges that he applied for FMLA leave in early October 2019. (Am. Compl. 28 at ¶ 25).

At another unspecified time, Plaintiff received "troubling texts" from a number he believes was "pretending to be someone else in [his] contacts." (Am. Compl. 28 at ¶ 26). The texts made "derogatory statement[s], [20] "question[ed]" whether Plaintiff was actually sick, and "stat[ed] that [his] meds are the reason [he] can't get any sleep." (Am. Compl. 28 at ¶ 26). Plaintiff intimates that Rodriguez is the unidentified sender because he told Rodriguez he was not getting any sleep "because of the ongoing harassment from NYU." (Am. Compl. 28 at ¶ 26).

***6** In early October 2019, Plaintiff took some sick days. (Am. Compl. 28 at ¶ 27). On October 12, 2019, Plaintiff's coworker, Freddie Olivia, approached Plaintiff, "put [him] in a chokehold from behind," and asked him where he had been the past few days. [21] (Am. Compl. 28 at ¶ 27). Plaintiff told Olivia that he was "concerned" that he was being harassed at work, and also complained that his "work in the Course Reserve Department ... was not being used effectively" because no one would "ever take the books outor [sic] barely." (Am. Compl. 28 at ¶ 27). Plaintiff does not describe what his "work in the Course Reserve Department" entails.

In the days following this interaction, Plaintiff alleges that "faculty members came up to [him] on several occasions and nervously told [him] why they weren't using their Course Reserve items." (Am. Compl. 28 at ¶ 28). Plaintiff also alleges that items were showing up "on [his] account when [he] wasn't doing Course Reserve work." [22] (Am. Compl. 28 at ¶ 28).

### 6. *Plaintiff is Suspended for Fighting at Work.*

On November 1, 2019, Plaintiff alleges that Olivia was "staring over [his] shoulder and following [his] movements." (Am. Compl. 28–29 at ¶ 29). Plaintiff confronted Olivia about this behavior and Olivia responded by "aggressively trying to [i]ncite a fight [with Plaintiff] and [saying], 'So [w]hat's up?!' " (Am. Compl. 29 at ¶ 29). Plaintiff began to walk away when another coworker, Robert Jameson, ran toward Plaintiff and "grabbed and/or pushed [Plaintiff]." (Am. Compl. at 29 ¶ 29). Plaintiff claims to have self-recorded audio of this interaction. (Am. Compl. 29 at ¶ 31).

That same day, Plaintiff was working alongside Adjoa Walker, a student-worker. (Am. Compl. 29 at ¶ 30). Plaintiff repeatedly asked Walker to help him check out customers until Walker began crying. (Am. Compl. 29 at ¶ 30). Plaintiff asked whether Walker was okay, and "suspect[ed] that she was crying because she was torn between harassing and agitating [him], at the request of the Employer, and doing her job." (Am. Compl. 29 at ¶ 30). Later that day, Plaintiff was called to HR where he met with Katie O'Brien, the Assistant Director of HR, and Enrique Yanez, the Director of HR. [23] (Am. Compl. 29 at ¶ 31). The exact order of the following events is unclear:

- O'Brien and Yanez left the room during the meeting because a security guard asked to speak with Plaintiff alone. (Am. Compl. 29 at ¶ 31).
- Plaintiff told the security guard that "[he] had a legal right to union representation if they were going to discipline [him], and that [he] didn't want to start the meeting" without representation. (Am. Compl. 29 at ¶ 31).
- When Plaintiff requested his Union Representative join the meeting, the meeting "was called to an end." (Am. Compl. 29 at ¶ 31).

- The security guard escorted Plaintiff out of the room. (Am. Compl. 29 at ¶ 31).

No grievance was filed by Wambaugh following this incident.[24] (Am. Compl. 29 at ¶ 32).

***7** Plaintiff then alleges a series of HR meetings involving Yanez, O'Brien, Rodriguez and possibly others, but does not coherently state the topic of each meeting or the events at each meeting. (Am. Compl. 30). On November 6, 2019, a meeting was scheduled between Plaintiff, Yanez, O'Brien, and a shop steward to discuss the November 1, 2019 incident with Jameson. (Am. Compl. 29–30 at ¶ 33). Plaintiff sent an audio file of the incident to those present. (Am. Compl. 30 at ¶ 33).

From November 6 to November 19, Plaintiff does not state whether he was working, suspended, or on unpaid leave. On November 14, 2019, Yanez and O'Brien asked to meet with Plaintiff because they "had new information on the case." (Am. Compl. 30 at ¶ 34). Plaintiff responded that he was not comfortable coming to the building because of the "[r]egular harassment [he] had been suffering from NYU", and that he "was under the weather[ ]." (Am. Compl. 30 at ¶ 34). On November 18, 2019, Plaintiff was called into a scheduled meeting via conference call with Wambaugh and O'Brien to discuss a complaint Rodriguez made about Plaintiff "ma[king]" Walker cry. (Am. Compl. 30 at ¶ 35). At the meeting, Plaintiff explained to O'Brien "that [he] just asked the student to help with the long line which is her job." (Am. Compl. 30 at ¶ 35). O'Brien reminded Plaintiff of the policy regarding how many patrons must be present for him to ask for help (which Plaintiff argued was incorrect). (Am. Comp. 30 at ¶ 35). Plaintiff additionally notes that "O'Brien stated that [Rodriguez] said she thinks [Plaintiff] felt guilty about what [he] did to the student, and labeled [his] concerns about the student as 'small talk.' " (Am. Compl. 30 at ¶ 35). At some point, O'Brien sent Plaintiff an email allowing him to return to work the next day. (Am. Compl. 30 at ¶ 36). In this email, Plaintiff was given a "final" warning.[25] (Am. Compl. 30 at ¶ 36). Plaintiff claims that aside from the warning about his attendance, "this is the only warning [he] had ever received." (Am. Compl. 30 at ¶ 36).

On November 19, 2019, Plaintiff returned to work. (Am. Compl. 30 at ¶ 37). Plaintiff "immediately" attended a meeting with O'Brien, Yanez, and Wambaugh at which O'Brien told Plaintiff that he was suspended for three days because [Plaintiff] exhibited threatening and violent behavior."[26] (Am. Compl. 30 at ¶ 36). Plaintiff does not clearly allege whether his suspension was because of the fight with Jameson or his interaction with Walker. (Am. Compl. 30 at ¶ 36). Wambaugh also informed O'Brien "that the Union was filing a grievance over [his] suspension." (Am. Compl. 30 at ¶ 38). The grievance concerned the November 19, 2019 suspension and the final written warning. HR notified Plaintiff on December 9, 2019 that "the November 19 grievance had been closed, and that the Employer was denying the grievance." (Am. Compl. 31 at ¶ 41). (ECF 49-2, Exhibit 2 (November 21, 2019 Step 2 Grievance) at 59).

### *7. Plaintiff Suspects Additional Foul Play from Coworkers.*

On November 30, 2019, Plaintiff recognized an application ("app") on his phone that was also on his NYU work computer, although he claims that *he* never installed the app. (Am. Compl. 31 at ¶ 39).[27]

***8** On December 10, 2019, Plaintiff asked Warrington if he could leave early that day "because [he] wasn't feeling good as [he was] being harassed by [his] coworkers, who were stalking [him]." (Am. Compl. 31 at ¶ 43). Warrington said no. (Am. Compl. 31 at ¶ 43). Rodriguez then asked Plaintiff to attend a meeting with HR. (Am. Compl. 31 at ¶ 43). Plaintiff said he needed Wambaugh to represent him, and the meeting was rescheduled for the next day. (Am. Compl. 31 at ¶ 44). Plaintiff asked to reschedule to either a different time the next day, or to December 16. (Am. Compl. 31–32 at ¶ 44). Neither O'Brien, Yanez, nor Rodriguez responded to this request. (Am. Compl. 32 at ¶ 44).

### *8. Plaintiff's Employment is Suspended at Least a Second Time, and then Terminated.*

Plaintiff does not clearly allege the order of the following events:

- On December 11, 2019, Plaintiff "saw some of the same suspicious Amazon IP addresses."[28] (Am. Compl. 32 at ¶ 47). Plaintiff alleges, however, that one of the "IP addresses" was "traceable to the Massachusetts Institute of Technology, which is an NYU partner [and that] (this IP hacked [Plaintiff's] personal email again on 5/21/20)." (Am. Compl. 32 at ¶ 47).

- At some point between December 10 and 12, 2019, Plaintiff was emailing "multiple parties" about "the harassment and retaliation that was ongoing" when Rodriguez approached Plaintiff and told him he could leave and would be paid for the rest of the time that he was scheduled to work. (Am. Compl. 32 at ¶ 45). Plaintiff again asked Rodriguez the time of the December 11 meeting. [29] (Am. Compl. 32 at ¶ 45). Rodriguez walked away and "about two minutes later [Plaintiff] heard her speaking by the entrance of the circulation Dept and use the words 'black man being aggressive.' " (Am. Compl. 32 at ¶ 45). Fifteen minutes later, two security guards and two NYPD officers arrived at the scene and stated that there was a complaint about Plaintiff "being aggressive, and trespassing." (Am. Compl. 32 at ¶ 45). Plaintiff responded that he worked there and that he was being harassed. (Am. Compl. 32 at ¶ 45). O'Brien cancelled the tentatively set December 11, 2019 HR meeting. (Am. Compl. 32 at ¶ 47).

- Plaintiff states that he was suspended because "the Employer knew, through its control of [his] devices, [he] discovered the Amazon web IP addresses logged into [his] personal and NYU email accounts." (Am. Compl. 32 at ¶ 47).

- Plaintiff asked Wambaugh "how [he] could be suspended without a meeting." (Am. Compl. 32 at ¶ 47).

On December 14, 2019, Plaintiff saw an email regarding his termination effective on December 13, 2019. (Am. Compl. 33 at ¶ 49). The email stated that "[Plaintiff] denied [a] meeting with management and HR ... and that [he] was aggressive and insubordinate ... which required the Employer to call the police to escort [him] out of the building." (Am. Compl. 33 at ¶ 49). Plaintiff alleges that "[his] suspension was converted to a termination because the Employer, having hacked [his] phone, knew that [he] had gone to the doctor to start FMLA leave, which would have given [him] job protection, and also went [to] a lawyer on December 12." (Am. Compl. 33 at ¶ 49).

### *9. Plaintiff Engaged in a Post-Termination Grievance Process.*

On December 19, 2019, Plaintiff asked Wambaugh "how [he] could be terminated without even having the suspension meeting." (Am. Compl. 33 at ¶ 51). Wambaugh told Plaintiff that she would file a grievance about Plaintiff's suspension and termination. [30] (Am. Compl. 33 at ¶ 52). Plaintiff also asked Wambaugh to "file a grievance alleging ADHD discrimination," which Wambaugh said she would do. (Am. Compl. at 33 ¶ 51); (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance)). Plaintiff alleges that he "turned down" severance and unemployment benefits. (Am. Compl. 33 at ¶ 51).

***9** On December 20, 2019, Plaintiff reached out to Wambaugh about the status of his suspension and termination grievances. (Am. Compl. 33 at ¶ 52). Plaintiff requested a grievance be filed about the grievance process along with an ADHD discrimination grievance. [31] (Am. Compl. 34 at ¶¶ 51, 53, 57) On the same day, Peter Lanzo, a New York State United Teachers representative, was assigned to Plaintiff's case. (Am. Compl. 34 at ¶ 54). Plaintiff asked Lanzo to give him access to his NYU email records, [32] which Plaintiff was initially denied because he was "rightfully terminated." (Am. Compl. 34 at ¶ 53); (Am. Compl. 36 at ¶ 62). Lanzo responded that he would speak with NYU regarding the email account access. (Am. Compl. 36 at ¶ 62).

On January 6, 2020, Plaintiff informed Lanzo that the grievances UCATS filed were missing important information; on January 22, 2020, Plaintiff asked that they be corrected. [33] (Am. Compl. 34 at ¶ 56); (Am. Compl. 35 at ¶ 58). The grievances were amended to reflect this missing information [34] on January 23, 2020. (Am. Compl. 35 at ¶ 58).

In May 2020, Plaintiff spoke with Lanzo and Marc Laffer, Lanzo's supervisor, who assured Plaintiff that the grievances were filed on time. (Am. Compl. 36 at ¶ 64). Lanzo and Laffer suggested that Plaintiff start the grievance process without the emails. (Am. Compl. 36 at ¶ 64). Plaintiff does not plead any facts about the grievance process, its timing, or any other details. Plaintiff alleges that he had wanted to set up a meeting with "management," which Lanzo suggested was not a good idea. (Am. Compl. 36 at ¶ 64).

A few days later, Plaintiff received an email from O'Brien asking Plaintiff to confirm a grievance meeting that Lanzo had attempted to schedule. (Am. Compl. 36–37 at ¶ 65). Plaintiff declined the meeting because he did not want to move forward with the meeting without his emails. (Am. Compl. 37 at ¶ 65).

Around the end of May or beginning of June 2020, Plaintiff alleges that he emailed Lanzo alerting him that the grievances were filed late. (Am. Compl. 37 at ¶ 66). Plaintiff alleges that

Lanzo said, "let's see if the employer notices." (Am. Compl. 37 at ¶ 66). Lanzo "took responsibility for the grievances being filed late." (Am. Compl. 37 at ¶ 66).

Plaintiff alleges that his suspension and termination grievances are still open and that the grievances he asked Wambaugh to file were never filed. (Am. Compl. 37 at ¶ 67).

### *10. Plaintiff's Other Factual Allegations*

On or about September 30, 2019, Rodriguez suggested that Plaintiff take FMLA leave. (Am. Compl. 27 at ¶ 23). Plaintiff asked Rodriguez for instructions, and Rodriguez told Plaintiff that he needed "to get certification" from his medical provider. (Am. Compl. 27 at ¶ 23). Wambaugh told Plaintiff the same thing. (Am. Compl. 27 at ¶ 24). Plaintiff also alleges that both Rodriguez and Wambaugh incorrectly gave him FMLA instructions that applied to non-union employees. (Am. Compl. 28 at 17). Plaintiff alleges that he applied for FMLA leave through "Lincoln Financial" in early October, but did not hear anything back for several months. (Am. Compl. 29 at ¶ 25).

***10** On December 12, 2019, Plaintiff was "in the process" of pursuing FMLA leave and visited a health care provider. (Am. Compl. 32–33 at ¶ 48). Plaintiff mentions that he has a diagnosis of ADHD, but that the doctor also "wanted to include a diagnosis of insomnia and major depression," which Plaintiff avers he had "never been tested for or diagnosed with." (Am. Compl. 32–33 at ¶ 48). Plaintiff's medical provider said that he would send Plaintiff's diagnosis to the insurance company so that Plaintiff could pursue FMLA leave. (Am. Compl. 32–33 at ¶ 48). On or about December 24, 2019, Plaintiff called Lincoln Financial to see if they received his FMLA leave request, which they said they did not. (Am. Compl. 34 at ¶ 54).

On December 26, 2019, however, Lincoln Financial notified Plaintiff that his claim had been denied "because [he] was no longer employed."[35] (Am. Compl. 34 at ¶ 54). Then in February 2020, Plaintiff "learned that Lincoln Financial ... without [his] permission, opened up another claim for [him], and approved a leave claim, which [he] wasn't qualified for or asked for ([i]nsurance fraud)." (Am. Compl. 35 at ¶ 61). Through his own research, Plaintiff "learned the FMLA instructions given to [him] by [NYU] and [UCATS] was [sic] in fact incorrect information, which was later confirmed by Lanzo." (Am. Compl. 36 at ¶ 61). Plaintiff confronted Lincoln Financial and NYU. Plaintiff alleges Lincoln Financial apologized; NYU never responded.[36] (Am. Compl. 36 at ¶ 61).

### *11. Plaintiff's Other Allegations of Stalking, Harassment, and Spying.*

Plaintiff alleges that from April 2019 to February 4, 2020, several unidentified individuals had acted on Defendants' behalf to stalk and harass Plaintiff, but does not tie these allegations to any Defendants:

- On February 4, 2020, Plaintiff went to T-Mobile, where the representative helping him engaged in "unusual conversation" and had spent an hour setting up Plaintiff's phone when it should have only taken 10 minutes. (Am. Compl. 35 at ¶ 59).
  - During this interaction, a man with sunglasses standing across the street kept looking at Plaintiff, and got into his car when Plaintiff walked past him. (Am. Compl. 35 at ¶ 59).
- On February 5, 2020, Plaintiff's phone had "the same amazon.com [IP] addresses that were being used by [NYU] in [his] phone[.]" (Am. Compl. 35 at ¶ 59).
- On February 9, 2020, Plaintiff was at a store across from a different T-Mobile store where someone "follow[ed] ... and harass[ed]" him in the store, which other patrons allegedly noticed. (Am. Compl. 35 at ¶ 60).
- Plaintiff's landlord, Tevia Clarke, who is an NYU alumna, has "harass[ed] ... and agitat[ed]" Plaintiff from July 2019 to April 2020, by "hacking [Plaintiff's] electronic devices and taking and/or tampering with ... packages sent to [his] house ... calling [him] 'weird' or stating [he is] crazy ... [and] constantly trying to start arguments in the apartment to get a violent reaction out of [him]." (Am. Compl. 37 at ¶ 68).
  - ***11** Plaintiff alleges that one time he had not been receiving messages from Clarke and when he made her aware of this, "she pressed something on her phone and all of the text messages from her and other people, voicemails came thr[ough] at the exact same time." (Am. Compl. 37 at ¶ 68).
  - On April 27, 2020, Plaintiff alleges "[he] saw Tevia Clarke Verizon IP address in [his] personal VPN

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

account ... which is linked to [his] personal email address and is password protected." (Am. Compl. 37 at ¶ 68).

- Plaintiff alleges that Clarke is being bribed by Defendants to retaliate against him. (Am. Compl. 37 at ¶ 68). To support this allegation, Plaintiff notes that "[he] received mailings from the Union in May 2019 or June 2019, which had the Queens address on it, even though [he] did not move or change [his] address until mid July 2019." (Am. Compl. 37 at ¶ 68). Further, Plaintiff alleges Clarke gave Plaintiff's address to NYU UCATS. (Am. Compl. 37 at ¶ 68).

- Plaintiff alleges that "NYU has been contacting lawyers to either not take or diminish [his] case at[ ]least since December 2019 ... since filing [his] case on 12/18/20." (Am. Compl. 38 at ¶ 74).

- On January 31, 2021, Plaintiff discovered text messages from Cindy Morren (his sister and an NYU student) and his mother, in which Cindy was texting from Plaintiff's phone number through iMessage and "pretending to be [Plaintiff] and pretending to have a good relationship with [his] mother." (Am. Compl. at 38). Plaintiff alleges that his sister got his Apple ID through his ex-girlfriend, who also worked at NYU. (Am. Compl. 38 at ¶ 74).

- Plaintiff alleges that on June 3, 2021, his mother "called mental help officials." (Am. Compl. 39 at ¶ 74). Plaintiff alleges that "[he] was not mentally ill and that she was just trying to harass [him] and deter [him] from making further complaints ...." (Am. Compl. 39 at ¶ 74).

- Plaintiff alleges in 2019-2020, Defendant NYU contacted his psychiatrist Dr. Rudoy "to diminish [his] complaints, and prescribe [him] wrong medication for illness he or his other doctors never diagnosed [Plaintiff] with." (Am. Compl. 39 at ¶ 74). Plaintiff was prescribed the medication in August 2019 following his complaints to Defendant NYU. (Am. Compl. 39 at ¶ 74). According to Plaintiff, Dr. Rudoy did not document any of Plaintiff's complaints and did not tell Plaintiff why. (Am. Compl. 39 at ¶ 74).

## IV. DISCUSSION

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, a plaintiff must plead enough facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). More specifically, the plaintiff must allege enough facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). For a claim to sufficiently "raise a right to relief above the speculative level," it must be grounded on factual allegations. *Twombly*, 550 U.S. at 555. A claim grounded on mere suspicion is not enough to meet this standard. *Id.* " '[L]abels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (internal citation omitted, alteration in original).

***12** As relevant here, a court is "obligated to afford a special solicitude to *pro se* litigants." *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010). Therefore, this Court must interpret Plaintiff's submissions "to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal citations omitted). "However, the liberal treatment afforded to *pro se* litigants does not excuse a *pro se* party 'from compliance with relevant rules of procedural and substantive law.' " *Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (quoting *Maisonet v. Metro Hosp. & Health Hosp. Corp.*, 640 F. Supp. 2d 345, 347 (S.D.N.Y. 2009)). Accordingly, the Court may not "invent factual allegations that a plaintiff has not pled." *Daly v. Westchester Cty. Bd. of Legislators*, No. 19-CV-4642 (PMH), 2021 WL 229672, at *4 (S.D.N.Y. Jan. 22, 2021) (alterations and quotations omitted) (quoting *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010)). Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted). As mentioned, however, the Court may consider facts raised in opposition papers, depending on the circumstances. *Davila v. Lang*, 343 F. Supp. 3d 254, 267 (S.D.N.Y. 2018).

In reaching its conclusions, the Court is aware that issues of fact, credibility, and the weight of the evidence are not properly considered on a motion to dismiss, and the Court has not considered them here. *Hughes v. Ester Co.*, 930 F.Supp.

2d 439, 461–62 (E.D.N.Y. 2013) ("[I]ssues concerning the weight that should be given to this study cannot be resolved on a motion to dismiss....").

### *1. Breach of Duty of Fair Representation*

Plaintiff brings a "hybrid" claim against UCATS and NYU under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and based on a union's duty of fair representation, arising from the National Labor Relations Act ("NLRA"). Liberally construed, Plaintiff alleges that NYU violated the CBA when it discriminated against him, and that UCATS breached its duty of fair representation when it: (1) failed to file grievances on Plaintiff's behalf, and (2) misled Plaintiff about the deadline for filing grievances. (Am. Compl. 12–14).

#### i. Applicable Law

The duty of fair representation arises out of a union's status as the exclusive bargaining agent with the employer. *See Greco v. Commc'ns Workers of Am., Loc.,* 1104, 824 F.Supp. 2d 351, 356 (E.D.N.Y. 2011). Accordingly, the duty requires a labor organization "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild, Inc.,* 525 U.S. 33, 44 (1998) (quotation marks omitted).

It is well established that an employee can sue their employer for breach of a CBA. *Smith v. Evening News Ass'n.*, 371 U.S. 195 (1962). Usually, an employee must exhaust any grievance or arbitration process set forth in the CBA before bringing suit. *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). In *DelCostello v. International Brotherhood of Teamsters*, however, the Supreme Court recognized that such an exhaustion requirement may result in an "unacceptable injustice" when the union representing the employee in these processes acts in "a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation." *DelCostello*, 462 U.S. at 164. In such a case, an employee can sue both the employer and the union, regardless of the grievance or arbitration proceeding. *Id.* In doing so, the plaintiff must allege that the union has breached its duty of fair representation and that the employer has breached its CBA. *Id.* A plaintiff has six months from the time he "knew or should have known of the breach of the duty of fair representation" to bring suit. *See White v. White Rose Food a Div. of DiGiorgio Corp.,* 128 F.3d 110, 114 (2d Cir. 1997).

***13** Breach of duty of fair representation is difficult to plead because "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents," subject to good faith and honesty in exercising its discretion. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953). A breach of this duty only occurs if a union's conduct toward a member of the collective bargaining unit are "shown to have arbitrarily, discriminatorily, or in bad faith foreclosed the employee's opportunities to vindicate such wrong through the grievance process." *Castro v. New York City Bd. of Educ.*, 777 F. Supp. 1113, 1118 (S.D.N.Y.), No. 89-CV-4114 (KTD), *aff'd*, 923 F.2d 844 (2d Cir. 1990). "[M]ere negligence, even in the enforcement of a collective-bargaining agreement, would not state a claim for breach of the duty of fair representation." *United Steelworkers of America, AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 372–73 (1990).

To support allegations of discrimination in a breach of duty of fair representation claim, a plaintiff must plead facts that show a defendant's conduct was motivated by discriminatory animus. *Rivera v. Communications Workers of America*, No. 16-CV-1673, 2017 WL 4338754, at *5 (E.D.N.Y. Sept. 29, 2017). A plaintiff must then allege "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Div. of DiGiorgio Corp.*, 237 F.3d 174, 179 (quoting *Spellacy*, 156 F.3d at 126).

#### ii. Plaintiff's Fair Representation Claims are Time-Barred.

As an initial matter, all of Plaintiff's claims for breach of duty of fair representation are time-barred. This Circuit has established that a plaintiff's duty of fair representation claim accrues "at the latest" by the date of his National Labor Relations Board ("NLRB") charge. *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003) ("His bringing of the NLRB charge establishes that he had actual knowledge of the breach by [the date of his NLRB filing]. It is beyond dispute that his claim had accrued by that date.").

Plaintiff filed an unfair labor practice ("ULP") charge with the NLRB on **June 15, 2020**, alleging that UCATS failed to fairly represent him. (See ECF 65, Ex. 5 (Plaintiff's filed EEOC Charge)). As a matter of law, Plaintiff knew or should have known of UCATS's alleged breach of the duty


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

of fair representation when he filed his ULP. Plaintiff filed his Complaint on **December 18, 2020**. Thus, any alleged breaches that Plaintiff knew or should have known about before **June 18, 2020** (6 months prior to the date of this action), are time-barred. Plaintiff does not argue that this statute of limitations should be tolled. Accordingly, his claim of a breach of duty of fair representation stemming from his June 15, 2020 NLRB charge should be dismissed. *See Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003).[37] Accordingly, I recommend that Plaintiff's claims against UCATS for breach of their duty of fair representation be dismissed. Additionally, because Plaintiff's claims against UCATS are "inextricably interdependent" with his claim against NYU, I recommend that Plaintiff's claim for breach of the CBA against NYU also be dismissed. *See DelCostello*, 462 U.S. at 164; *Tomney v. Int'l Ctr. For Disabled*, 357 F.Supp. 2d 721, 738 ("The Union did not violate its DFR, and so Tomney's claims against [the employer] for violating the CBA are dismissed.").

### *2. Breach of Contract*

***14** Reading the Complaint most liberally, Plaintiff may be seeking to bring additional breach of contract claim(s) against NYU and UCATS. Plaintiff makes references to the "Union" or "Ucats" contract, but does not include any other facts about, or even references to, any other contracts. (Am. Compl. 20) ("WRONGFUL TERMINATION PURUSANT TO ... BREACH OF CONTRACT"); (Am. Compl. 24 at ¶ 5) ("I complained about potential contract violations to the Employer and to the Union ...."); (Am. Compl. 23 at ¶ 4) ("which it states in the Ucats Contract"); (Am. Compl. at 14) ("The Union Contract does not contain a clear and unmistakable waiver of my right to sue.").

NYU is correct that any state-law breach of contract claim Plaintiff brings against NYU is preempted by Section 301 of the LMRA. (ECF 46 at 20). Although the LMRA does not preempt claims for a violation of the CBA, if Plaintiff is claiming that Defendants violated the CBA, those claims are time barred. *See* Section V. *Cunningham v. Local 30, Int'l Union of Operating Eng'rs*, 234 F.Supp.2d 383, 395 (S.D.N.Y. 2002). Similarly, to the extent Plaintiff complains about UCATS's failure to pursue grievances on his behalf, these would be claims for breach of fair duty of representation, addressed in Section 1, *supra*.

### *3. Employment Discrimination*

To state a claim for employment discrimination, a plaintiff must allege that: (i) he is a member of a protected class, (ii) he was qualified for his position, (iii) he suffered an adverse employment action ("AEA"), and (iv) there are facts suggesting an inference of discriminatory motivation.[38] *Littlejohn v. City of N.Y.*, 795 F.3d 297, 311 (2d Cir. 2015). Specifically, Plaintiff must show either that he "suffered an adverse job action under circumstances giving rise to an inference of discrimination on the basis of race, color, religion, sex, or national origin, or ... demonstrat[e] that harassment on one or more of these bases amounted to a hostile work environment." *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (citing *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001)). Similarly, to state a claim for disability discrimination, Plaintiff would need to plausibly allege that (1) Defendants are subject to the relevant statutes; (2) he suffers from a disability within the meaning of the statute; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered an adverse employment action because of his disability.[39]

***15** To survive a motion to dismiss, a plaintiff must allege facts that plausibly suggest that the employer discriminated against him *because of* his race, national origin, or disability. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015). "An inference of discrimination can arise from circumstances including, but not limited to, the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Littlejohn*, 795 F.3d at 312 (internal quotation marks omitted).

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination or retaliation. *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014). The evidence necessary to satisfy this initial burden is "minimal and *de minimis*." *Zimmermann v. Assocs. First Cap. Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (internal quotations omitted). The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for its actions. *Id.* If defendant does so, the burden shifts back to the plaintiff to demonstrate that defendant's reason is merely a pretext for discrimination

or retaliation. *Id.* In other words, the Court only evaluates "pretext" if Plaintiff adequately alleges a *prima facie* case.

Evaluating his claims under those laws, Plaintiff fails to allege that he experienced any adverse employment action under circumstances that give rise to an inference of discrimination. (Am. Compl. 13). Plaintiff complains that: (1) he was unable to take vacations or sick leave for "religious/cultural event[s]" in Trinidad; (2) his seniority was miscalculated resulting in a less convenient schedule; (3) he experienced a "hostile work environment" because he had been subjected to derogatory comments, was "mocked daily," "ostracized," harassed, cyberstalked, and stalked; (4) NYU "retaliated" against Plaintiff for complaining about these events by "wrongfully suspend[ing] [him] twice" and eventually terminating his employment; and (5) NYU failed to provide him reasonable accommodations for his ADHD (Am. Compl. 14). I evaluate all of Plaintiff's claims for discrimination on the basis of race or national origin first, and then turn to Plaintiff's disability discrimination claim.

i. Plaintiff Does not Allege Discrimination on the Basis of Race or National Origin

I evaluate Plaintiff's first two discrimination claims under a disparate treatment analysis, and in the alternative, a disparate impact analysis. *See Gonzalez v. Police Com'r Bratton*, 2000 WL 1191558, at *20 (S.D.N.Y. Aug. 22, 2000) (acknowledging hostile work environment and disparate treatment claims are "distinct" from one another and "require[ ] different pleading and proof"); *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617 n.10 (S.D.N.Y. 2009) ("[I]t bears emphasis that the analysis of adverse employment actions involving disparate treatment claims is different [from] that involving retaliation claims."). Notwithstanding the differences between disparate treatment and retaliation, "[t]he burden of proof in retaliation claims follows the general disparate treatment analysis in *McDonnell Douglas Corp.* ..." *Shah v. New York State Dep't of Civ. Serv.*, 341 F. App'x 670, 673 (2d Cir. 2009).

*a. Plaintiff does not Allege Defendants Had a Full Prohibition on Vacation or Restricted his Sick Leave.*

Plaintiff alleges that in 2017 or 2018, Plaintiff went to a "Religious/Cultural" festival in Trinidad. Rodriguez instructed Plaintiff to use sick leave during his absence and said Plaintiff would not need a doctor's note. (Am. Compl. 10 & 24 at ¶ 8). Plaintiff alleges that he complained that his coworker, Speziale was treated differently because he "gets religious requests approved" while he did not. Upon return, Caesar told Plaintiff NYU "will have to let [him] go if [he doesn't] have a doctor's note" for the time he was out. (Am. Compl. 10). Ultimately, Plaintiff reported that he was sick, produced a doctor's note, and therefore was not terminated for taking his trip[s] to Trinidad. (Am. Compl. 10).

***16** Although it is unclear whether Plaintiff actually lost or was denied vacation time, a loss or denial of vacation time "does not generally rise to the level of an adverse employment action." *Chukwuka v. City of New York*, 795 F.Supp. 2d 256, 261 (S.D.N.Y. 2011); *see Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 272 (E.D.N.Y. 2019). Courts in this District have declined to recognize an employer's denial of a vacation request as an adverse employment action where this denial did not constitute a "complete bar" on a plaintiff's taking vacation. *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("The particular timing of a vacation is not so disruptive that it crosses the line from 'mere inconvenience' to 'materially adverse' employment action."); *see also Roff v. Low Surgical & Med. Supply, Inc.*, No. CV-033655 (SJF) (JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004). Plaintiff here did not allege that NYU completely forbade him from taking vacation; indeed, Plaintiff states at one point that NYU approved Plaintiff's request to go to Trinidad for this event three years in a row. (Am. Compl. 15).

*b. Plaintiff's Seniority Miscalculation Does Not Result in an AEA.*

Plaintiff alleges that he was given a worse work schedule than his coworkers, who were less senior to him. (Am. Compl. 23 at ¶ 4). Plaintiff states that both NYU supervisors and UCATS's representative Wambaugh believed Speizale to be senior to Plaintiff, which Plaintiff disputed. Loss of "seniority" in this context is not an adverse employment action because unfavorable work schedules are not an adverse employment action, and Plaintiff alleges no other ramifications or less favorable treatment because of the seniority miscalculation. *See Antonmarchi v. Consol. Edison Co. of New York*, No. 03-CV-7735, 2008 WL 4444609, at *14 (S.D.N.Y. Sept. 29, 2008) (finding denial of transfer to position with better hours was not an adverse employment action) *aff'd*, 514 F. App'x 33 (2d Cir. 2013); *Daniels v.*

*Connecticut*, No. 12-CV-0093, 2015 WL 4886455, at *8 (D. Conn. Aug. 17, 2015) ("[Plaintiff] also suggests that the ... position is a 'preferred working schedule for officers,' but an unfavorable schedule is not an adverse employment action.") (citing *Albuja v. Nat'l Broad. Co. Universal*, 851 F.Supp. 2d 599, 608 (S.D.N.Y. 2012)).

*c. None of the Alleged Adverse Employment Actions Give Rise to an Inference of Discrimination.*

Even if changes to Plaintiff's vacation time and work schedule were considered adverse employment actions, Plaintiff still does not state a claim for employment discrimination because none of Plaintiff's alleged AEAs —including suspension, termination, and hostile work environment—occurred under circumstances that give rise to an inference in discrimination.[40] "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999). "In order to make such a showing, the plaintiff must compare herself to employees who are 'similarly situated in all material respects.' " *Id.* "Employment characteristics which can support a finding that two employees are 'similarly situated' include 'similarities in education, seniority, performance, and specific work duties.' " *Sollazzo v. Just Salad Rest.*, No. 15-CV-252 (ER), 2018 WL 1273661, at *6 (S.D.N.Y. Mar. 5, 2018) (quoting *DeJesus v. Starr Tech. Risks Agency, Inc.*, No. 03-CV-1298 (RJH), 2004 WL 2181403, at *9 (S.D.N.Y. Sept. 27, 2004)). A plaintiff also "must show that [his] co-employees were subject to the same performance evaluation and discipline standards." *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d. Cir. 2000). While "all material respects" varies, a plaintiff must typically "plead comparators' relevant experience and length of employment in order to raise an inference of discrimination." *LeeHim v. New York City Dep't of Educ.*, No. 17-CV-3838 (PAE), 2017 WL 5634128, at *6 (S.D.N.Y. Nov. 21, 2017).

***17** The Amended Complaint lacks factual allegations to support an infererence that similarly situated non-Black or non-disabled employees were treated differently from Plaintiff. The only comparator Plaintiff alleges is Gary Speizale, who he alleges is white, less senior to him, and gets his holiday vacation time approved. (Am. Compl. 10). Plaintiff conclusorily alleges that Speizale is "similarly situated" to him in "all material respects," and does not identify any other comparator. *Wegmann v. Young Adult Inst., Inc.*, No. 15-CV-3815 (KPF), 2016 WL 827780, at *10 (S.D.N.Y. Mar. 2, 2016) (finding plaintiff was not similarly situated to comparators where she did not plead facts about their positions, responsibilities, tenure, or experiences). Accordingly, the Complaint's conclusory allegations of differential treatment are insufficient to plausibly suggest an inference of discrimination with regard to work schedule or denial of travel to Trinidad. *See id.*; *see also Burgis v. N.Y. City Dep't of Sanitation*, 798 F.3d 63, 68–69 (2d Cir. 2015); *Henry v. NYC Health & Hosp. Corp.*, 18 F.Supp. 3d 396, 408 (S.D.N.Y. 2014).

Similarly, Plaintiff does not allege discrimination under a disparate impact theory. To do so, Plaintiff must allege that his employer "uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(k)(1)(A)(i). This requires: (i) identifying a specific employment practice or policy; (ii) demonstrate that a disparity exists; and (iii) alleging a causal relationship between the two. *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012). To demonstrate a disparity sufficient to withstand a motion to dismiss, plaintiffs must allege statistical evidence or allege that a "neutral employment practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues." *Gordon v. City of N.Y.*, No. 14-CV-6115 (JPO) (JCF), 2016 WL 4618969, at *23 (S.D.N.Y. Sept. 2, 2016).

Plaintiff has not identified any employment practice or policy related to vacation time or his work schedule.[41] *See African Am. Legal Defense Fund v. N.Y. State Dep't of Educ.*, 8 F.Supp. 2d 330 (S.D.N.Y. 1998) (dismissing Title VII disparate impact claim where plaintiff failed to allege any statistics to support allegations that facially neutral hold-harmless provisions had a disparate impact on minorities). Accordingly, I recommend Plaintiff's race and national origin discrimination claims be dismissed.

ii. Plaintiff Fails to Allege a Hostile Work Environment.

To state a claim for a hostile work environment under § 1983, § 1981, Title VII, or the NYSHRL, a plaintiff must allege facts plausibly demonstrating that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive

working environment." *Littlejohn*, 795 F.3d at 320–21 (internal quotation marks omitted). To plead an abusive working environment, a plaintiff must satisfy "both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Id.* at 321 (internal quotation marks omitted). This requires that the incidents be "more than episodic." *Id.* A court "must consider the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotation marks omitted). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." *Bermudez v. City of New York*, 783 F.Supp. 2d 560, 579 (S.D.N.Y. 2011) (citation omitted).

***18** The standards for a union's liability for hostile work environment are different from those governing the liability of an employer. Under Title VII, a union may not "cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e–2(c)(3). To plead union liability, Plaintiff must plead (1) the existence of a hostile work environment, (2) that a union representative caused or attempted to cause the hostile work environment, and (3) that the representative's conduct may properly be imputed to the union. [42] *See Agosto v. Correctional Officers Benevolent Ass'n*, 107 F.Supp. 2d 294, 307 (S.D.N.Y. 2000); *Grandy v. Manhattan & Bronx Surface Transit Operating Auth.*, No. 16-CV-6278 (VEC), 2018 WL 4625768, at *21–22 (S.D.N.Y. Sept. 26, 2018).

*a. Plaintiff Does Not Adequately Allege that NYU or UCATS Stalked or Harassed Plaintiff, or Hacked Plaintiff's Electronic Devices.*

Plaintiff's allegations that he was stalked, harassed, and hacked are conclusory. *Gench v. HostGator.com LLC*, No. 14-CV-3592 (RA) (GWG), 2015 WL 3757120, at *10 (S.D.N.Y. June 17, 2015), *R&R adopted*, No. 14-CV-3592 RA, 2015 WL 4579147 (S.D.N.Y. July 29, 2015) (finding plaintiff's allegations that certain conduct "allow[ed] 'criminal host(s) to steal the site content' ... 'manipulate users' web activity," "lose control of her email account, and [ ] be subject to email spam" conclusory). Plaintiff's allegations here—that numerous people, including T-Mobile employees; Plaintiff's roommate/landlord, psychiatrist, sister, or mother; and/or strangers on the subway were hired by Defendants to stalk and harass him—are wholly unsupported by facts and do not state a claim for a hostile work environment. [43] The Court understands that Plaintiff describes these instances in support of his *belief* that there is an ongoing conspiracy against Plaintiff to create a hostile work environment for him. Plaintiff's beliefs—however strongly he may hold them—are not facts. *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic' or 'delusional.' ") (quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992)); *Tessema v. Env't Prot. Agency*, No. 1:20-CV-9700 (MKV), 2021 WL 2666855, at *4 (S.D.N.Y. June 29, 2021), *appeal dismissed sub nom. Tessema v. United States Env't Prot. Agency*, No. 21-1729, 2021 WL 6427942 (2d Cir. Dec. 16, 2021) (finding that Plaintiff's claims that the EPA has tortured him and subjected him to human experiments involving exposure to hazardous pollutants were "fanciful" in nature and "clearly warrants dismissal"); *Mercier v. Mercier,* No. 07-CV-0523, 2007 WL 1582267, at *1–2 (N.D.N.Y. May 25, 2007) (Kahn, J.); *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss."); *see also Banks v. Mental Health Clinicians,* No. 11–CV–7848, 2012 WL 6201259, at *5 (S.D.N.Y. Dec. 11, 2012) (granting motion to dismiss where the plaintiff alleged that the defendants were deliberately indifferent when they exacerbated the plaintiff's suicide risk by transferring him to a special unit for mentally ill inmates, finding, *inter alia*, that Plaintiff did not state facts that supported his bald allegation that Plaintiffs acted with "punitive intentions") (internal quotation marks omitted).

***19** Additionally, Plaintiff has failed to allege sufficient facts from which one could reasonably conclude that the alleged hostile conduct was *because of* Plaintiff's membership in protected classes. *See Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558 (JMF), 2021 WL 918770, at *5 (S.D.N.Y. Mar. 10, 2021).

*b. Plaintiff Does Not Adequately Allege Discriminatory Comments That Rise to a Hostile Work Environment.*

Plaintiff also does not plead sufficient facts to support a hostile work environment claim against NYU (and therefore

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

UCATS) arising from allegedly discriminatory comments because the conduct about which Plaintiff complains is not severe or pervasive.[44] *See* *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d at 99. Plaintiff alleges he was subject to several derogatory statements and was "ostracized," stalked, harassed, and hacked at work. (Am. Compl. 20). *See also* Am. Compl. 22 ("was labeled a criminal, threatening, violent, aggressive, unprofessional all which are racial sterotypes[sic]/profiles for person(s) of [A]frican descent"); Am. Compl. 20 ("Management and my coworkers would say things like 'why don't you go back to your country since you keep complaining', or 'you don't fit the culture here.' "); Am. Compl. 24 at ¶ 7 (" 'You don't fit the culture here, You have to fit the culture, you got another chance, you better not mess it up this time around' "); Am. Compl. 15 ("Why don't you just go back to Trinidad to live since [you're] always complaining about what we do here."); Am. Compl. 32 at ¶ 45 (Rodriguez used the words 'black man being aggressive' "); Am. Compl. 11 ("subjected to numerous disparaging comments from 4/2/19 to 12/10/19").

Because Plaintiff's Complaint is at times vague and repetitive, I cannot discern for many of the claims the speaker, context, or frequency of these comments. Accordingly, Plaintiff fails to state a claim for hostile work environment based on the comments identified here.

iii. Plaintiff Does not Adequately Allege Retaliation.

To establish a claim of retaliation under § 1981, Title VII and the NYSHRL, Plaintiff must allege facts that plausibly suggest that: (i) he participated in protected activity, (ii) he suffered an adverse employment action, and (iii) there was a causal connection between his engaging in the protected activity and the adverse employment action.[45] *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010); *see also Wilson*, 2021 U.S. Dist. LEXIS 45132, at *13.

***20** Liberally construing the Complaint, Plaintiff claims that he was suspended and fired for seeking to file grievances (or otherwise complaining) about mistreatment in the workplace. *See* Am. Compl. 12 ("[Plaintiff has] complained about a hostile workplace, Harassment, Retaliation, Discrimination and my complaints were either wrongfully labeled as meritless or I was deceitfully told they were filed when they were not.").[46] It is well settled that filing "[a] union grievance can constitute protected activity if it concerns discrimination, but union grievances that complain of matters other than discrimination do not constitute protected activity for purposes of Title VII." *Chidume v. Greenburgh-N. Castle Union Free Sch. Dist.*, No. 18-CV-01790 (PMH), 2020 WL 2131771, at *4 (S.D.N.Y. May 4, 2020) (quoting *Mack v. Paris Maint. Co. Inc.*, No. 14-CV-6955, 2016 WL 8650461, at *9 (S.D.N.Y. Feb. 22, 2016), *R&R adopted*, No. 14-CV-6955, 2016 WL 1071030 (S.D.N.Y. Mar. 17, 2016)).

Plaintiff does not adequately allege that he engaged in protected activity. Although Plaintiff alleges that coworkers made racially charged comments to him, Plaintiff does not provide facts about when he sought to file a grievance for this conduct, or for any other **discriminatory conduct** that he endured based on his race or national origin. Although Plaintiff sought to file many grievances with UCATS, in the majority of the alleged instances, Plaintiff only states that UCATS did not or could not file a grievance—not that he sought to file a grievance because of discrimination on the basis of race or national origin. (Am. Compl. 24 at ¶ 4); (Am. Compl. 25 at ¶ 14); (Am. Compl. 9); (Am. Compl. 26 at ¶ 17); (Am. Compl. 27 at ¶ 20); (Am. Compl. at 30 ¶ 32). Only on three occasions does Plaintiff plead slightly more. Specifically, Plaintiff alleges that: (1) Defendants "maliciously misled [him] into thinking the grievances were filed when they weren't" so that both parties could avoid a breach of a duty of fair representation claim (Am. Compl. 9); (2) Wambaugh "did not file a grievance for racial discrimination, which *she should have known* to [do because] she had the audio evidence" of the fight between Plaintiff, Olivia, and Jameson (Am. Compl. 29 at ¶ 32) (emphasis added); and (3) UCATS violated their duty of fair representation in May 2020 because some grievances UCATS allegedly filed were "not actual grievances and lack sig[ ]natures by all parties." (ECF 68). Plaintiff does not allege any facts that suggest UCATS's decision not to file a grievance for Plaintiff was motivated by discriminatory animus.[47] Accordingly, I recommend that Plaintiff's Retaliation claim be dismissed.

iv. Plaintiff's Disability Discrimination Claim Fails.

Plaintiff does not adequately plead disability discrimination under the ADA, the NYCHRL or the NYSHRL. Plaintiff does not allege that the Defendants are subject to the ADA, that he was in fact disabled under the ADA, or that he suffered an adverse employment action under circumstances giving rise to an inference of disability discrimination.[48]

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

***21** A person has a "disability" within the meaning of the ADA if he has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;" or if he is (C) "regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working," 29 C.F.R. § 1630.2(i). Plaintiff has not alleged that his ADHD has impacted him in any way. [49]

Moreover, Plaintiff does not plead any facts that support his allegation that Defendants denied him any reasonable accommodation. To state a claim for failure to accommodate, "a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations." *Howard v. United Parcel Serv., Inc.*, 101 F. Supp. 3d 343, 352 (S.D.N.Y. 2015), *aff'd sub nom. Howard v. United Parcel Serv.*, 648 F. App'x 38 (2d Cir. 2016). Here, Plaintiff merely restates the legal standard that employer generally have a duty to accommodate employees with disabilities and checks a box that the Defendants denied him accommodations. (Am. Compl. 5, 14). This is conclusory and insufficient.

Although Plaintiff's November 21, 2019 Step 2 Grievance states that he "was discriminated against based on having a disability," his supporting reasons include that he was "stalked, bullied, harassed[ ], character defamed, privacy breached," among other things. (ECF 49-3 at 3). As addressed above, these allegations are fanciful and should be dismissed. *Gallop*, 642 F.3d at 368 (2d Cir. 2011). Accordingly, I recommend that the Court dismiss Plaintiff's disability discrimination claims.

### *4. FMLA Interference*

Plaintiff believes that UCATS and NYU violated the FMLA because they denied his initial claim, but then approved an FMLA application for Plaintiff that Plaintiff claims he never made. These allegations do not support a claim for FMLA violations against either defendant. To state an FMLA interference claim, Plaintiff must establish: (i) that he is an eligible employee under the FMLA; (ii) that the defendant is an employer as defined by the FMLA; (iii) that he was entitled to take leave under the FMLA; (iv) that he gave adequate notice to the defendant of his intention to take leave; **and** (v) that he was denied benefits to which he was entitled under the FMLA. *See Graziadio v. Culinary Institute of America*, 817 F.3d 415, 424 (2d Cir. 2016).

Plaintiff's claim against UCATS fails because Plaintiff has not (and cannot) allege that UCATS is an "employer" within the meaning of the FMLA. *Eckert v. United Auto. Workers Loc. Union 897*, No. 04-CV-538S, 2005 WL 2126295, at *9 (W.D.N.Y. Sept. 1, 2005) (concluding that a union that represented plaintiff's interests and acted on his behalf "relative to [Plaintiff's] employment" is "precisely the opposite" of an employer under the FMLA); *see also Latella v. Nat'l Passenger R.R. Corp. (Amtrak)*, 94 F. Supp. 2d 186, 190 (D. Conn. 1999) (rejecting an argument for breach of duty of fair representation against a union for "not advising him of his rights under the FMLA" because "no private right of action exists for a violation of the FMLA's notice requirements against an employer or a union."). Accordingly, Plaintiff's FMLA claim is not applicable against UCATS, and I recommend that it be dismissed.

***22** Plaintiff's claim against NYU also fails. Plaintiff does not allege any facts that identify how NYU interfered with his FMLA rights or resulted in a denial of Plaintiff's benefits. Plaintiff alleges that he applied for FMLA leave in early October 2019, after a September 30, 2019 conversation between Plaintiff and Rodriguez. (Am. Compl. 28 at ¶¶ 23, 25). Plaintiff also alleges that on December 12, 2019 he visited a doctor in "pursu[it] [of] FMLA leave." (Am. Compl. 32–33 at ¶ 48). Plaintiff does not allege whether the FMLA leave he was pursuing in December 2019 was a part of the same request or not. Plaintiff's operative complaint is devoid of any allegations regarding his FMLA process for the two months immediately preceding Plaintiff's termination. NYU terminated Plaintiff's employment on December 13, 2019. (Am. Compl. 33 at ¶ 49). At most, Plaintiff alleges that Rodriguez "deliberately" gave him "the wrong Fmla [sic] request instructions ... which interfered with [his] FMLA rights entitlement." (Am. Compl. 17).

NYU is correct, however, that failure to provide notice of the terms of the FMLA, "where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act," is insufficient to state a cause of action. *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 162 (2d Cir. 1999). Plaintiff makes the conclusory statement that Rodriguez's and Wambaugh's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

errors "interfered with [his] FMLA rights entitlement," but does not allege how being provided non-union employee instructions affected Plaintiff's pursuit of FMLA leave when he knew that he was a union employee. (Am. Compl. 17). Because of conflicting and incoherent allegations, I cannot discern from Plaintiff's pleadings: (1) what Rodriguez's FMLA instructions were; (2) when he requested FMLA leave; or (3) any October 2019 request was approved or denied. Accordingly, I recommend that Plaintiff's FMLA interference claim be dismissed.

***5. Conspiracy under Section 1985(3).***

Plaintiff fails to assert a § 1985 claim against both defendants for the same reason: he fails to allege any facts that suggest either defendant acted in agreement with anyone, or acted with an intent to deprive Plaintiff of any of his rights under the law. As stated in Section VII, Plaintiff also does not allege that any party acted with discriminatory animus.

To state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons to the equal protection of the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privileges of a citizen of the United States." *Trautz v. Weisman,* 819 F. Supp. 282, 290 (S.D.N.Y. 1993). The conspiracy must further be "motivated by 'some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.' " *Cuoco v. U.S. Bureau of Prisons*, No. 98-CV-9009 (WHP), 2001 WL 167694, at *3 (S.D.N.Y. Feb. 16, 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). The claim must be pleaded with "at least some degree of particularity ... [to] establish the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Gropper v. Fine Arts Housing, Inc.*, 12 F. Supp. 3d 664, 671 (S.D.N.Y. 2014). This requires "establish[ing] the existence of an agreement among the defendants to deprive [the plaintiff] of his constitutional rights." *Id*. (quoting *Roach*, at 147 (2d Cir. 1999). An explicit agreement is not necessary but may be shown through a "general conspiratorial objective" among the participants in the conspiracy. *LeBlanc-Sternberg v. Fletcher,* 67 F.3d 412, 427 (2d Cir. 1999) (quoting *Snell v. Tunnell,* 920 F.2d 673, 702 (10th Cir. 1990)). A plaintiff must further allege that the defendant's "overt acts ... were reasonably related to the promotion of the claimed conspiracy." *Id.* (quoting *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999)). In making this claim, a plaintiff must adequately allege "the most fundamental aspect of a conspiracy: an agreement." *Gropper,* 12 F. Supp. 3d at 671. The Court will not simply infer an agreement from violations of the laws because that would essentially "permit every civil rights case to become a civil rights conspiracy case, which the Second Circuit has rejected in analogous contexts." *Id.* at 671.

***23** Plaintiff alleges that he complained to UCATS about the hostile work environment he experienced, but UCATS told him his concerns were meritless, or told Plaintiff they filed grievances when they had not. (Am. Compl. 9, 12). Defendants' "dishonesty," Plaintiff alleges, is a "clear sign of a conspiracy to deprive [him] of [his] rights." (Am. Compl. 12). While Plaintiff was upset by UCATS's responses that they either would not or could not file a grievance for some of the events about which Plaintiff complained, Plaintiff does not allege sufficient facts to withstand a motion to dismiss. Plaintiff fails to state any facts with particularity that suggest UCATS and NYU employees worked *in concert* (either totally within UCATS, totally within NYU, or some combination of UCATS and NYU) to *deprive* Plaintiff of his constitutional rights.

Plaintiff's allegations are limited to conclusory statements. Complaints that state "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Maack v. Wyckoff Heights Med. Ctr.*, No. 15-CV-3951 (ER), 2017 WL 4011395, at *8, (S.D.N.Y. Sept. 11, 2017); *see also Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) ("A court may dismiss a claim as 'factually frivolous' if the sufficiently well-pleaded facts are 'clearly baseless'—that is, if they are 'fanciful,' 'fantastic.' or 'delusional.' ") (quoting *Denton v. Hernandez*, 504 U.S. 25, 32-33 (1992). Evidence to support a conspiracy may be "when, where or with whom an unlawful agreement was made" or "any specific acts performed in furtherance of the alleged unlawful agreement. *Almonte v. Florio*, No. 02-CV-6722 (SAS), 2004 WL 60306, at *5 (S.D.N.Y. Jan. 13, 2004). None of that is present. Plaintiff does not adequately allege that UCATS or NYU acted in furtherance of a conspiracy to deprive him of his constitutional rights because his allegations are conclusory. As discussed, the Complaint does not adequately allege that NYU or UCATS's actions were motivated by a racial animus. *Blue v. City of New York*, No. 14-CV-7836 (VSB), 2018 WL 1136613, at *16 (S.D.N.Y. Mar. 1, 2018). Accordingly, I

recommend that Plaintiff's § 1985 claim against UCATS be dismissed.

### *6. Civil Rights Violation Under Civil Rights Law Section 79-n.*

Civil Rights Law § 79-n creates a cause of action against anyone who "summons a police officer ... without reason to suspect a violation of the penal law, any other criminal conduct, or an imminent threat to a person or property," "because of a belief or perception regarding," *inter alia*, race or disability. Civil Rights Law § 79-n. To state a claim under CRL § 79-n, a plaintiff must allege that a defendant (1) intentionally committed, (2) damage to a person or property, (3) 'because of a belief or perception regarding [that person's] ... [protected characteristic].' " *Le v. Triza Elec. Corp.*, No. 19-CV-5134 (ARR) (PK), 2020 WL 1274977, at *3 (E.D.N.Y. Mar. 16, 2020). Section 79-n does not provide a remedy "where existing discrimination laws already provide protection, such as in employment ... decisions. Unless a plaintiff could show bias-related violence or intimidation in the hiring ... decision ... [they] could not bring an action under this new section." *Governor's Approval Memorandum*, No. 7, ch. 227, filed with Assembly Bill Number 529.

Plaintiff's Section 79-n claim fails because of the availability of other statutory remedies in the employment context. Even if it did not, Plaintiff would still fail to state a claim. Plaintiff alleges that Rodriguez "falsely summoned" an NYPD officer "to arrest [him] and or escort [him] out for criminal trespassing" as he was writing an email about the hostile work environment he was experiencing. (Am. Compl. 12 at ¶ 6). Rodriguez is not a defendant in this action. [50] Even if this behavior extended to NYU, Plaintiff does not assert that NYU intentionally threatened Plaintiff *because of* his protected characteristics. [51] As best as I can discern, Plaintiff alleges that he was suspended on or before December 11, 2019 because NYU knew, "through its control of [Plaintiff's] devices," that Plaintiff knew NYU hacked his devices. (Am. Compl. 32 at ¶ 47). By Plaintiff's own account, his employment was suspended, and his supervisor suggested he leave. When he did not leave, he overheard Rodriguez say, "black man being aggressive" and NYPD officers appeared to "arrest [him] for criminally trespassing." [52]

### *7. Negligent Infliction of Emotional Distress.*

***24** Plaintiff brings claims against both NYU and UCATS for negligent infliction of emotional distress ("NIED"). Plaintiff alleges that he experienced emotional distress because of the "employment discrimination" he experienced at NYU. (Am. Compl. 13).

As an initial matter, Plaintiff's NIED claim against NYU is barred by the exclusivity provisions of the New York Workers' Compensation Law ("WCL"). *See* N.Y. Work. Comp. Law § 11. The WCL provides the exclusive remedy for an employee who is injured "by the negligence or wrong of another in the same employ." *Rivera v. Baccarat, Inc.*, No. 95-CIV-9478 (MBM), 1996 WL 251850, at *4, (S.D.N.Y. May 10, 1996). WCL precludes Plaintiff from recovering from claims of NIED that arise out of workplace conduct. *D'Annunzio v. Ayken, Inc.*, 25 F. Supp. 3d 281, 294 (E.D.N.Y. 2014); *Stevens v. New York*, 691 F. Supp. 2d 392, 397 (S.D.N.Y. 2009); *see Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (finding negligence claim for hostile work environment barred by exclusivity of workers compensation). While the Court is sympathetic to Plaintiff's distress, Plaintiff's allegations arise out of alleged workplace conduct. Accordingly, the claim is barred by the WCL and must be dismissed.

Plaintiff's NIED claim against UCATS also fails. First, while Plaintiff makes this claim against "NYU **and UCATS**" (Am. Compl. 25 at 13), he does not provide facts that support any allegation that UCATS as an entity or a UCATS employee did anything that would support a claim for negligent infliction of emotional distress. (Am. Compl. 25 at 13–14). While Plaintiff alleges that he was being stalked and is experienced a hostile work environment (allegations that appear to be targeted at NYU, not UCATS), these allegations are conclusory. *See Goodrich v. Long Island R.R. Co.,* No. 10 Civ. 2195 (SAS), 2010 WL 2473593, at *1, (S.D.N.Y. June 17, 2010) (following Plaintiff's coworker posting on a public bulletin board his positive HIV status, Plaintiff withdrew his NIED claim, conceding he " 'was never placed in fear of imminent bodily harm, nor did he ever suffer any physical impact' "). To the extent Plaintiff is alleging UCATS acted negligently by failing to file grievances for Plaintiff, as discussed, UCATS has wide discretion in those decisions, and Plaintiff does not adequately allege that they abused their discretion. *See supra* Section 1.

### V. Conclusion and Recommendation

For the reasons stated above, I recommend that the Motion be **GRANTED**. Although *pro se* complaints should generally be given leave to amend when there is "any indication that a valid claim might be stated," *Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002), amendment may be denied upon a finding of futility. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 271–72 (2d Cir. 1996). I do not recommend that Plaintiff be given leave to amend his conspiracy claim because his allegations, even liberally construed, are still fanciful and factually frivolous. *See Kraemer v. City of New York*, No. 19-CV-6671 (VEC), 2020 WL 1974204, at *4 (S.D.N.Y. Apr. 24, 2020) ("While the Court has no basis to doubt the sincerity of Plaintiff's beliefs, the allegations exhibit a level of delusional paranoia that makes the continuation of this vexatious litigation an unjustified expenditure of public and private resources.") (finding Plaintiff's allegations of coordinated efforts by police, AMC movie theaters, T-Mobile, Starbucks, NYU and others to "surveil, mock, and harass Plaintiff" frivolous). Similarly, because Plaintiff's fair representation claims are time-barred, leave to amend would also be futile.

***25** Because Plaintiff is proceeding *pro se*, however, I recommend that he be given **one final opportunity** to replead only his **Discrimination Claims for Hostile Work Environment and Retaliation, and his FMLA Claims,** and that he be directed to file a proposed second amended complaint within 30 days of Your Honor's final disposition of this motion. To the greatest extent possible, Plaintiff's amended complaint must allege facts to support that his claims, including:

(1) Identifying the NYU or UCATS employees, if any, who engaged in the specific discriminatory conduct; and

(2) Identifying and describing the specific acts by the NYU or UCATS employees that constitute discriminatory acts.

### VI. Objections

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days (including weekends and holidays) from receipt of this Report to file written objections. *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). A party may respond to any objections within fourteen (14) days after being served. Such objections, and any responses to objections, shall be addressed to the Honorable J. Paul Oetken, United States District Judge. Any requests for an extension of time for filing objections must be directed to Judge Oetken.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983). If Plaintiff wishes to review, but does not have access to, cases cited herein that are reported on Westlaw, she should request copies from the Defendants. *See Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009).

Defendants are directed to serve a copy of this Report and Recommendation on Plaintiff by mail and file proof of service on the docket within seven days. Alternatively, if circumstances related to the ongoing COVID-19 pandemic prevents their service, they must file a letter on the docket instead.

### All Citations

Not Reported in Fed. Supp., 2022 WL 1666918

## Footnotes

1 The case was reassigned earlier this year to Judge Oetken.

2 I reviewed ECF 40, Plaintiff's Proposed Second Amended Complaint, and do not find that Plaintiff's Proposed Second Amended Complaint alleges additional facts that would have been material to this Report & Recommendation.

3 Plaintiff alleged on October 7, 2021 that NYU was continuing to retaliate against him by sending the “answer to [his] complaint to his old address.” (ECF 65 at 1). NYU filed an Affirmation and a “true and correct copy of the confirmation that Defendant's Motion to Dismiss papers were delivered” to Plaintiff's address listed on the docket. (ECF 71).

4 For purposes of deciding the Motion, the Court accepts as true all facts alleged by Plaintiff, *see* *Krassner v. 2nd Ave Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007), and draws all inferences in the Plaintiff's favor. *See* *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003).

5 To reduce the likelihood of confusion, all citations to the Amended Complaint reference PDF page numbers, ranging from one (1) to thirty-nine (39) (the entirety of ECF 25 in one PDF). Plaintiff did not include paragraph numbers until page 22. Accordingly, citations to the Amended Complaint on or after page 22 will also include paragraph citations.

6 Plaintiff does not identify or define “management,” nor does he identify subsequent work reviews at which he was informed he was performing adequately.

7 Plaintiff does not identify these individuals nor does he detail any incidents in connection with this complaint.

8 Management also asked that Plaintiff not wear his coat/jacket while working, even though he was cold, because the security guard had complained about the way “it looked” on Plaintiff. (Am. Compl. 23 at ¶ 3).

9 Plaintiff does not allege whether Speizale was in fact senior to him, nor does he allege why his supervisors and union representative thought Speizale was senior to Plaintiff. Plaintiff also does not allege facts about other similarly situated coworkers and their work schedules.

10 Article 34 of the CBA governs the Grievance and Arbitration Procedure with UCATS. (ECF 49-1, CBA at 27).

11 Plaintiff alleges extremely similar facts occurred in 2018. (Am. Compl. 10). It is unclear whether these facts are for the same event in 2017 and Plaintiff misstates the date, or whether this is a different event entirely.

Plaintiff alleges that in 2018, he asked Rodriguez for unpaid time off to attend a “religious holiday,” and his request was denied. (Am. Compl. 10). Plaintiff “brought up the fact that Gary Speizale gets his religious requests approved” but Plaintiff was told “to worry about [himself].” (Am. Compl. 10). Plaintiff alleges that Rodriguez told Plaintiff to “call out sick for those days,” and told Plaintiff that he would not need a doctor's note. (Am. Compl. 10). Plaintiff followed Rodriguez's suggestion and upon returning, Caesar told Plaintiff that he had abused sick days and NYU “will have to let [him] go if [he doesn't] have a doctor's note.” (Am. Compl. 10). Plaintiff alleges that he reported he was sick, produced a doctor's note, and therefore was not terminated. (Am. Compl. 10).

Plaintiff does not allege any additional facts about what Rodriguez advised him to do regarding his sick time and the festival, what doctor he saw, or what sickness, if any, he experienced.

12 Plaintiff does not identify “they,” or whether “they” were supervisors.

13 Plaintiff does not provide any facts about when or to whom he disclosed his ADHD disability. He also does not plead the original length of his probationary period.

14 Plaintiff does not identify any of these individuals.

15 Plaintiff alleges that he “heard people in the library discussing videos [he] had watched, or things on [his] social media [ac]counts and email accounts and electronic devices, that no one but [Plaintiff] should have

knowledge of." (Am. Compl. 26 at ¶ 19). He also alleges that "Amazon web IP addresses [were] popping up on [his] phone and laptop that weren't there before." (Am. Compl. 26 at ¶ 19).

16 Plaintiff said that "[he] noticed people on the train looking at [him], standing next to [him], raising their phones at [him] as if they were recording [him], stomping in front of [him], and engaging in other activity that [he] viewed as an effort to agitate [him]. [He] suspected that the Employer was involved in this because it was the same behavior [he] was experiencing at the library [a]nd only started after [his] initial complaints." (Am. Compl. 27 at ¶ 20).

17 Plaintiff alleges "[t]he meds the psychiatrist prescribed [Plaintiff], shouldn't have been prescribed, as [he] wasn't diagnosed with any of the ailments [that mandated] the medication." (Am. Compl. 38 at ¶ 72). Plaintiff further alleges that the psychiatrist had omitted all of his "confessions of the stalking from NYU" and other misconduct by Defendants but Plaintiff does not say why the psychiatrist did this. (Am. Compl. 38 at ¶ 72).

18 Plaintiff does not identify or describe specific acts that he believes constitute harassment other than the stalking and hacking events, and specific arguments and altercations, described in this section and Section III.11.

19 At this meeting, Rodriguez asked Plaintiff to sign "the verbal warning," but Plaintiff said he wanted to speak with a Union representative first. (Am. Compl. 27 at ¶ 23). Rodriguez then "shredded the verbal warning she asked [Plaintiff] to sign." (Am. Compl. 27 at ¶ 23).

20 The text messages stated "[N _ _ _ S] are not even human no more" and accused Plaintiff of being "involved in 'a whole lot of gang shit.' " (Am. Compl. 28 at ¶ 26).

21 Plaintiff thinks NYU "was using Olivia to spy on [him] to see why [he] wasn't at work." (Am. Compl. 28 at ¶ 27).

22 Plaintiff further "suspect[ed] that this was all part of the Employer's campaign to retaliate against [him]." (Am. Compl. 28 at ¶ 28). Plaintiff does not explain the nature of his "Course Reserve" work, the relevance or significance of his conversations with these faculty members, or how these alleged facts constitute retaliation.

23 Plaintiff does not "recall if they told [him] that it was because of the incident with Freddy [O]livia, but in the event they didn't, [he] understood that was what the meeting was about, because it was the only incident that happened that day." (Am. Compl. 29 at ¶ 31).

24 Plaintiff alleges that Wambaugh "should have known to file a grievance" for "racial discrimination," for him, since she "had the audio evidence" of the fight with Jameson. (Am. Compl. at 29 ¶ 32).

25 Plaintiff does not explain what the "final warning" threatened. Plaintiff states that he told O'Brian that "[he] didn't understand how [he] was getting a final warning and suspension, when [he] had audio of the incident which proves that [he] didn't threaten or touch anyone." (Am. Compl. 30 at ¶¶ 36–38).

26 It is unclear whether this was a new suspension, or a continuation of another suspension.

27 Plaintiff additionally notes that on December 9, 2019, his "phone(s) had been installed as a modems [sic]," (Am. Compl. 31 at ¶ 41), but Plaintiff does not explain what this means.

28 Plaintiff does not explain, and the Court cannot discern, the significance of the "suspicious Amazon IP addresses."

29 Plaintiff does not allege the purpose of the December 11 meeting with the Union and Human Resources. This meeting was previously scheduled for December 10, 2021, where Plaintiff requested Human Resources be present, and Human Resources rescheduled it. (Am. Compl. 31 at ¶ 43).

30 Plaintiff also asked Wambaugh about "the final warning grievance, and the Employer's failure to respond to the information request in time." (Am. Compl. 33 at ¶ 51). Plaintiff does not clarify what information he sought and whether any information was conveyed by Wambaugh.

31 Plaintiff alleges that Wambaugh told Plaintiff that she was not going to file the ADHD discrimination grievance and that she had not known that Plaintiff had ADHD. (Am. Compl. 33–34 at ¶ 52).

32 Plaintiff wanted his NYU emails because he sought proof that Defendants were being dishonest about the grievances they filed. (Am. Compl. 13). Plaintiff suggests that Defendants withheld his emails so that he "wouldn't have proof during arbitration." (Am. Compl. 13).

33 Plaintiff also had intended to file a grievance about the grievance process, which Lanzo allowed, but Wambaugh said was not done. (Am. Compl. 33 at ¶ 51); (Am. Compl. 34 at ¶ 57).

34 The amended document shows the provision violated changed from "Article 5 – No Discrimination and all other Articles that apply" to "Article 37 – Health and Safety." The nature of grievance was further amended from "Mr. Morren was discriminated against based on having a disability" to "The university failed in its obligation and policy's [sic] to maintain a healthy and safe working conditions [sic]." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance) (Amended 1/22/2020 Step 1 Grievance)).

35 Plaintiff further alleges:

> "[T]hey said I requested FMLA while I was employed, they said that was false. Lincoln Financial also informed me that their point of contact at the Employer was Enrique Yanez. NYU, between the 24th and the 26th, how did they get in contact with Enrique Yanez, At home on his personal time? [A]nd, I note that Yanez is not the person who handles leave claims at NYU. As such, I believe that my claim was denied because the Employer is retaliating against me." (Am. Compl. 34 at ¶ 54).

36 Plaintiff then alleges:

> "I believe that the approval of the short-term claim was part of the Employer's retaliation against me. I also believe that the Employer was engaged in a conspiracy with my doctor to retaliate against me, which led to medical malpractice, doctoring of my medical records, and prescribing me with medication for ailments I was not diagnosed with, which causes suicide and other life threatening diseases. Maliciously [i]nciting a suicide attempt is attempted murder." (Am. Compl. 36 at ¶ 61).

37 Allegations about Wambaugh allegedly giving Plaintiff the "incorrect FMLA leave Request Instructions (Am. Compl. at 6), and UCATS' failure to file a grievance—all of which occurred before June 18, 2020 (Am. Compl. at ¶¶ 7, 9, 14–16, 17, 20, 37–38, 40, 41) (Am. Compl. at 6)—are time barred.

Even if these claims were not time-barred, however, Plaintiff has not alleged any facts that support his claim that UCATS declined to file grievances on Plaintiff's request *with an improper intent, purpose, or motive.* Without any supporting facts, this assertion is conclusory, and insufficient to state a claim for breach of the duty of fair representation. *See* *Stoner v. Walsh,* 772 F. Supp. 790, 806–07 (S.D.N.Y. 1991) (Mukasey, J.). Where Plaintiff alleges slightly more, the allegations are still conclusory and circular, and should be dismissed.

38 Employment discrimination claims under Section 1981 and the NYSHRL are analyzed under the same framework as Title VII. *McGill v. University of Rochester*, 600 F. App'x 789, 790 (2d Cir. 2015). "[C]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing the

NYCHRL's provisions broadly in favor of discrimination [to] plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (internal quotation marks omitted). "[T]o state a claim for discrimination under the NYCHRL, a plaintiff must only show differential treatment of any degree based on a discriminatory motive; 'the NYCHRL does not require either materially adverse employment actions or severe and pervasive conduct.' " *Carter v. Verizon*, No. 13-CV-7579 (KPF), 2015 WL 247344, at *5 (S.D.N.Y. Jan. 20, 2015) (quoting *Gorokhovsky v. N.Y.C. Hous. Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014)).

39 Aside from the NYSHRL and NYCHRL having a broader definition of "disability," "[t]he standard for pleading a claim for disability discrimination under the NYSHRL and the NYCHRL is virtually identical to the ADA." *Marquez v. Starrett City Assocs.*, 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017).

40 Indeed, "[b]eing forced to endure a hostile work environment is one type of adverse employment action." *Dietrich v. City of New York*, No. 18 CIV. 7544 (CM), 2020 WL 4226591, at *16 (S.D.N.Y. July 23, 2020).

41 While Plaintiff alleges that he sought to file a grievance about the grievance process, he does not allege any facts about the process and procedure for filing grievances, or how the process was allegedly different for him due to his membership in a protected class. (Am. Compl. 34–35 at ¶ 53, 57).

42 The case law governing a union's liability for hostile work environment under the NYSHRL and NYCHRL is less clear. Most cases, however, hold that NYSHRL and NYCHRL claims against a union "are subsumed by the duty of fair representation when the gist of the claim is the failure to represent the plaintiff in a fair and non-discriminatory manner." *Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16-CV-4779, 2017 WL 2345658, at *7 (E.D.N.Y. May 30, 2017) (collecting cases).

43 Generally, an employer is not liable as a matter of law for harassment resulting "from nonwork-related, off-duty interactions between co-employees, because those actions are not part of the work environment." *See Devlin v. Teachers' Ins. & Annuity Ass'n of Am.,* No. 02-CV-3228 (JSR), 2003 WL 1738969, at *2 (S.D.N.Y. Apr. 2, 2003) (granting the defendant's motion for summary judgment on the plaintiff's sexual harassment claim because, *inter alia,* the plaintiff's co-worker's acts occurred at a bar outside of work hours) (quotation & citation omitted).

44 To the extent any part of Plaintiff's claims under the NYSHRL fall under the less demanding NYCHRL standard, his claims also fail for the reasons discussed herein. The burden to state a claim under the NYCHRL is somewhat less demanding, requiring the plaintiff to allege: (i) that the plaintiff was "treated less well than other employees;" and (ii) that such treatment was because of the plaintiff's protected class. *Wilson v. JPMorgan Chase Bank, N.A.*, No. 20-CV-4558, 2021 U.S. Dist. LEXIS 45132, at *13 (S.D.N.Y. Mar. 10, 2021).

45 Plaintiff must also establish these elements under the NYCHRL, except that instead of an adverse employment action, he need only prove that "something happened that would be reasonably likely to deter a person from engaging in protected activity." Wilson, 2021 U.S. Dist. LEXIS 45132, at *20.

46 Even though Plaintiff has not pleaded a *prima facie* case for discrimination that would, under *McDonnell Douglas*, shift the burden to Defendants to provide a legitimate non-discriminatory reason for Plaintiff's suspension and termination, Plaintiff nonetheless acknowledges that NYU's proffered reasons for his suspensions and termination were because of Plaintiff's interpersonal conflicts with coworkers. (Am. Compl. 30 at ¶ 37, 38).

47 In fact, only Plaintiff's January 16, 2020 Grievance Form states that Plaintiff "was discriminated against based on having a disability." (ECF 49-2, Exhibit 3 (January 16, 2020 Step 1 Grievance). The Grievance does not reference Plaintiff's race or national origin, at all.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

48 Among other things, Plaintiff neither pleads when he made his employer aware of his ADHD nor how his ADHD is related to any alleged adverse employment action.

49 Even if Plaintiff has a disability under the broader NYSHRL definition in light of his ADHD diagnosis (ECF 65-7 at 1), it is unnecessary for me to evaluate this since Plaintiff fails to allege any adverse employment action giving rise to an inference of disability discrimination. *See* *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05-CV-5109 (JCF), 2007 WL 1149979, at *19 (S.D.N.Y. Apr. 18, 2007), *aff'd sub nom.* *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943 (2d Cir. 2008).

50 Plaintiff does not allege any facts involving UCATS and the Court cannot discern any Civil Rights § 79-n claim against them.

51 As Defendants point out, at least one court has dismissed a Section 79-n claim because it was brought against an organization and not an individual. *Morrison v. Shalach*, 67 Misc. 3d 451, 457, 124 N.Y.S.3d 512 (N.Y. Sup. Ct. Westchester Cty. 2020).

52 Plaintiff compares his experience to that of his coworkers Speizale and Wambold, who he alleges could come into the building "on their days off," use the workstations, and were "never asked to leave" or have NYPD "called to arrest them for criminally trespassing. (Am. Compl. 32 at ¶ 46). But Plaintiff's comparison falls short in this instance because Plaintiff was not given a day off when he was told to leave—he had already been suspended from working at NYU.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 1665013
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Darwyn M. MORREN, Plaintiff,
v.
NEW YORK UNIVERSITY, et al., Defendant.

20-CV-10802 (JPO)
|
Signed 05/25/2022

**Attorneys and Law Firms**

Darwyn M. Morren, Westbury, NY, Pro Se.

Jessica Rose Schild, Robert Mossman Tucker, Ogletree, Deakins, Nash, Smoak & Stewart, P.C., New York, NY, for Defendant.

ORDER ADOPTING REPORT AND RECOMMENDATION

J. PAUL OETKEN, District Judge:

***1** *Pro se* Plaintiff Darwyn M. Morren sues New York University and UCATS Local 3382 under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981; the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*; the Labor Management Relations Act, 29 U.S.C. § 185; 42 U.S.C. § 1985; the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 *et seq*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*, the New York City Human Rights Law, N.Y. City Admin. Code § 8-101 *et seq*; and New York Civil Rights Law § 79-n. Plaintiff also brings claims for breach of contract and negligent infliction of emotional distress. (*See* Dkt. No. 25 (“Am. Compl”); Dkt. No. 25-1 (“Pl.'s Memo”) 4-14.) Defendants have each moved to dismiss the amended complaint for failure to state a claim. (*See* Dkt. No. 47 (“UCATS Mot.”); Dkt. No. 53 (“NYU Mot.”).) In a report and recommendation, Magistrate Judge Ona T. Wang has recommended that Defendants' motions to dismiss be granted. (*See* Dkt. No. 76 (“R. & R.”) at 49.)

Plaintiff objects to the report and recommendation only on the grounds that (i) he did not file a motion to amend his complaint; (ii) he did not receive Defendants' motions to dismiss; and (iii) UCATS Local 3882 did not process his grievances. (*See* Dkt. No. 79 (“Pl.'s Objections”) at 1-2.) In reviewing a report and recommendation, a district judge “must determine de novo any part of the magistrate judge's disposition that has been properly objected to.” Fed. R. Civ. P. 72(b). In reviewing a *pro se* party's submissions, the court is “obligated to afford a special solicitude,” *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010), so such submissions are read “to raise the strongest arguments that they suggest,” *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam).

Plaintiff's objections here are without merit. Magistrate Judge Wang's report and recommendation concerns Defendants' motions to dismiss the amended complaint, not any motion to further amend the complaint. (*See* R. & R. at 49.) Defendants filed these motions on ECF, and Plaintiff had consented to the electronic service of court documents through ECF. (*See* Dkt. No. 3.) Finally, Plaintiff does not meaningfully contest that his claims against UCATS Local 3882 relating to the failure to process his grievances are time-barred. Plaintiff brings a claim that UCATS breached its duty of representation, but a plaintiff has only six months to bring suit from the time he “knew or should have known of the breach of the duty of fair representation.” *White v. White Rose Food a Div. of DiGiorgio Corp.*, 128 F.3d 110, 114 (2d Cir. 1997). Such a claim accrues “at the latest” by the date of a National Labor Relations Board (“NLRB”) charge. *Kovowras v. N.Y. Times Co.*, 328 F.3d 50, 55 (2d Cir. 2003). Plaintiff filed an unfair labor practice charge with the NLRB on June 15, 2020. (*See* Dkt. No. 49-5 (“NLRB Charge”).) In that charge, he alleged that UCATS failed to fairly represent him. (*See id.* at 2.) Plaintiff had until December 15, 2020, to bring suit, but he did not do so. (*See* Dkt. No. 1 (“Compl”).) Accordingly, even if Plaintiff's allegations are true, his claim must be dismissed.

***2** The remainder of the report and recommendation is adopted in full. Where there is no objection, a district court reviews for clear error. *See* Fed. R. Civ. P. 72(b), Advisory Committee's Notes (1983) (“When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.”); *see also* *Borcsok v. Early*, 299 F. App'x 76, 77 (2d Cir. 2008). Magistrate Judge Wang's thorough and well-reasoned report presents no errors, clear or otherwise.

For the foregoing reasons, Plaintiff's objections are overruled and Judge Wang's Report and Recommendation (Dkt. No.

76) is ADOPTED in full. Defendants' motions to dismiss are GRANTED. Further, for the reasons explained by Judge Wang, Plaintiff is granted leave to amend his discrimination claims for hostile work environment and retaliation and his FMLA claims, provided that he must file a proposed second amended complaint repleading those claims within thirty days after the date of this order.

The Clerk of Court is directed to close the motions at Docket Numbers 47 and 53.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2022 WL 1665013

End of Document © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 11438085
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ted PERRY, Plaintiff,
v.
COUNTY OF WESTCHESTER, Defendant.

Case No. 06-CV-3000 (KMK)
|
Signed 03/31/2008

**Attorneys and Law Firms**

Pamela D. Hayes, Esq., Law Office of Pamela D. Hayes, Esq., New York, New York, Counsel for Plaintiff.

Stuart E. Kahan, Esq., Oxman Tulis Kirkpatrick Whyatt & Geiger, LLP, White Plains, New York, Counsel for Defendant.

OPINION AND ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

***1** On April 19, 2006, Plaintiff Ted Perry ("Plaintiff") filed this employment discrimination suit against Defendant County of Westchester ("Defendant"). Before the Court is Defendant's Motion for Summary Judgment, seeking dismissal of Plaintiff's Complaint. For the reasons stated herein, Defendant's Motion is GRANTED.

## I. Background

### A. Employment and Disciplinary History

The following facts are undisputed, except where indicated. Plaintiff, an African-American man, began his employment with Defendant in June 1988 as a seasonal laborer in the Department of Parks Recreation and Conservation. (Def.'s Revised Statement of Material Facts Pursuant to Local Civil Rule 56.1(a) ¶¶ 1-2 ("Def.'s 56.1 Stmt"); Pl.'s Revised Counter-Statement of Material Facts Pursuant to Local Rule 56.1(b) ¶¶ 1-2 ("Pl.'s 56.1 Stmt").) Shortly thereafter, in July 1988, Plaintiff was promoted to a full-time Maintenance Laborer, Grade IV. (Def.'s 56.1 Stmt ¶ 3; Pl.'s 56.1 Stmt ¶ 3.) In 1992, Plaintiff was promoted to the position of Maintenance Mechanic II, Grade VII. (Def.'s 56.1 Stmt ¶ 4; Pl.'s 56.1 Stmt ¶ 4.)

Later, in 1993, Plaintiff's title was reclassified to the position of Housekeeper, Grade VII. (Def.'s 56.1 Stmt ¶ 5; Pl.'s 56.1 Stmt ¶ 5.) The titles of two other employees – Roger Emery ("Emery") and John Ponce ("Ponce"), both of whom are Caucasian – were also reclassified to Housekeeper, but, unlike Plaintiff, these employees filed a union grievance regarding this reclassification. (Def.'s 56.1 Stmt ¶¶ 6-7; Pl.'s 56.1 Stmt ¶¶ 6-7.) Emery and Ponce were successful in their grievance and had their positions reclassified to Maintenance Mechanic. (Def.'s 56.1 Stmt ¶ 8; Pl.'s 56.1 Stmt ¶ 8; Aff. of Stuart E. Kahan, Ex. H ("Kahan Aff.").)

In the fall of 1995, Plaintiff was suspended for approximately sixty days without pay in connection with an altercation between Plaintiff and a co-worker. (Def.'s 56.1 Stmt ¶¶ 9-12; Pl.'s 56.1 Stmt ¶¶ 9-12; Kahan Aff., Ex. J.) Plaintiff was soon thereafter reassigned to the Division of General Maintenance in November 1995. (Def.'s 56.1 Stmt ¶ 13; Pl.'s 56.1 Stmt ¶ 13.) Years later, in 2000, Plaintiff was reassigned to Croton Point Park, and in 2001, Plaintiff was again reassigned to the Bronx River Parkway Reservation, where he reported to superintendent Robert Bates ("Bates"). (Def.'s 56.1 Stmt ¶¶ 21-22; Pl.'s 56.1 Stmt ¶¶ 21-22.)

Plaintiff was issued a warning notice by Bates on May 14, 2002 for "refus[ing] to do the work assigned to him and [for leaving the] work site without permission." (Def.'s 56.1 Stmt ¶ 23; Pl.'s 56.1 Stmt ¶ 23.) On October 24, 2002, Bates issued to Plaintiff another warning notice, citing Plaintiff for "time abuse." (Def.'s 56.1 Stmt ¶ 25; Pl.'s 56.1 Stmt ¶ 25.) According to Plaintiff, on November 8, 2002, he missed several hours of work to answer a jury summons in the Bronx County Courthouse. (Def.'s 56.1 Stmt ¶ 26; Pl.'s 56.1 Stmt ¶ 26.) Plaintiff alleges that on the following work day, November 12, 2002, Bates reprimanded Plaintiff for attending jury duty and told him that his pay would be docked for the time missed. (Def.'s 56.1 Stmt ¶ 27; Pl.'s 56.1 Stmt ¶ 27.) [1] Defendant claims that Plaintiff's time was never docked for jury duty (Def.'s 56.1 Stmt ¶ 28), but Plaintiff insists that it was (Decl. of Pl. Ted Perry in Opp'n to Def.'s Mot. for Summ. J. ¶ 14 ("Pl.'s Decl.") ). On November 25, 2002, Plaintiff was issued another warning notice, this time for taking time off on November 18, 2002, though he had already used up all of his available time. (Kahan Aff., Ex. Y.) Plaintiff, however, denies missing work on November 18, 2002, and insists that this warning notice was actually for the time he missed

attending jury duty. (Pl.'s Decl. ¶ 14.) Yet more warning notices were issued to Plaintiff on December 30, 2002, for failing to produce a driver's license, and on January 24, 2003 and January 27, 2003, for calling in sick with no sick leave balance. (Kahan Aff, Ex. AA, BB.)

***2** On May 2, 2003, Plaintiff injured his back while working, which he did not report until May 5, 2003. (Def.'s 56.1 Stmt ¶¶ 34-35; Pl.'s 56.1 Stmt ¶¶ 34-35.) Also on May 5, Plaintiff was issued a warning notice for inappropriate conduct and insubordination. (Kahan Aff., Ex. DD.) That was the last day Plaintiff went to work. Plaintiff was issued two more warning notices, on May 8, 2003 and May 9, 2003, both for failing to report to work and failing to call in. (Def.'s 56.1 Stmt ¶ 37; Pl.'s 56.1 Stmt ¶ 37.) Thereafter, Plaintiff began collecting worker's compensation and social security disability benefits. (Def.'s 56.1 Stmt ¶ 39; Pl.'s 56.1 Stmt ¶ 39.) Defendant officially terminated Plaintiff's employment on October 28, 2004. (Def.'s 56.1 Stmt ¶¶ 44-45; Pl.'s 56.1 Stmt ¶¶ 44-45.)

B. Plaintiff's Allegations of Discrimination

Plaintiff alleges that Defendant discriminated against him on the basis of race in violation of Title VII of the Civil Rights Act of 1964 and of the Civil Rights Act of 1866, 42 U.S.C. § 1981. Plaintiff claims that he was subjected to disparate treatment and a hostile work environment when he was forced to work out-of-title – while his Caucasian co-workers were not – from 1995 through May 5, 2003, performing dangerous and undesirable tasks that had no relationship to his job duties and that ultimately resulted in his back injury. (Compl. 3-4, 7-8.)[2] Further, Plaintiff asserts that, from 1999 to 2003, he was subjected to a hostile work environment when he was disciplined for minor infractions, while Caucasian employees were not disciplined for the same or worse behavior. (*Id.* 3.) One incident highlighted by Plaintiff is alleged to have taken place in November 2002, when Plaintiff claims to have had his pay docked for attending jury duty. Plaintiff asserts that Caucasian employees – in particular, Jason Aubry ("Aubry") – were never docked pay for attending court appearances. (*Id.* 4-5, 7.)

In sum, Plaintiff alleges that:

> Plaintiff has continually been disciplined and treated in a disparage [sic] fashion, due to his race. He was forced to work out of title since 1995 when he was required to perform tasks which had no relationship to his duties. He was docked for performing legitimate duties, such as jury duty, all the while white employees were given time off to go to court. He was disciplined, while other white employees were not disciplined for the same or worse behavior. Said discrimination occurred solely because of Plaintiff's race, and amounted to a hostile environment.

(*Id.* 1-2.)

C. Procedural History

On October 5, 1999, Plaintiff filed a complaint alleging harassment on account of his race with the Westchester County Equal Employment Opportunity/Affirmative Action Office ("EEO/AAO"). (Def.'s 56.1 Stmt ¶ 14; Pl.'s 56.1 Stmt ¶ 14.) In February 2000, the EEO/AAO determined that there existed no evidence of racial discrimination or harassment, and in May 2000, the EEO/AAO closed its file on Plaintiff's complaint. (Def.'s 56.1 Stmt ¶¶ 15-16; Pl.'s 56.1 Stmt ¶¶ 15-16.) Plaintiff filed a complaint dated June 2, 2000 with the Equal Employment Opportunity Commission ("EEOC"), alleging racial discrimination and retaliation premised on a continuing violation spanning from August 2, 1999 to April 14, 2000. (Def.'s 56.1 Stmt ¶ 17; Pl.'s 56.1 Stmt ¶ 17.) In June 2001, the EEOC issued to Plaintiff a Dismissal and Notice of Rights Letter, in which it "adopted the findings of the State or Local Fair Employment Practices Agency that investigated this charge." (Def.'s 56.1 Stmt ¶ 19; Pl.'s 56.1 Stmt ¶ 19.) Plaintiff never filed a lawsuit in connection with these claims. (Def.'s 56.1 Stmt ¶ 20; Pl.'s 56.1 Stmt ¶ 20.)

***3** On August 11, 2003, Plaintiff filed another complaint alleging discrimination with the New York State Department of Human Rights ("NYSDHR"). (Def.'s 56.1 Stmt ¶ 40; Pl.'s 56.1 Stmt ¶ 40.) In this complaint, Plaintiff claimed that he had been treated disparately by Defendant due to his race from 1999 until May 5, 2003, and that he had been assigned undesirable tasks at work since 1999. (Kahan Aff., Ex. GG.) The NYSDHR determined on September 28, 2005, that there existed no probable cause to support Plaintiff's allegations of discrimination. (Def.'s 56.1 Stmt ¶ 42; Pl.'s 56.1 Stmt ¶ 42.) On January 17, 2006, the EEOC issued to Plaintiff a Dismissal

and Notice of Rights letter. (Def.'s 56.1 Stmt ¶ 43; Pl.'s 56.1 Stmt ¶ 43.)

Plaintiff initiated the present lawsuit on April 19, 2006, alleging: (i) employment discrimination in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e-5(f) (Compl. 8); and (ii) racial discrimination in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (*id.* 6). Discovery closed on January 3, 2007. On February 26, 2007, Defendant filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b), seeking summary judgment in its favor on the following grounds:

> (a) portions of plaintiff's complaint are time barred pursuant to the 300 day limitations period set forth [in] 42 U.S.C. § 2000e-5(e); (b) plaintiff may not seek damages due to his termination from employment since plaintiff failed to exhaust administrative remedies; (c) the plaintiff has failed to make out a prima facie case of racial discrimination via disparate treatment since the plaintiff cannot prove that he was subjected to an adverse employment action or that a reasonable inference of racial discrimination can be reached based upon defendant's actions; (d) assuming that plaintiff has met the minimal requirements for a prima facie case of racial discrimination, the County presented a race neutral reason for its employment decisions regarding [Plaintiff] and the plaintiff cannot prove that the County's actions were mere pretext; (e) the plaintiff's claim based upon the existence of a hostile work environment must be dismissed because there is no evidence that such an environment existed; and (f) plaintiff's Section 1981 claim must be dismissed.

(Def.'s Mem. of Law in Supp. of Def. County of Westchester's Mot. for Summ. J. 1-2 ("Def.'s Mem.").)

Plaintiff did not file opposition papers by the March 12, 2007 deadline set by Judge Colleen McMahon, to whom this case was originally assigned. On June 28, 2007, Judge McMahon issued an order, stating: "Plaintiff's opposition was due March 12, 2007. The court has not received any response. Plaintiff has 30 days to file a response to the motion. If no response has been filed, the motion will be deemed submitted and the court will decide it without benefit of any response." (Docket No. 27.) Plaintiff failed to file opposition papers within the thirty-day deadline set by Judge McMahon on June 28, 2007. On August 6, 2007, the case was reassigned to this Court. Plaintiff finally filed opposition papers on August 22, 2007 – without explanation as to the delay or permission from the Court to do so. The Court held oral argument on March 11, 2008. For reasons stated herein, Defendant's Motion for Summary Judgment is GRANTED.

## II. Discussion

### A. Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also* *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See* *Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See* *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) ); *see also* *McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted) ).

***4** The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990); *see also Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006). A court's goal should be to "isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323-24.

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Though district courts must pay careful attention to affidavits and depositions that may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ); *see also* Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006) (noting the caution with which the Second Circuit reviews the grant of summary judgment in discrimination cases "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions[,]" but stating that "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact" (internal quotation marks omitted) ).

B. Applicable Time Limitations

In its Motion for Summary Judgment, Defendant argues that Plaintiff is not entitled to base his claim on any discrete acts of alleged discrimination occurring before October 14, 2002 because such acts are more than 300 days before Plaintiff's NYSDHR complaint was filed.[3] (Def.'s Mem. 3.) Further, Defendant argues that acts of alleged discrimination that served as the basis of Plaintiff's 1999 complaint with the NYSDHR may not form the basis of Plaintiff's present claim because Plaintiff failed to file suit on those acts within ninety days of the EEOC's June 11, 2001 Notice of Rights letter. (*Id.* 5-6.)

To these arguments, Plaintiff responds that his present claims are not dependent on any discrete acts occurring before those time periods but insists that consideration of past acts is appropriate in demonstrating the existence of a hostile work environment and validating a theory of a continuing violation based on disparate treatment and out-of-title work. (Pl.'s Mem. of Law in Opp'n to Def. County of Westchester's Mot. for Summ. J. Pursuant to Fed. R. of Civ. P. 56(b) 4 ("Pl.'s Mem.") ("These instances provide the Court with a history of how the underlying cause of action came to pass and does not specifically ask for action on events which started years earlier. It merely demonstrates the theory of a continuing violation.").)

***5** The Supreme Court has made clear that discrete acts occurring more than 300 days before Plaintiff filed his complaint with the NYSDHR are not actionable. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the ... 300-day time period after the discrete discriminatory act occurred."). Recently, in *Ledbetter v. Goodyear Tire & Rubber Co.*, the Supreme Court elaborated:

> A new violation does not occur, and a new charging period does not commence upon the occurrence of subsequent nondiscriminatory acts that entail adverse effects resulting from past discrimination. But of course, if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed.... [C]urrent effects alone cannot breathe life into prior, uncharged discrimination....

127 S. Ct. 2162, 2169 (2007)

Acts that were the subject of Plaintiff's 1999 EEO/AAO and EEOC complaints are also not actionable because Plaintiff failed to bring suit on those acts within ninety days from receipt of the EEOC Notice of Rights letter. To the extent that the second right-to-sue letter, dated January 2006, is based on the same facts as the first, Plaintiff cannot complain about those claims in this lawsuit. *See Lo v. Pan Am. World Airways*, 787 F.2d 827, 828 (2d Cir. 1986) (per curiam) (denying claims where second EEOC complaint was based on same facts as earlier lapsed right-to-sue letter). However, the June 2001 right-to-sue letter will not preclude the current suit "to the extent that plaintiff's Complaint is based on allegations in the second [EEOC complaint] which did not appear in the first [EEOC complaint]." *Dahbany-Miraglia v. Queensboro Cmty. Coll.*, No. 03-CV-8052, 2004 WL 1192078, at *7 (S.D.N.Y. May 27, 2004). Time-barred acts will only be considered to the extent that they constitute "background evidence in support of a timely claim." *Morgan*, 536 U.S. at 113 ("The existence of past acts and the employer's prior knowledge of their occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed."); *see also Williams v. British Airways, PLC*, 06-CV-5085, 2007 WL 2907426, at *11 n.20 (E.D.N.Y. Sept. 27, 2007) ("[C]ertain incidents, even if time-barred, 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue.' " (quoting *Morgan*, 536 U.S. at 112) ).

The continuing violation theory is a tolling mechanism that rarely permits recovery for otherwise untimely violations. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 485 F. Supp. 2d 327, 331 (S.D.N.Y. 2007) ("Very few acts qualify as continuing violations, so as to trigger a continuous tolling of the statute of limitations."). A hostile work environment claim is a type of continuing violation based on the "cumulative affect of individual acts," which together constitute "one unlawful employment practice." *See Morgan*, 536 U.S at 115. "It does not matter, for purposes of the [time limitation in the] statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.* at 117; *accord Santiago*, 485 F. Supp. 2d at 331 ("[I]n a hostile work environment case, acts outside the 300 day limit that contribute to an ongoing hostile work environment are actionable under a continuing violation theory."). The Supreme Court, however, has rejected the notion "that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." *Ledbetter*, 127 S. Ct. at 2172.

***6** To the extent Plaintiff is able to establish that there existed a hostile work environment during his employment with Defendant, recovery may be premised even on untimely acts as long as they – in conjunction with timely acts – created a hostile work environment. The Court notes, however, that even if the past acts contributed to a hostile work environment under a continuing violation theory, those acts would not be actionable to the extent that they formed the basis of Plaintiff's 1999 complaint. Plaintiff's opportunity to file suit on those alleged violations has long since passed and no tolling doctrine will revive them at this point. With respect to Plaintiff's disparate treatment claim based on adverse employment actions, Plaintiff can only rely on discrete acts of alleged discrimination occurring within the 300-day period preceding Plaintiff's August 11, 2003 EEOC complaint. *See Morgan*, 536 U.S. at 113.

C. Plaintiff's Request to Supplement the Record

On March 13, 2008, after March 11 oral argument, Plaintiff's counsel submitted to the Court an application to supplement the record with a new affidavit from Plaintiff and with what appears to be the minutes of a meeting held on November 9, 1999.[4] According to Plaintiff's counsel, these additional submissions "clearly show Plaintiff was treated differently, that everyone knew about it ... and [that] Plaintiff was held to a different standard which was discriminatory and caused him to suffer damages." (Letter from Pamela D. Hayes, Esq., to the Court, dated March 17, 2008.) Notably absent from Plaintiff's counsel's recent submissions is an explanation as to why it has taken until now to submit these items to the Court – over a year after Plaintiff's full response to Defendant's Motion was due.

"Under Fed. R. Civ. P. 6(b)(2), the Court has discretion to allow plaintiff to submit new evidence if the Court determines that plaintiff's failure to submit such evidence in a timely fashion 'was the result of excusable neglect.' " *Davidson v. Scully*, 148 F. Supp. 2d 249, 251 (S.D.N.Y. 2001) (quoting *Davidson v. Keenan*, 740 F.2d 129, 132 (2d Cir. 1984) ). "The determination whether neglect is 'excusable' in a particular case rests with the sound discretion of the district court." *Keenan*, 740 F.2d at 132. In making the equitable

determination of whether failure to make a more timely submission of new evidence constitutes excusable neglect, the factors that the Court may consider include: " 'the danger of prejudice' to the non-moving party, 'the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith.' " *Scully*, 148 F. Supp. 2d at 251-52 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395 (1993) ).

Here, the Court has little trouble finding that Plaintiff (or, really his counsel) has failed to meet the excusable neglect burden. The information Plaintiff seeks to add was available to him long ago (over a year) and obviously any first-hand testimony he offers has always been available to him. Moreover, Defendant is plainly prejudiced by the late use of this information as it likely would have been the subject of rigorous inquiry during Plaintiff's deposition and other discovery. Nor is there good faith. Plaintiff's counsel only tendered these new offerings when it was clear that her initial representations were exposed as wholly unsupported by the record as it existed at the time the Motion was fully briefed. Thus, the Court finds the extraordinary delay here to be inexcusable. Therefore, Plaintiff's request to supplement the record with the March 13 submissions is denied.

## D. Plaintiff's Claims of Employment Discrimination

***7** Plaintiff claims he was the victim of employment discrimination. To establish a claim of racial discrimination, Plaintiff must show that either: "(1) an adverse employment action under circumstances giving rise to an inference of discrimination based on race; or (2) harassment on the basis of race that amounts to a hostile work environment." *Williams*, 2007 WL 2907426, at *11 (citing *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) ). Plaintiff asserts claims of racial discrimination based on each of these theories, so the Court will consider them in turn.

### 1. Disparate Treatment Claim & the *McDonnell Douglas* Framework

Title VII of the Civil Rights Act of 1964 makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court's opinion in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish, by a preponderance of the evidence, a prima facie case of racial discrimination. *Id.* Plaintiff's burden in establishing a prima facie case is "de minimis." *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 289 (S.D.N.Y. 2002). However, a party's bald assertions, without more, are insufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegation of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Fair v. Weiburg*, No. 02-CV-9218, 2006 WL 2801999, at *3 (S.D.N.Y. Sept. 28, 2006) ("To avoid summary judgment ... the non-moving party must offer 'some hard evidence' of its version of the facts, not merely rely on conclusory allegations or speculation."); *During v. City Univ. of N.Y.*, No. 01-CV-9584, 2005 WL 2276875, at *4, *8-9 (S.D.N.Y. Sept. 19, 2005) (granting summary judgment on discrimination claim where only evidence was conclusory allegations of plaintiff).

The establishment of a prima facie case gives rise to a presumption of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). At that point, the burden of production (not persuasion) shifts to the defendant "to provide a legitimate, nondiscriminatory reason for [its] decision." *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 49 (2d Cir. 2002) (hereinafter *RECAP*) (citing *Reeves*, 530 U.S. at 142 and *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d. Cir. 1999) ). A defendant's burden in this regard is not high; indeed, a defendant need not prove that it was actually motivated by these legitimate reasons. *See Deravin v. Kerik*, No. 00-CV-7487, 2007 WL 1029895, at *6 (S.D.N.Y. Apr. 2, 2007) (citing *Burdine*, 450 U.S. at 254).

If the defendant makes a satisfactory showing, the presumption of discrimination disappears and the burden shifts back to the plaintiff. *See id.* The plaintiff must then "prove that the defendant[ ] intentionally discriminated against [him] on a prohibited ground." *RECAP*, 294 F.3d at 49. In other words, the plaintiff must show that defendant's "articulated, legitimate, non-discriminatory reasons were

pretextual." *Id.* (internal quotation marks omitted); *accord* *Feingold*, 366 F.3d at 152 ("If the defendant has stated a neutral reason for the adverse action, 'to defeat summary judgment ... the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.' " (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) ) ); *Deravin*, 2007 WL 1029895, at *6 ("The plaintiff 'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " (quoting *Burdine*, 450 U.S. at 254) ).

***8** Under *McDonnell Douglas* and its progeny, the plaintiff has the ultimate burden of proving discrimination, regardless of whether the defendant offers evidence of a legitimate reason for the adverse employment action at issue. *See* *St. Mary's Honor Ctr.*, 509 U.S. at 507; *Burdine*, 450 U.S. at 253; *Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 292 (S.D.N.Y. 2005) (holding that plaintiff ultimately has the burden of proving employer's discriminatory animus to survive summary judgment).

a. Prima Facie Case

A plaintiff may establish a prima facie case of disparate treatment by demonstrating: "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold*, 366 F.3d at 152.

Because Plaintiff is an African-American man, he belongs to a protected class and thereby satisfies the first prong of his prima facie case. Defendant is willing to assume, as is the Court, that Plaintiff was qualified for the position he held while working for Defendant, satisfying the second prong. (Def.'s Mem. 9.) Defendant argues that it is entitled to summary judgment on Plaintiff's discrimination claim because Plaintiff failed to satisfy the third and fourth prongs of his prima facie case.

i. Adverse Employment Action

An adverse employment action is a " 'materially adverse change' in the terms and conditions of employment. To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted). The Second Circuit has "defined adverse employment action broadly to include 'discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand.' " *Lovejoy-Wilson v. Noco Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) ); *accord* *Feingold*, 366 F.3d at 152 ("Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." (internal quotation marks omitted) ).

Plaintiff argues that the following constitute adverse employment actions: (1) the alleged docking of Plaintiff's pay for attending jury duty on November 8, 2002 (Pl.'s Mem. 11); and (2) the out-of-title work Plaintiff was allegedly forced to perform, particularly on May 2, 2003, which led to his back and neck injury and significant loss of earning potential (*id.* 9-11).[5] Defendant argues that neither of these constitutes an adverse employment action. (Def.'s Mem. 10, 12-15.)

***9** Plaintiff alleges that he was docked pay for the several hours of work he missed on November 8, 2002, when he answered a jury summons in Bronx County. (Pl.'s Mem. 11; Compl. 4.) On November 25, 2002, Bates issued to Plaintiff a warning notice, in which Bates wrote: "Mr. Perry has used up all his time and continues to take off. On November 18, 2002 [he] used 3 ½ hrs. [leave without pay]. This is warning no. 2." (Kahan Aff., Ex. Y.)

Defendant argues that Plaintiff was never docked pay for attending jury duty on November 8, 2002, but that he was docked 3.30 hours of pay for being absent on November 18, 2002. In support of this position, Defendant submitted Plaintiff's leave history, which shows that Plaintiff was not docked any time on November 8, 2002, and that he was docked 3.30 hours on November 18, 2002. (Kahan Aff., Ex. W.) Defendant also offered affidavits from Joan Vassari, Defendant's director of personnel, and Bates, Plaintiff's then-supervisor, both of whom swear that Plaintiff was never docked pay for attending jury duty. (Aff. of Joan Vassari ¶ 13 ("Vassari Aff."); Aff. of Robert Bates ¶ 8 ("Bates Aff."); Dep.

of Joan Vassari 11 ("Vassari Dep.") ("[An employee] would never be docked for jury duty.").)

The only evidence in the record that supports Plaintiff's claim that he was docked pay for attending jury duty on November 8, 2002, is his own deposition testimony and his own declaration, in which Plaintiff claims that Bates told him that he would be docked for attending jury duty. (Dep. of Ted Perry 81-82 ("Pl.'s Dep."); Pl.'s Decl. ¶ 14.) Plaintiff swears that he was not absent from work on November 18, 2002, arguing instead that the time he took off for jury service was not docked from his paycheck until the following pay period on November 18, 2002. Plaintiff claims that the November 25, 2002, warning notice was actually for the time Plaintiff missed on November 8, 2002. (Pl.'s Decl. ¶ 14.)

Thus, with regard to whether Plaintiff was docked pay for jury duty, the Court has before it conflicting evidence, giving rise to a factual question suited for a jury. Therefore, construing the evidence in the non-movant's favor, the Court assumes for purposes of this Motion that Plaintiff was docked pay for attending jury duty.

Assuming therefore that Plaintiff's pay was docked for his jury duty service, the next question is whether such a docking of pay qualifies as an adverse employment action; in other words, whether it constitutes a "materially adverse change in the terms and conditions of employment." *See Galabya*, 202 F.3d at 640 (internal quotation marks omitted). For purposes of this Motion, the Court is willing to assume that it does. *See Cunningham v. Consol. Edison Inc.*, No. 03-CV-3522, 2006 WL 842914, at *17 (E.D.N.Y. Mar. 28, 2006) ("[D]ocking of an employee's pay is an adverse employment action."); *see also Hicks v. Baines*, 99-CV-315, 2006 WL 1994808, at * (W.D.N.Y. July 14, 2006) ("The only specific allegations that arguably evince an adverse employment action are the docking of two hours of [one plaintiff's] pay ... and the docking of 15 minutes of [the other plaintiff's] pay...."). Therefore, Plaintiff satisfies the third prong of his prima facie case with respect to the jury duty issue.

Plaintiff argues that he also suffered an adverse employment action when he was forced to work outside of his Housekeeper title – often performing the duties meant for employees with higher pay grades – beginning in 1995. [6] (Pl.'s Mem. 12.) New York State Civil Service Law § 61(2) prohibits out-of-title work by declaring that "[n]o person shall be appointed, promoted or employed under any title not appropriate to the duties to be performed and, except upon assignment by proper authority during the continuance of a temporary emergency situation, no person shall be assigned to perform the duties of any position unless he has been duly appointed, promoted, transferred or reinstated to such position...." New York courts have further defined out-of-title work to encompass situations "when an employee has been assigned ... to perform the duties of a higher grade, without a concomitant increase in pay, frequently, recurrently and for long periods of time." *Sprague v. Governor's Office of Employee Relations*, 786 N.Y.S.2d 634, 635 (App. Div. 2004) (internal quotation marks omitted) (ellipses in original). [7] However, "not all additional duties constitute out-of-title work, and the mere fact that there may be some overlap between two particular positions does not mandate a finding that a petitioner is being compelled to perform out-of-title work." *Woodward v. Governor's Office of Employee Relations*, 718 N.Y.S.2d 465, 467 (App. Div. 2001).

***10** Plaintiff claims that his working out-of-title eventually led to a back injury when, on May 2, 2003, he was ordered to move several concrete bumpers. (Compl. 3-4; Pl.'s Decl. ¶ 17.) This injury resulted in a partial permanent disability and loss of Plaintiff's earning potential, which, according to Plaintiff, constituted an adverse employment action. (Pl.'s Mem. 9-11; Compl. 7.)

Defendant disputes Plaintiff's claim that he was working out-of-title or that he was performing the work of a higher salary grade employee. (Def.'s Mem. 13.) Defendant cites *Healy v. County of Nassau*, 796 N.Y.S.2d 377, 379 (App. Div. 2005), for the proposition that "work is not considered 'out-of-title' where it is related to, similar in nature to, or a reasonable outgrowth of, the 'in-title' work." According to Defendant, the job assignments that Plaintiff was asked to complete either fell under his title of Housekeeper or were "reasonably related to" the Housekeeper job description (Def.'s Mem. 14.), and, in either case, were based on the needs of the Department (*id.* 19).

The Court finds a genuine issue of material fact as to whether the assignments given to Plaintiff – particularly the May 2, 2003 assignment – were out-of-title, in-title, or reasonably related to in-title work. In order for Plaintiff to establish that allegedly out-of-title assignments, particularly the assignment to move concrete bumpers, constituted an adverse employment action, Plaintiff must demonstrate that such assignments resulted in a " 'materially adverse change' in the terms and conditions of [his] employment." *Galabya*, 202 F.3d at 640. If what Plaintiff claims is true – that he was assigned duties outside of his Housekeeper title that somehow

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

were typically performed by employees in a higher pay grade – then Plaintiff will have satisfied his minimal burden of demonstrating that he suffered an adverse employment action, at least with regard to out-of-title work performed within the 300-day-period preceding the filing of Plaintiff's NYSDHR complaint. *See Santiago*, 485 F. Supp. 2d at 335-36 (referring to employer's refusal to compensate employee's performance of out-of-title duties as discrete act). Defendant has failed to adequately demonstrate that there exists no genuine issue of material fact with regard to whether Plaintiff's pay was concomitant with the duties he was assigned. Therefore, for purposes of this Motion, the Court assumes that Plaintiff suffered an adverse employment action by being assigned out-of-title work usually performed by employees with a higher pay grade.

ii. Inference of Discriminatory Intent

To establish his prima facie case, and thereby shift the burden of production to Defendant, Plaintiff must establish an inference of discrimination. Though not required, this is most commonly done by demonstrating that other similarly situated persons, not of Plaintiff's protected class, were treated more favorably than he was in the workplace. *See Abdu-Brisson*, 239 F.3d at 467-68. Indeed, Plaintiff has chosen this approach to make his case. To be similarly situated, these persons must have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir. 1999); *see also McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal prima facie case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination."). Evidence of disparate treatment, however, cannot be based on conclusory allegations. *See Finney v. Planned Parenthood of N.Y. City, Inc.*, No. 02-CV-7942, 2003 WL 22928730, at *4 (S.D.N.Y. Dec. 10, 2003) (granting summary judgment where only evidence of disparate treatment was plaintiff's own conclusory allegations); *Griffin v. Ambika Corp.*, 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." (internal quotation marks omitted) ).

***11** Defendant argues that even if Plaintiff did suffer adverse employment actions, Plaintiff failed to establish that such actions took place under circumstances giving rise to an inference of discriminatory intent. (Def.'s Mem. 16-18.) Plaintiff relies on the alleged disparate treatment between him and his Caucasian co-workers (in particular, Aubry, Emery and Ponce) to support his claim that he suffered adverse employment actions under circumstances giving rise to an inference of discriminatory intent. (Pl.'s Mem. 12-13.) More specifically, Plaintiff claims that he was constantly disciplined and forced to do undesirable out-of-title work, while his Caucasian co-workers were not. According to Plaintiff, this disparate treatment demonstrates that the adverse employment actions he suffered were motivated by racial discrimination.

In 1993, Emery, Ponce and Plaintiff had their positions reclassified to that of Housekeeper – the position Plaintiff still held when his employment with Defendant ended. After filing a grievance, Emery and Ponce had their positions reclassified to Maintenance Mechanic, which, according to Plaintiff, left them "open to higher salaries and promotion opportunities." (Pl.'s Decl. ¶¶ 7-8.) Plaintiff claims that he was not allowed to grieve his reassignment. (*Id.* ¶ 8.) Plaintiff makes this argument with no proof whatsoever.

As previously noted, after oral argument, Plaintiff submitted to the Court an application to supplement the record with what appears to be the minutes from a meeting that took place in November 1999. According to Plaintiff, this document demonstrates that "Defendant treated Plaintiff differently from the white County employees (Mr. Em[e]ry and Mr. Ponce), thereby showing that Defendant ... was fully aware that Plaintiff's title was supposed to have been changed and was not." (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 17, 2008.) Despite Plaintiff's urging, this document cannot be used to create an issue of fact because the meeting minutes are inadmissible hearsay. *See Patterson v. County of* Oneida, 375 F.3d 206, 219 (2d Cir. 2004); *Witkowich v. Gonzales*, 05-CV-7756, 2008 WL 701280, at *10 n.11 (S.D.N.Y. Feb. 25, 2008) ("[I]nadmissible hearsay ... [cannot] be used to defeat summary judgment."). Further, as discussed above, Plaintiff has failed to demonstrate to the Court that excusable neglect was to blame for this document not being added to the record earlier. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (plaintiff was permitted to supplement the summary judgment record because the new evidence was not previously available, plaintiff exercised good faith, and only minimal delays would result). Moreover, even if admissible,

these minutes do Plaintiff no good, for they fail to rebut Defendant's argument that Plaintiff was always free to grieve his assignment, but never did. Plaintiff claims he was unaware of this option, a claim contradicted by the minutes themselves, but Plaintiff still fails to tender any evidence that Defendant engaged in any conduct blocking Plaintiff's efforts to grieve his assigned title.

Without this inadmissible and tardy information, Plaintiff has no admissible evidence showing that Defendant prohibited him from grieving his reassignment, that Defendant had an affirmative obligation to notify Plaintiff of his right to grieve his reassignment or to help him do it, or that Defendant helped Emery and Ponce to grieve their status. Moreover, this alleged act of discrimination was a discrete act occurring several years before Plaintiff initiated legal action. Therefore, the Court will not entertain Plaintiff's argument that discriminatory intent can be inferred from Emery and Ponce being reclassified to the Maintenance Mechanic position after filing grievances.

Plaintiff also focuses on what he sees as the disparate treatment between him and Aubry. Plaintiff claims that he was docked for attending jury duty, but that when Aubry had to appear in court on several occasions, he was given time off and never had his pay docked. (Compl. 4-5; Pl.'s Dep. 117 ("Jason used to go to jail for long periods of time and come back and have his job and nothing said or nothing done.").)[8] Also, Plaintiff alleges that Aubry was permitted to drive County vehicles without a license – even though one was required for his position – but that Plaintiff was disciplined for failing to produce a driver's license – even though his position did not require that he have such a license. (Compl. 5; Pl.'s Mem. 13; Kahan Aff., Ex. AA.) Indeed, according to Plaintiff, he was disciplined for not having a license, while Defendant actually helped Aubry obtain his license. (Pl.'s Mem. 13.) Further, Plaintiff claims that he was constantly disciplined for minor infractions, while Aubry committed much more serious infractions and was not similarly disciplined or docked pay. (*Id.* 13; Compl. 4-5; Pl.'s Decl. ¶ 19; Kahan Aff., Ex. GG ("In contrast to Mr. Aubry, I have been written up for numerous incidents, none of which are as grave as the incidents involving Mr. Aubry.").)

***12** Plaintiff offers no evidence to support his argument that Aubry went undisciplined while committing infractions similar to or worse than those committed by Plaintiff. Plaintiff was disciplined many times during the course of his employment with Defendant, mostly for infractions such as time abuse and insubordination, and he offers no proof that those were improperly imposed sanctions. (Def.'s 56.1 Stmt ¶¶ 9-12, 23, 25, 29-33, 36-37.) Moreover, Defendant submitted unrefuted evidence demonstrating that Aubry was in fact disciplined for time abuse, at least during 2003 and 2004. (Kahan Aff., Exs. LL-NN.) In fact, the evidence shows that, because of his excessive absenteeism, Aubry was denied salary increments on August 13, 2003, November 10, 2003, and February 19, 2004, and that he was denied an unpaid leave of absence on February 2, 2004. (*Id.*, Ex. MM.) Further, an Amended Notice of Charges dated April 15, 2004, was issued to Aubry, detailing 169 charges and specifications brought against him by Defendant for time abuse spanning from January 16, 2003, through April 5, 2004. (*Id.*, Ex. LL.) Aubry resigned before the charges could be resolved. (*Id.*) According to Plaintiff, this evidence does nothing to disprove his claim of disparate treatment since "nothing was done to Mr. Aubry while Plaintiff was on the job." (Pl.'s Mem. 13.)

Although the Court agrees with Plaintiff that the record contains evidence of discipline of Aubry (who was employed by Defendant for far less time than Plaintiff) that largely post-dates Plaintiff's employment and, therefore, it does little to disprove Plaintiff's claim of disparate treatment, it is not Defendant's burden to disprove an unsupported claim of disparate treatment. Plaintiff has the ultimate burden under the *McDonnell Douglas* framework, *St. Mary's Honor Ctr.*, 509 U.S. at 507, and he cannot satisfy his burden by making bare and conclusory assertions that he and Aubry were similarly situated but that they were treated differently.[9] A conclusory allegation without support in the record will not give rise to an inference of discriminatory intent nor will it defeat a motion for summary judgment.

Aubry, who was a Maintenance Laborer, was required to have a driver's license. Based on the Housekeeper job specifications, it appears that Plaintiff was not.[10] (Kahan Aff., Ex. I.) On December 30, 2002, however, Plaintiff was issued a warning notice by Bates for failure to produce a license. (*Id.*, Ex. AA ("Mr. Perry could be asked to drive at any time and should have his license with him.").) The record shows that on June 17, 2002, Aubry was notified by Commissioner Stanley G. Motley that his probationary appointment would be terminated if he failed to produce a driver's license by July 22, 2002. (Pl.'s Exs. in Opp'n Pursuant to Local Rule 56.1(a) 21 ("Pl.'s Ex.").) In response to this notification, Aubry wrote a letter to Motley on July 8, 2002, indicating that he was in the process of getting his license back, but that he may not have it back from the Department of Motor Vehicles ("DMV") within the time limit specified. (*Id.*)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Motley replied to Aubry on July 10, 2002, stating that "[the County] will try to expedite the return of your driver's license through the Department of Motor Vehicles. I[n] the event we can not please be assured that you will still be an employee in good standing since you have met the legal requirements and are just awaiting the return of your paperwork from the State of New York." (*Id.*)

***13** Again, Plaintiff has not pointed to any evidence in the record from which the Court could conclude that Plaintiff and Aubry were similarly situated with regard to the driver's license issue. The record demonstrates that Aubry was threatened with termination (by someone other than Bates) if he did not produce a driver's license by a certain date. The record also suggests that Defendant did not offer to "help" Aubry until it was satisfied that Aubry had done all that he could to obtain his driver's license and that he was waiting on paperwork from the DMV. Plaintiff offers no evidence suggesting that, at the time he was issued a warning notice, he, like Aubry, had done all that could to obtain his license but was waiting on documentation from the DMV. Further, Plaintiff and Aubry did not hold the same positions. Though it is not entirely clear from the record why Plaintiff was issued a warning notice for failure to produce a driver's license, there is nothing in the record suggesting that the reason was racial discrimination. And, Plaintiff's bare belief that Defendant was "messing" with him is not evidence of anything. *See Powell v. Consol. Edison Co.*, 97-CV-2439, 2001 WL 262583, at *12 (S.D.N.Y. Mar. 13, 2001) ("[P]laintiff's subjective belief that a supervisor had an improper motive is not evidence at all...."). From this feeble evidence, no reasonable jury could find that Plaintiff and Aubry were similarly situated but were treated disparately under circumstances giving rise to an inference of discriminatory intent.

Plaintiff argues that he was forced to work out-of-title, while his similarly-situated Caucasian co-workers were not. Some of his complained of out-of-title duties included digging ditches, performing firefighter duties, and moving concrete parking lot bumpers, none of which expressly appear on the illustrative list of possible Housekeeper duties. (Compl. 3-4; Kahan Aff., Ex. I.) [11] Even if the Court accepts Plaintiff's argument that he was given assignments outside of his Housekeeper title, Plaintiff has offered no evidence from which the Court could infer that such assignments were given on account of Plaintiff's race as opposed to any other reason (such as department need or even personal dislike of Plaintiff). It is noteworthy that in regard to this claim, Plaintiff has submitted no evidence of disparate treatment.

Defendant has submitted an affidavit from Bates, in which he stated that "[t]he decisions regarding jobs to be performed depended upon the needs of the department and who is available.... Perry's job assignments were no more difficult, demanding or dangerous than assignments given to other ... employees. That Perry did not like some of [ ]his job assignments is true, but Perry was not singled out for particular jobs." (Bates Aff. ¶¶ 3-4.) Plaintiff testified that during a meeting while Plaintiff was at Bronx River Parkway, Bates said that "any shit detail that was going to be done, [Plaintiff] would be doing it." (Pl.'s Dep. 45.) Plaintiff also testified that, while at Bronx River Parkway, he worked as part of a crew – albeit "not the popular crew." (*Id.* 44.)

Plaintiff cannot defeat Defendant's Summary Judgment Motion with these statements. By themselves, these alleged comments show only that Bates might have disliked Plaintiff (and others in the group), not that he discriminated against him. Thus, it is even more apparent that Plaintiff has failed to demonstrate that any of the work he was assigned – including the assignment that allegedly led to his back injury on May 2, 2003 – was assigned to him because of his race. In a conclusory fashion, Plaintiff claims that he was made to perform dangerous and demanding out-of-title work, while Caucasian co-workers were not. (Pl.'s Mem. 9.) Plaintiff has not made any specific allegations asserting, nor has he provided any admissible evidence suggesting, that Plaintiff was given assignments more dangerous or demanding than similarly-situated Caucasian co-workers. [12] *See Meiri*, 759 F.2d at 998 ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); *Jones*, 2008 WL 495498, at *11 (finding plaintiff failed to establish prima facie case of discrimination because plaintiff offered no specific information or evidence to substantiate his conclusory allegation that "white [co-workers] with less seniority and experience were provided summer employment while he was not"); *Marro v. Nicholson*, No. 06-CV-6644, 2008 WL 699506, at *10 (E.D.N.Y. Mar. 12, 2008) (holding vague and conclusory statements that similarly situated employees were treated differently failed to give rise to issue of material fact regarding disparate treatment); *Randolph v. CIBC World Markets*, No. 01-CV-11589, 2005 WL 704804, at *13 (S.D.N.Y. Mar. 29, 2005) ("Although [plaintiff] has made the general allegation that he was treated more harshly than white ... employees who committed similar violations ..., there is no other evidence in the record to support this

assertion. Conclusory allegations of this sort are insufficient to survive a motion for summary judgment.").

***14** As set forth above, Plaintiff has failed to establish a prima facie case of racial discrimination based on disparate treatment because he has not offered admissible evidence suggesting that he suffered adverse employment actions under circumstances giving rise to an inference of racial discrimination.

2. Hostile Work Environment Claim

Plaintiff also brings a hostile work environment claim. "The question of whether a work environment is sufficiently hostile to violate Title VII is one of fact. On a motion for summary judgment, the question for the court is whether a reasonable factfinder could conclude, considering all the circumstances, that the harassment is of such quality or quantity that a reasonable employee would find the conditions of [his] employment *altered for the worse.*" *Schiano*, 445 F.3d at 600 (internal quotation marks and citations omitted).

> In order to prevail on a hostile work environment claim, a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Second, the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile work environment to the employer.

*Feingold*, 366 F.3d at 149-50 (internal citations and quotation marks omitted).

The first prong involves an objective and a subjective component: "the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Id.* (internal quotation marks omitted). In determining whether a work environment is "hostile" or "abusive," courts are to look at the totality of the circumstances, as guided by the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *abrogated on other grounds by, Burlington Indust., Inc. v. Ellerth*, 524 U.S. 742 (1998). Thus, to satisfy the first prong, a plaintiff " 'must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment.' " *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) ). Though a single incident may be severe enough to materially alter employment conditions, *see Patterson*, 375 F.3d at 227, in general the actions taken by the defendant "must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.' " *Alfano*, 294 F.3d at 375 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) ); *see also Carrero v. N.Y. City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (holding "incidents must be more than episodic"). "Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law." *Patterson*, 375 F.3d at 227.

***15** The existence of a hostile environment alone is insufficient to make out a Title VII claim, however. Plaintiff must also show there is some reason to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Employers are not generally liable for the harassing behavior of a plaintiff's co-workers; to make an employer liable for a hostile work environment claim, the harassment must generally come from a supervisor with authority over a plaintiff. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 123 (2d Cir. 2003) ("[I]t is only when a supervisor with immediate (or successively higher) authority over the employee has engaged in the complained of conduct, that the employer may be subject to vicarious liability. Employers are not, by contrast, vicariously liable for hostile work environment created by a mere co-worker of the victim." (internal citations and quotation marks omitted) ).

Finally, Plaintiff must prove that the hostile conduct occurred because of his membership in a protected class. To make such a showing, a plaintiff must introduce evidence of hostile conduct that a reasonable juror could find was a result of the

plaintiff's membership in a protected class. *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff argues that the accumulation of the following incidents – which occurred from 1995 through May 2003 – demonstrate that he was treated differently than his Caucasian co-workers and constitute a hostile work environment: [13] (1) After filing a grievance, Emery and Ponce were reclassified from the Housekeeper title to the Maintenance Mechanic title, and Plaintiff was not (Pl.'s Mem. 15); (2) Plaintiff was told he would be fired if he did not do what he was told, regardless of whether the assignment was in- or out-of-title (*id.*; Compl. 5; Pl.'s Dep. 112); (3) Plaintiff was the only person docked pay for going to jury duty (Pl.'s Mem. 15); (4) Plaintiff was written up for excessive absenteeism on May 8 and 9, 2003, even though his supervisor knew that he was out because of the May 2, 2003 injury (*id.*); (5) Plaintiff had to drive Aubry around, even though Aubry was required to have a license (*id.*; Pl.'s Dep. 113); (6) Plaintiff was not allowed to wear safety equipment like his Caucasian co-workers (Pl.'s Mem. 15); (7) Plaintiff was subjected to "Kunta Kinte" jokes (*id.* 15-16); [14] and (8) Plaintiff was disciplined for minor infractions while his Caucasian co-workers were not (Compl. 3). Plaintiff acknowledges that he was not generally subjected to racial epithets or insults, but insists that, because he was the only African-American person in his group, no outright insults were necessary. (Pl.'s Mem. 16.)

***16** Plaintiff does not suggest, and the Court does not find, that any one of these alleged incidents was severe enough by itself to alter the conditions of Plaintiff's employment and thereby constitute hostile work environment. [15] Therefore, the Court considers these incidents in the aggregate to determine whether, under the totality of the circumstances, Plaintiff was subjected to a hostile work environment during his employment with Defendant. For present purposes, with regard to timeliness, the Court will assume – without deciding – that these acts are all properly before the Court as part of Plaintiff's hostile work environment claim, unless otherwise noted.

The first issue for the Court is whether Plaintiff was subjected to an objectively hostile environment during his employment with Defendant. *Feingold*, 366 F.3d at 150. In making this determination, the *Harris* factors guide the Court's "totality of the circumstances" analysis. *See Harris*, 510 U.S. at 23. The conduct complained of spans a period of approximately eight years, which is a considerable amount of time considering the fact that most of the incidents complained of are isolated occurrences. The fact that the incidents are spread out over a long period of time tends to weigh against a finding that Plaintiff's work environment was altered for the worse. *See Williams*, 2007 WL 2907426, at *11 ("The incidents that plaintiff points to were isolated in nature and took place over a number of years.... Taken together, the incidents described are separated in time and space and do not demonstrate a change in work environment.").

Nonetheless, keeping in mind that it is not for the Court to act as a " 'hierophant of social graces,' " *see Schiano*, 445 F.3d at 605 (quoting *Holtz v. Rockefeller Co.*, 258 F.3d 62, 75 (2d Cir. 2001) ), the Court is unwilling to say that no reasonable jury could find that the incidents listed above were severe enough in the aggregate to alter the conditions of Plaintiff's employment, though the Court has serious doubts. Indeed, the Second Circuit has cautioned that "hostile work environment claims present 'mixed question[s] of law and fact' that are 'especially well-suited for jury determination.' " *Id.* (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999) ) (alteration in original). Only when "application of the law to th[e] undisputed facts will reasonably support only one ultimate conclusion" is summary judgment appropriate. *Richardson*, 180 F.3d at 438. Because reasonable minds may differ on the issue of whether the conduct complained of altered Plaintiff's employment for the worse, the Court will not grant summary judgment to Defendant on the objective element of Plaintiff's hostile work environment case.

With regard to whether Plaintiff subjectively believed that his work environment with Defendant was hostile, Plaintiff has pled that he was caused to "undergo an intimidat[ing], hostile and offensive work environment causing [him] monetary damages and emotional injuries and numerous other injuries." (Compl. 8.) At this stage, Defendant does not challenge Plaintiff's claim that he found the work environment subjectively hostile, so the Court will assume, for purposes of this Motion, that this element is satisfied.

Plaintiff must show a basis upon which to impute the discriminatory conduct of the employees that created the hostile work environment to the employer. *See Perry*, 115 F.3d at 149. Because most of the complained-of conduct was alleged to have been committed by Bates, Plaintiff's direct supervisor, Defendant can be held vicariously liable for any resulting hostile work environment. *See Mack*, 326 F.3d at 123.

***17** Finally, Plaintiff must demonstrate that the hostile conduct occurred because of his membership in a protected class. *See Brennan*, 192 F.3d at 318. "Although the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred ... they must occur under circumstances in which ... the incidents can reasonably be interpreted as having taken place on the basis of that trait or condition." *Williams*, 2007 WL 2907426, at *10 (internal quotation marks omitted) (ellipses in original). Plaintiff points to no admissible evidence in the record suggesting that his race played a role in the way he was treated during his employment with Defendant. Instead, Plaintiff relies on his own conclusory statements that: (1) race must have been a motivating factor because Plaintiff was the only African American employee in the group (Pl.'s Mem. 16); and (2) he was treated differently from his Caucasian co-workers (Compl. 1-2, 3-5, 7; Pl.'s Mem. 15). The problem, however, is that Plaintiff's membership in a protected class in and of itself does not establish discriminatory intent. *See Ghent v. Moore*, 519 F. Supp. 2d 328, 338 (W.D.N.Y. 2007) ("Without other evidence of discrimination, [the fact that plaintiff was the only African-American employee] alone is not probative of unlawful discrimination."); *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 252 (S.D.N.Y. 2006) ("It is not enough simply to be a member of a protected class. To invoke the protections of Title VII, an employee must have actually suffered discrimination."). Further, as discussed above, Plaintiff has offered no evidence demonstrating that these Caucasian co-workers were similarly-situated to and actually treated differently than Plaintiff. *See Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 360 (S.D.N.Y. 2006) ("When a person only makes general allegations that African-Americans are treated differently in the workplace, those allegations are insufficient to support a hostile work environment claim."); *see also Marro*, 2008 WL 699506, at *10; *Randolph*, 2005 WL 704804, at *13.

The Second Circuit has said that "[i]n a hostile work environment case, it may well be a proper exercise of the district court's broad discretion to allow the plaintiff to build [his] case partly by adducing incidents for which the link to any discriminatory motive may, in the first instance, appear tenuous or nonexistent." *Schiano*, 445 F.3d at 605. However, the Second Circuit has stood firm on its position that district courts are not to "treat discrimination differently from other ultimate questions of fact." *Abdu-Brisson*, 239 F.3d at 466; *accord Schiano*, 445, F.3d at 603 ("[S]ummary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." (internal quotation marks omitted) ). On the record before the Court, no reasonable jury could find that Plaintiff was subjected to a hostile work environment on account of his membership in a protected class. Therefore, Defendant's Motion for Summary Judgment dismissing Plaintiff's hostile work environment claim is granted.

### 3. Section 1981 Claim

The *McDonnell Douglas* burden-shifting framework also applies to 42 U.S.C. § 1981 claims. *See Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 402 (S.D.N.Y. 2007). "To establish the requisite prima facie case for a violation of [Section 1981], a plaintiff must establish: (1) that [he] is a member of a racial minority; (2) that the Defendant intended to discriminate against Plaintiff on the basis of [his] race; and (3) that the Defendant discriminated in connection with one of the statute's enumerated activities." *Id.* (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 1999) ).

An individual may be held liable under Section 1981 where the plaintiff demonstrates "some affirmative link to causally connect the [defendant] with the discriminatory action." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) (internal quotation marks omitted). Although the elements of a Section 1981 claim and a Title VII claim are distinct, discriminatory intent is a necessary element of a Section 1981 claim. *See Patterson*, 375 F.3d at 226 ("[A] plaintiff pursuing a claimed violation of § 1981 ... must show that the discrimination was intentional."). Thus, a failure to establish sufficient evidence of discriminatory intent to survive summary judgment on a Title VII claim is fatal to a similar claim of racial discrimination under Section 1981. *See Gonzalez v. City of New York*, 354 F. Supp. 2d 327, 330 n.2 (S.D.N.Y. 2005) ("Although claims under 42 U.S.C. § 1981 ... involve different elements than those involved in Title VII claims, they share in common with Title VII claims the essential element of intentional unlawful discrimination. Therefore, the Court's determination that certain of Plaintiffs' Title VII claims do not survive summary judgment due to the inadequacy of evidence regarding discriminatory intent also results in dismissal of Plaintiffs' § 1981 ... claims." (internal quotation marks and citations omitted) ); *Patterson*, 375 F.3d at 225 (holding that reasons supporting summary judgment for defendants on Title VII claims also merited dismissal of plaintiff's Section

1981 claims). As described in the previous section, Plaintiff has failed to show intentionally discriminatory conduct on the part of Defendant, and therefore, summary judgment on Plaintiff's Section 1981 claim is granted.

III. Conclusion

***18** For the reasons stated herein, Plaintiff's application to supplement the record is DENIED, and Defendant's Motion for Summary Judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions (Dkt. Nos. 23, 45), to enter judgment for Defendant, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2008 WL 11438085

## Footnotes

1 Defendant's Employee Handbook provides the following:

> If you are required to serve as a juror or to appear in court pursuant to a subpoena or court order, you will be granted a leave with pay for such required attendance. Any fees received for such attendance, other than travel and meals, must be paid to the County. This leave with pay does not apply when your own personal interests are the subject of the court activity.

(Kahan Aff., Ex. Z.)

2 The Court will cite to Plaintiff's Complaint by page number rather than paragraph number in an attempt to alleviate the confusion resulting from Plaintiff's reuse of paragraph numbers within the document.

3 "[I]n a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice ..., such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred...." 42 U.S.C. § 2000e-5(e)(1).

4 Plaintiff offered these tardy additions to the record, after he failed to provide the record evidence he claimed would prove that a supervisor had referred to Plaintiff as "Kunta Kinte." Obviously, the Court found Plaintiff's assertion of this claim in response to Defendant's Summary Judgment Motion, which was not backed up by any evidence in the record (despite representations to the contrary), to be potentially material, if not dispositive, in resolving the Motion. Accordingly, the Court asked counsel for Plaintiff to show where in the record there was support for this assertion. Plaintiff never did provide any evidence in the record as it existed when he responded (several months late) to Defendant's Motion. Instead, Plaintiff sought to augment the record with the March 13 submissions.

5 Defendant reads Plaintiff's submissions to assert that the various warning notices Plaintiff was issued for time abuse and failure to produce a driver's license were adverse employment actions in support of this claim. The Court disagrees with this reading. Instead, it is evident to the Court, based on its reading of Plaintiff's various submissions, that Plaintiff relies on these warning notices not as adverse employment actions, but as evidence of discriminatory intent and in support of his hostile work environment claim.

6 Plaintiff offers no specific allegations – let alone evidence – to support this claim. First of all, Plaintiff never identifies which title would be the appropriate recipient of such duties, nor does he identify the salary grade appropriate to these duties. Despite these significant infirmities in Plaintiff's claim and because the outcome

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

herein is the same either way, the Court will assume – for purposes of this Motion – that the complained-of assignments would normally be given to an employee with a higher salary-grade title.

7 Interestingly, Plaintiff does not here claim a failure to compensate for higher grade work he allegedly was assigned, but claims that the out-of-grade work he was assigned both was highly undesirable (which one would imagine would be lower-grade work) and led to his injuries in May 2003.

8 In his Complaint, Plaintiff also states "the other white employees were given time off without being docked when they had to perform citizenship duties." (Compl. 7.) Without any specific allegations or evidence to support this statement, it cannot be relied upon to establish the fourth prong of Plaintiff's prima facie case. *See Jones v. W. Suffolk Boces*, No. 03-CV-3252, 2008 WL 495498, at *11 (E.D.N.Y. Feb. 20, 2008) (finding as insufficient to satisfy fourth prong of prima facie case plaintiff's conclusory allegation that "white [employees] with less seniority and experience were provided summer employment while [plaintiff] was not").

9 On December 14, 2006, Magistrate Judge George A. Yanthis ordered that Defendant turn over to Plaintiff in discovery Aubry's leave history from 2001 through 2004. (Dkt. No. 15.) Exhibit 34 to Plaintiff's Local Civ. R. 56.1 Statement indicates that these records were in fact provided to Plaintiff. Interestingly, however, Plaintiff decided not to include Aubry's leave history in the present record. Based solely on the record before it, the Court has no way of knowing whether Aubry was excessively absent while Plaintiff was employed by Defendant or, more importantly, whether his pay was ever docked as a result. The Court cannot assume either of these things to be the case based solely on Plaintiff's bare assertions.

10 The Court notes, however, that there is evidence in the record to suggest that, in May 2002, Plaintiff was told that some work assignments would require him to drive. (Kahan Aff., Ex. V.) During his deposition, Plaintiff testified to his belief that his supervisors would make him drive because "they w[ere] just messing with [him]." (Pl.'s Dep. 60.)

11 Plaintiff elaborated more fully on this issue in his complaint before the NYSDHR:

> Since Mr. Bates became my supervisor, I have been assigned tasks that no one else wants to do. These tasks are the most physically demanding and dangerous assignments. For example, I have been assigned to dig holes without a back hoe or assistance, and I have been required to move concrete parking lot bumpers despite the fact that I have a documented back injury. I have been sent to do weed-whacking jobs without chaps, safety glasses and ear protection. The aforementioned examples are not an exhaustive list of undesirable duties I have been assigned since 1999. It should be noted that when co-workers are assigned to work with me, they view the assignments as a form of punishment. I am being punished everyday especially since almost all the work I perform is out of my job title.

(Kahan Aff., Ex. GG.) Again, it is entirely unclear from Plaintiff's allegations and submissions the title for which Plaintiff believes these duties are appropriate.

12 One of the alleged out-of-title assignments that Plaintiff complains of was when he was allegedly asked to perform "firefighter duties." (Compl. ¶ 1.) However, in an undated letter written by Donald Kranker, a Maintenance Laborer and Shop Steward, he complains of an August 23, 2002 firefighting assignment that was given to him, Plaintiff, Jason Aubry and one other employee. (*See* Pl.'s Ex. 29.) Thus, at least with respect to the firefighting assignment, the record not only fails to show that Plaintiff was singled out for the assignment, but actually demonstrates that Caucasian co-workers were given the same assignment; in fact, Jason Aubry – who happens to be the employee Plaintiff focuses on to demonstrate disparate treatment – was one of the employees sent to perform firefighting duties with Plaintiff. Therefore, there is no basis whatsoever for Plaintiff to claim that he was assigned firefighter duties based on his race.

13 In his Complaint, Plaintiff alleged that the hostile work environment spanned from 1999 to 2003. (Compl. 3.)

14 In his opposition brief, Plaintiff asserted – as evidence that he was subjected to a hostile work environment – that he endured comments about “Kunta Kinte.” (Pl.'s Mem. 15-16.) In support of this allegation, Plaintiff offered the Court an unhelpful and erroneous citation – without page number – to Plaintiff's Exhibit 3, which is an approximately 50-page excerpt from Plaintiff's deposition testimony. Yet, there was no reference to this comment in Plaintiff's deposition. In fact, nothing Plaintiff provided in opposition to the Summary Judgment Motion contained any evidence that Plaintiff was subjected to such comments.

During oral argument, the Court asked Plaintiff's counsel what in the record supported the allegation that Plaintiff was subjected to “Kunta Kinte” comments. Plaintiff's counsel represented to the Court that Plaintiff testified during his deposition that he was referred to as “Kunta Kinte” by his supervisor. Defendant's counsel indicated that he had a recollection of such testimony. Plaintiff's counsel further represented that she would send the relevant pages from Plaintiff's deposition transcript to the Court the following day, which she failed to do.

Instead, on March 12, 2008, Defendant's counsel sent to the Court Plaintiff's entire deposition transcript and a letter, in which he represented: “I have found no reference to the ‘Kunta Kinte’ comment referenced by plaintiff's counsel. I was in error when I stated that such a comment was made by Mr. Perry at his deposition.” (Letter from Stuart E. Kahan, Esq., to the Court, dated Mar. 11, 2008.)

On March 14, 2008, the Court received from Plaintiff's counsel via overnight mail: (1) a letter dated March 13, 2008, in which she admitted, “[t]here is no reference to [the “Kunta Kinte” comment] in the *deposition* transcript,” and (2) an application to supplement the record with a new affidavit from Plaintiff and what appears to be the minutes of a meeting held on November 9, 1999. (Letter from Pamela D. Hayes, Esq., to the Court, dated Mar. 13, 2008.) In his putative supplemental affidavit, Plaintiff states that he was referred to as “Kunta Kinte” by a supervisor identified only as “Mike,” without any details regarding when or where this allegedly occurred.

This affidavit is suspicious. First, Plaintiff never made this allegation in either claim he made to the EEOC, nor included it in his Complaint. Second, it is plainly lacking in details – including the full identity of the speaker and the date. In any event, the Court will not accept this affidavit, as it is way out of time from a party that has already demonstrated, through his counsel, a profound disregard for deadlines and process in this case. *Cf. Scully*, 148 F. Supp. 2d at 251-52 (allowing plaintiff to oppose defendant's summary judgment with new evidence for limited purposes because plaintiff could not have submitted new evidence earlier and plaintiff demonstrated good faith).

15 Again, this excludes the alleged “Kunta Kinte” reference.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3352758
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheila ROBINSON, Plaintiff,
v.
Mark WILLIAMS, et al., Defendants.

6:22-CV-0982 (GTS/ML)
|
Signed January 12, 2023

**Attorneys and Law Firms**

SHEILA ROBINSON, Plaintiff, Pro Se, 939 Ontario Avenue, Niagara Falls, New York 14301.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

***1** The Clerk has sent a *pro se* complaint in the above captioned action together with (1) an application to proceed *in forma pauperis*, and (2) an application to appoint counsel, filed by Sheila Robinson ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2, 5.) For the reasons discussed below, I (1) grant Plaintiff's *in forma pauperis* application, (2) deny Plaintiff's motion for appointment of counsel, and (3) recommend that Plaintiff's Complaint be dismissed in its entirety (a) in part with leave to amend, and (b) in part without leave to amend. (Dkt. Nos. 1, 2, 5.)

## I. BACKGROUND

Construed as liberally [1] as possible, Plaintiff's Complaint alleges that she formed clothing brands and has since been targeted and harassed by defendants Mark Williams, Kyle Piersall, John De Traglia, Joseph Aiello, Brian Baye, Marissa Vomer, K. Phillips, Benny Grullon, Derek Schultz, Reginald Sanders, Brian French, Hiram Rios, Louis L. Stanton, John Does, Letitia James, Chuck Schumer, Amazon.com, Jeff Bezos, Facebook.com, Mark Zuckerberg, Google.com, Sergin Brin, Larry Page, Sundar Pichai, Zazzle.com, Robert Beaver, Cafepress.com, Bob Marino, Fred Durham, Redbubble.com, Barry Newstead, Martin Hopskin, Utica New York Police Department, and City of Utica in New York State (collectively "Defendants"). (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that she frequented Miller Park in Utica, New York. (Dkt. No. 1 at 5.) Plaintiff alleges that when she would go to Miller Park, Utica police officers would also be present in the park and that the police officers' presence in the park at the same time as Plaintiff put her in "fear of [her] safety and well being" such that she "stopped going to [the] park in fear of being shot by the [U]tica police." (*Id.*)

Plaintiff alleges that, at some point in time, she called the police regarding issues she was having with third-party, Biory Chavez Tinco. (*Id.*) Plaintiff alleges that she sought to pursue charges against Mr. Tinco and to obtain a restraining order that would protect her from Mr. Tinco, but that the Utica police officers refused to arrest Mr. Tinco or assist Plaintiff in obtaining an order of protection. (*Id.* at 5-6.)

Plaintiff alleges that, at some point in time, she went to get her mail and an unnamed maintenance person "came out and provoked [P]laintiff into accidentally macing," [2] the maintenance person then called the police, Plaintiff was arrested, and paid a $300 fine. (*Id.* at 6.)

Plaintiff alleges that a building located next to her residence is a nuisance because it is a gathering place for drug users and dealers. (*Id.* at 6.) Plaintiff alleges that she sought police assistance "multiple times" to address individuals from the property next door who trespassed on to her property. (*Id.*) However, Plaintiff alleges that the Utica police refused to arrest individuals that criminally trespassed and did not conduct warrant checks on the trespassers. (*Id.* at 6-7.)

***2** Plaintiff alleges that Defendant Derek Schultz filed a false statement that Plaintiff was suffering from mental illness. (*Id.* at 7.) Plaintiff alleges that Defendant Marissa Vomer filed a false statement stating that Plaintiff was rambling. (*Id.*) Plaintiff alleges that Defendant Reginald Sanders retaliated against Plaintiff by refusing to arrest third-party T. Jones and stating to Plaintiff "you wanted Utica police fired[.] [W]hy should we help you[?]" (*Id.*)

Plaintiff alleges that Defendant Louis Stanton was the assigned judge to another one of her civil cases and that he conspired to violate Plaintiff's right to a jury trial. (*Id.* at 8.) More specifically, Plaintiff alleges that Defendant Stanton dismissed Plaintiff's civil case against "tech-giants" via electronic notice so that Plaintiff would not receive the notice in time to appeal the decision. (*Id.*)

Plaintiff alleges that she contacted the New York State Attorney General's office multiple times regarding the harassment she experienced by "one or more of the tech-giants" and the stalking that she experienced at Miller Park by the Utica police officers but that the New York State Attorney General's office informed her that it does not investigate those matters and directed Plaintiff to obtain her own attorney. (*Id.* at 9-10.)

Plaintiff alleges that unnamed "New York State Officials" deprived her of "Erap arrears" by incorrectly and "intentionally posting online that [P]laintiff had not uploaded [the] required documents." (*Id.* at 10-11.)

Plaintiff alleges that she contacted Defendant Chuck Schumer to help her "stop and collect the unauthorized apparel from [A]mazon warehouses" after Plaintiff saw that her clothing line brand was being improperly sold by Defendant Amazon.com. (*Id.* at 11.) Plaintiff alleges that Defendant Schumer failed to assist her because his family members are employed by Defendant Amazon.com. (*Id.*)

Plaintiff alleges that third-party Yahoo.com and Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg, conspired to target, cyberstalk, and stalk Plaintiff to interfere with her civil right to make online profits. (*Id.* at 11.) Plaintiff also alleges that Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg racially targeted her because she is a Black American and they are white or of Asian descent. (*Id.* at 12.)

Based on these factual allegations, Plaintiff appears to assert the following ten claims: (1) a claim against Defendant Utica Police Department for its conduct at Miller Park in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim against Defendant Utica Police Department for its refusal to arrest Mr. Tinco and obtain an order of protection in favor of Plaintiff against Mr. Tinco in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (3) a claim against Defendant Utica Police Department for its refusal to arrest individuals who trespassed on Plaintiff's residence in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (4) a claim against Defendant Stanton for violating Plaintiff's due process right to a jury trial pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (5) a claim against Defendant Stanton for sending a dismissal notice electronically in violation of the First Amendment and 42 U.S.C. § 1983; (6) a claim against the New York State Attorney General's Office for failure to investigate and enforce the laws in violation of the Fourteenth Amendment and 42 U.S.C § 1983; (7) a claim against unnamed New York State officials for interfering with Plaintiff's right to equal housing in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant Schumer for violating Plaintiff's right to equal protection under the law pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (9) a claim against Yahoo.com and Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg for conspiracy to deprive Plaintiff equal protection under the law pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; and (10) a claim against "the Tech-Giant gang" for stalking, cyberstalking, and harming Plaintiff. (*See generally* Dkt. No. 1.)

***3** As relief, Plaintiff seeks, *inter alia*, $100,000,000,000 in compensatory damages, punitive damages in the amount of $300,000,000,000, and costs and attorney's fees. (*Id.*)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [3] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [4]

## III. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e). Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [5]

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

***4** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Against the Utica Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by* 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

As a result, I recommend that all claims against Defendant Utica Police Department be dismissed for failure to state a claim upon which relief may be granted.

Moreover, to the extent that the Court is inclined—for the sake of judicial efficiency—to review Plaintiff's claims against Defendant Utica Police Department, as against Defendant City of Utica, I still recommend dismissal of Plaintiff's claims for failure to state a claim upon which relief may be granted.

A municipality may only be named as a defendant in certain circumstances. Pursuant to the standard for establishing municipal liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. 658); *see also Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer."). A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). A plaintiff must also establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights. *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion). Indeed,

municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right; it "may not be held liable on a theory of *respondeat superior.*" *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000).

***5** Critically, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

### 1. Miller Park

I recommend that Plaintiff's claims with respect to Miller Park be dismissed for failure to state a claim upon which relief may be granted. The allegation that police officers are merely present in a public space, such as a park, at the same time as Plaintiff fails to allege that Plaintiff's rights were violated in any way. *See Hickombottom v. City of Chicago,* 739 F. Supp. 1173, 1179 (N.D. Ill. 1990) (police surveillance of plaintiff's apartment did not violate the Fourth Amendment in that plaintiff had no reasonable expectation of privacy as to his comings and goings); *Phillips v. City of San Jose*, C-94-20468, 1994 WL 706213, at *4 (N.D. Cal. Dec. 13, 1994) (allegations that the police officers followed and observed plaintiff in public areas were not sufficiently egregious to constitute a due process violation under the Fourteenth Amendment).

Moreover, courts in this Circuit have routinely dismissed similar claims as factually frivolous. *See McNaughton v. de Blasio*, 20-CV-6991, 2020 WL 5983100, at *4-5 (S.D.N.Y. Oct. 8, 2020) (dismissing as frivolous the plaintiff's allegations including, *inter alia*, that the N.Y.P.D. was enlisting parents and their children in an elaborate scheme to lure the plaintiff into committing pedophilic acts); *Gamez v. U.S. Dist. Court Eastern and Southern Dist. of-Tyranny, New York*, 11-CV-4068, 2011 WL 3949807, at *2 (E.D.N.Y. Sept. 6, 2011) (dismissing as factually frivolous, the plaintiff's claims that the police were stalking, ambushing, and illegally surveilling him). "[A finding of] factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). The term "frivolous" embraces "not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Plaintiff's allegations, even under a liberal reading that the courts give *pro se* pleadings, easily qualify as frivolous under the standard asserted above. *See Denton,* 504 U.S. at 33.

As a result, I recommend that Plaintiff's claims regarding Miller Park be dismissed for failure to state a claim upon which relief may be granted and, in the alternative, for frivolity.

### 2. Failure to Arrest Mr. Tinco

To the extent that Plaintiff's Complaint asserts a claim based on an alleged failure to file charges against Mr. Tinco or help Plaintiff obtain an order of protection against Mr. Tinco, I recommend that it be dismissed. Plaintiff does not have standing to compel any law enforcement agency to prosecute suspected criminal acts because there is no private right of action to enforce state or federal criminal statutes. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at *5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at *3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

***6** As a result, I recommend that Plaintiff's claims regarding the failure to arrest Mr. Tinco be dismissed.

### 3. Failure to Arrest Trespassers

For the reasons set forth above in Part IV.A.2. of this Order and Report-Recommendation, I recommend that Plaintiff's claims regarding the failure to arrest alleged trespassers be dismissed for lack of standing.

**B. Claims Against Defendant Stanton**

Plaintiff's Complaint appears to assert claims against Defendant Stanton in his individual and official capacity, for actions he allegedly took in his position as Senior United States District Judge of the Southern District of New York. (Dkt. No. 1 at 8-9.)

It is well settled that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see also* *Mireles v. Waco*, 502 U.S. 9, 9-10 (1991) (citations omitted) ("A long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages. Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."); *Mahapatra v. Comstock*, 97-CV-7129, 1998 WL 88054, at *1 (2d Cir. Feb. 26, 1998) ("[T]he district court properly dismissed the claims for damages based on absolute immunity. Judges are shielded from liability for civil damages for judicial acts performed in their judicial capacities."); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 523 (E.D.N.Y. 2010) ("It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

Plaintiff's allegations regarding Defendant Stanton appear to relate to actions he took as judge, while presiding over another civil proceeding initiated by Plaintiff. (*See generally* Dkt. No. 1.) The Complaint is devoid of facts plausibly suggesting that Defendant Stanton took any action as an individual, and therefore also fails to allege that he acted in the clear absence of all jurisdiction. As a result, I recommend that the claims against Defendant Stanton be dismissed in their entirety based on the doctrine of absolute judicial immunity.

**C. Claims Against New York State Attorney General's Office**

As set forth above in Part IV.A.2. of this Order and Report-Recommendation, this Court does not have authority to commence its own investigation, commence criminal prosecution, compel a law enforcement agency to investigate suspected criminal activity, or compel a prosecutor to prosecute. Prosecutors possess discretionary authority to bring criminal actions, and they are "immune from control or interference by citizen or court." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972).

***7** As a result, I recommend that Plaintiff's claims against the New York State Attorney General's Office be dismissed.

**D. Claims Against Unnamed New York State Officials**

I recommend that Plaintiff's claims against unnamed New York State officials regarding the denial of her Emergency Rental Assistance Program ("ERAP") housing application, be dismissed.

First, to the extent that those claims are asserted against employees of New York State in their official capacity, they are barred by the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009).

New York [6] has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See* *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). The Eleventh Amendment therefore bars Plaintiff's § 1983 claims against New York State officials in their official capacity as employees of New York State from proceeding in federal court.

Second, Courts have held that there is no private cause of action for the denial of an application for federally funded emergency rental assistance program funds. [7] *See Wexler v. Dep't of Children and Families*, 22-CV-1111, 2022 WL 5250140, at *2 (M.D. Fla. Sept. 19, 2022) (recommending dismissal of the plaintiffs' claims alleging that their federal Emergency Rental Assistance Program applications were

mishandled and misappropriated and holding that "there is no express or implied cause of action under the CAA and the undersigned is aware of no Court ... that has found otherwise"); *Turner v. Hamilton Cnty. Trustee Assn.*, 22-CV-0275, 2022 WL 1606289, at *4 (S.D. Ind. May 20, 2022) (dismissing the plaintiff's claim that his application for federally funded Emergency Rental Assistance Program was improperly denied as fraudulent and holding that "there is no private right of action created, expressly or impliedly, by Congress in the CAA or the CARES Act.").

As a result, I recommend that Plaintiff's claims against unnamed New York State officials for denial of her ERAP application, be dismissed based on the doctrine of immunity pursuant to the Eleventh Amendment and because it fails to state a claim upon which relief may be granted.

**E. Claims Against Defendant Schumer**

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Chaney v. Koupash*, 04-CV-0126, 2008 WL 5423419, at *20 (N.D.N.Y. Dec. 30, 2008) (Homer, M.J.) (citing *Myers v. Barrett*, 95-CV-1534, 1997 WL 151770, at *3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.)). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005).

***8** Plaintiff fails to allege any facts plausibly suggesting that she was treated differently from similarly situated individuals or any other individuals. Vague and conclusory allegations, are insufficient to plausibly suggest an equal protection violation. *See* *De Jesus v. Sears Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996); *see Byng v. Delta Recovery Servs.*, LLC., 13-CV-0733, 2013 WL 3897485, at *15, n. 5 (N.D.N.Y. July 29, 2013) (D'Agostino, J.) (finding that Attica inmate alleged no facts in the complaint to indicate he was similarly situated to anyone or that someone else was treated differently than he was). The Complaint is devoid of allegations plausibly suggesting that Plaintiff was similarly situated to anyone or that she was treated differently. Accordingly, I recommend that Plaintiff's Fourteenth Amendment Equal Protection claims against Defendant Schumer be dismissed for failure to state a claim upon which relief may be granted. [8]

Further, to the extent that Plaintiff attempts to state conspiracy claims pursuant to 42 U.S.C. §§ 1985, 1986, I recommend that they be dismissed for failure to state a claim upon which relief may be granted.

"[T]o make out a violation of § 1985(3) ..., the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 103 S. Ct. 3352, 3356 (1983). A "conspiracy" requires, for purposes of Section 1985, "a plurality of actors committed to a common goal." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 456 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

In addition, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). The Complaint fails to allege any racial or class-based animus other than one conclusory assertion that the "Tech-giants" racially targeted Plaintiff because she is a Black American "and all the tech-giant defendants are of white or Asian" descent. (*See generally* Dkt. No. 1.) "[C]onclusory allegations are inadequate to make out a claim under Section 1985." *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 472 (S.D.N.Y. 2006) (citing *Salgado v. City of N.Y.*, 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001); *Sadler v. Brown*, 793 F. Supp. 87, 90 (S.D.N.Y. 1992)). Thus, Plaintiff does not sufficiently allege a conspiracy between Defendant Schumer and/or others to deprive Plaintiff of any federally protected rights.

Likewise, Plaintiff does not allege a claim under Section 1986, which proscribes knowingly failing to prevent a Section 1985 conspiracy "which such person by reasonable diligence could have prevented," and explicitly requires an underlying

conspiracy under Section 1985. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a valid § 1985 claim.").

***9** As a result, I recommend that Plaintiff's claims against Defendant Schumer be dismissed.

### F. Claims Against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg

A claim for relief under 42 U.S.C. § 1983 must allege facts showing that the defendant acted under color of state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Generally, private parties are not state actors, and are not liable under § 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties....") (internal quotation marks and citations omitted). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yartsky*, 457 U.S. 991, 1002 (1982)). A private defendant may be held liable only as "a willing participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Claims under § 1983 can be brought against private entities by "showing that a person acting under color of state law ... collaborated with a private person ... to deprive the plaintiff of a constitutional right." *Fries v. Barns*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes*, 398 U.S. at 144).

Here, the Complaint fails to allege facts plausibly suggesting that Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg were "state actors" or were "collaborating" with state actors. Plaintiff's inclusion of citations to the statute—42 U.S.C. § 1983—in her Complaint, does not change that the Complaint is devoid of factual allegations alleging any state involvement by Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg. (*See generally* Dkt. No. 1.)

Moreover, to the extent that Plaintiff sought to allege a claim against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg for stalking, cyberstalking, and harming Plaintiff, there is no private cause of action for stalking or general "harm." *Sonnick v. Budlong*, 20-CV-0410, 2020 WL 2999109, at *5, 9 n.8, 11 (N.D.N.Y. June 4, 2020) (Lovic, M.J.) (citations omitted) ("[F]ederal stalking is a crime pursuant to 18 U.S.C. § 2261A, and does not provide for a private cause of action.... New York does not recognize private causes of action for stalking, harassment, or trespass."), *report and recommendation adopted by* 2020 WL 4345004 (N.D.N.Y. July 29, 2020) (McAvoy, J.).

***10** As a result, I recommend that Plaintiff's claims against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg be dismissed for failure to state a claim upon which relief may be granted.

### G. Conspiracy

As set forth above in Part IV. E. of this Order and Report-Recommendation, the Complaint fails to allege facts plausibly suggesting racial or class-based animus—other than Plaintiff's legally insufficient, conclusory assertion that unnamed "Tech-giants" racially targeted Plaintiff because she is a Black American "and all the tech-giant defendants are of white or Asian" descent. (Dkt. No. 1 at 12.) Thus, Plaintiff does not sufficiently allege a conspiracy between Defendants and/or others to deprive her of any federally protected rights pursuant to 42 U.S.C. § 1985. Moreover, because Plaintiff fails to allege an underlying conspiracy pursuant to 42 U.S.C. § 1985, she likewise fails to allege a claim pursuant to 42 U.S.C. § 1986, which proscribes knowingly failing to prevent a Section 1985 conspiracy.

As a result, to the extent that Plaintiff alleges conspiracy claims pursuant to 42 U.S.C. §§ 1985, 1986 against any Defendant, I recommend that they be dismissed.

### H. Claims Against Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin**

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

The caption of the Complaint lists Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin but the body of the Complaint does not contain any factual allegations regarding them. Thus, I recommend that Plaintiff's claims against Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin be dismissed. *See Johnson v. Gonzalez*, 14-CV-0745, 2015 WL 1179384, at *6 (N.D.N.Y. Mar. 13, 2015) (Kahn, J.) (dismissing the claims against a defendant where the complaint lists the defendant's "name in the caption, but fails to again name or assert allegations against him."); *Serrano v. New York State Dep't of Envtl. Conservation*, 12-CV-1592, 2013 WL 6816787, at *15 (N.D.N.Y. Dec. 20, 2013) (D'Agostino, J.) (citing *Jaffer v. Chemical Bank*, 93-CV-8459, 1994 WL 392260, at *3 (S.D.N.Y. July 26, 1994) (holding that "[w]hen a complaint's caption names a defendant but the complaint does not indicate that the named party injured the plaintiff or violated the law, the motion to dismiss must be granted")) (dismissing the plaintiff's claims against two defendants who were listed as parties in the complaint and in the caption, but not elsewhere in the complaint).

**I. Statements of Defendants Schultz, Vomer, and Sanders**

***11** Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that, to the extent Plaintiff has asserted any state law claims—such as defamation claims against Defendants Schultz, Vomer, and Sanders [9]—the Court decline to exercise jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

**V. OPPORTUNITY TO AMEND**

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [10]

***12** I recommend that Plaintiff's claims against Defendant Utica Police Department be dismissed without leave to amend because it is not an entity that is amenable to suit. Moreover, to the extent that Plaintiff's claims against Defendant Utica Police Department are construed as against Defendant City of Utica, I recommend that they be dismissed without leave to amend because (1) Plaintiff's claims regarding Miller Park


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

are factually frivolous, and (2) a better pleading will not cure the issue with Plaintiff's claims alleging that the Utica Police Department failed to arrest Mr. Tinco and the criminal trespassers.

I recommend that Plaintiff's claims against Defendant Stanton be dismissed without leave to amend because he is entitled to absolute judicial immunity.

In addition, a better pleading will not cure the issue with Plaintiff's claim against the New York Attorney General's Office alleging that it failed to investigate and prosecute alleged criminal and improper conduct. As a result, to the extent that the Complaint is construed as asserting any claim against the New York Attorney General's Office, I recommend that it be dismissed without leave to amend.

To the extent that Plaintiff's Complaint is construed as asserting any claims against unnamed New York State officials for denying her ERAP application, I recommend that they be dismissed without leave to amend because (1) the officials in their official capacity are immune from suit pursuant to the Eleventh Amendment, and (2) there is no private cause of action to pursue Plaintiff's allegations.

Further, to the extent that Plaintiff asserted claims against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg for stalking, cyber stalking, and harassment, I recommend that they be dismissed without leave to amend because there is no private cause of action for stalking, cyber stalking, and harassment.

This Court has serious doubts about whether Plaintiff can amend to assert actionable claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin, Schultz, Vomer, and Sanders. However, out of an abundance of caution, I recommend that Plaintiff be permitted to amend those claims against those Defendants. In addition, to the extent that Plaintiff sought to allege any defamation claim against Defendants Schultz, Vomer, and Sanders, I recommend that she be permitted to amend that claim too.

If Plaintiff chooses to file an amended complaint, she should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

## VI. PLAINTIFF'S MOTION TO APPOINT COUNSEL

***13** Plaintiff has also submitted a request for appointment of counsel. (Dkt. No. 5.)

As an initial matter, "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case." *Leftridge v. Connecticut State Trooper Officer No. 1283*, 640 F.3d 62, 68 (2d Cir. 2011) (citations omitted). Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. As a threshold matter, the court should ascertain whether the indigent's claims seem likely to be of substance. A motion for appointment of counsel may be properly denied if the court concludes that the plaintiff's "chances of success are highly dubious." *Leftridge*, 640 F.3d at 69. If the court finds that the claims have substance, the court should then consider:

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp.*, 28 F.3d at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

In the present matter, the Court has recommended dismissal of the action. As such, the Court cannot find that Plaintiff's claims are likely to be of substance. Plaintiff's motion (Dkt. No. 5) is therefore denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 5) is **DENIED without prejudice to refiling**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts (1) claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin, Schultz, Vomer, and Sanders, and (2) a defamation claim against Defendants Schultz, Vomer, and Sanders, because it fails to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts (1) claims against Defendants Utica Police Department, City of Utica, and Stanton; (2) claims against the New York Attorney General's Office and unnamed New York State officials; and (3) claims of stalking, cyber stalking, and harassment against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

***14 ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [11]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [12] Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3352758

## Footnotes


© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 It is unclear if Plaintiff intended to state that she "accidentally menaced" the maintenance person or that she "accidentally" used mace or some form of pepper spray.

3 The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

4 Plaintiff is reminded that, although her application to proceed *in forma pauperis* has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

5 To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

6 "An official capacity suit against a municipal employee is a suit against the municipality itself." *Pittman v. Billings*, 20-CV-0422, 2020 WL 2079440, at *9 (N.D.N.Y. Apr. 30, 2020) (Baxter, M.J.), *report and recommendation adopted by* 2020 WL 2574631 (N.D.N.Y. May 21, 2020) (Sharpe, J.).

7 The "Coronavirus Aid Relief and Economic Security Act ("CARES Act"), which was continued by the [Consolidated Appropriations Act of 2021] CAA and the America Rescue Plan Act, allocated funds for rental assistance." *Turner*, 2022 WL 1606289, at *2.

8 The Court notes that, should this action proceed against Defendant Schumer and the United States Attorney make the requisite certification such that the United States be substituted as defendant, Plaintiff has failed to allege compliance with the administrative exhaustion requirements set forth in the Federal Tort Claims Act (FTCA). *See* *De Masi v. Schumer*, 608 F. Supp. 2d 516, 518-526 (S.D.N.Y. 2009) (replacing the United States as the allegedly liable party and proceeding as a FTCA suit where the plaintiff alleged that Senator Charles Schumer failed to respond to the plaintiff's repeated requests for assistance as one of Senator Schumer's constituents).

9 To the extent that Plaintiff attempts to allege a retaliation claim against Defendant Sanders pursuant to 42 U.S.C. § 1983 and the First Amendment, I recommend that it also be dismissed because Plaintiff fails to allege that she engaged in any protected speech. (*See generally* Dkt. No. 1.) Instead, Plaintiff alleges only that Defendant Sanders accused Plaintiff of "want[ing] [U]tica police fired" and asked "why should we help you[?]" after refusing to make an arrest. (Dkt. No. 1 at 7.) However, with additional factual allegations, Plaintiff may have a viable claim against Defendant Sanders. *See generally* *Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 513-516 (6th Cir. 2020) (citing *Briner v. City of Ontario*, 370 F. App'x 682, 700 (6th Cir. 2010); *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999)) (holding that (1) "[t]he freedom of speech ... protects the right of an ordinary citizen to criticize public officials ... without fear of criminal or civil repercussions," and thus, formal petitions including citizen complaints and informal requests for police assistance qualify as protected petitioning of the government, and (2) although " 'the right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views[,]' [a]nd individuals have no constitutional entitlement to police protection[,].... the 'unconstitutional conditions' places limits on the government's ability to deny an otherwise discretionary benefit in retaliation for a person's protected speech.... [thus the Sixth Circuit has previously held that a plaintiff] stated a plausible claim by

suggesting that the police 'refused to investigate the theft of [his] GMC truck in retaliation for complaints regarding the [police's] alleged failure to properly investigate [an earlier] burglary[.]' ").

10 *See also* *Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

11 The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

12 If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2986825
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheila ROBINSON, Plaintiff,
v.
Mark WILLIAMS, Utica NY, Police Officers 1-12; Kyle Piersall, Utica NY, Police Officers 1-12; John DeTraglia, Utica NY, Police Officers 1-12; Joseph Aiello, Utica NY, Police Officers 1-12; Brian Baye, Utica NY, Police Officers 1-12; Marissa Vomer, Utica NY, Police Officers 1-12; K. Phillips, Utica NY, Police Officers 1-12; Benny Grullon, Utica NY, Police Officers 1-12; Derek Shultz, Utica NY, Police Officers 1-12; Reginald Sanders, Utica NY, Police Officers 1-12; Brian French, Utica NY, Police Officers 1-12; Hiram Rios, Utica NY, Police Officers 1-12; Louis L. Stanton, New York State Judge; John Does, Unknown New York State Erap Officials; Letitia James, New York State Attorney General; Chuck Schumer, U.S. Senator for New York; Amazon.com; Jeff Bezos, CEO of Amazon.com; Facebook.com; Mark Zuckerberg, CEO of Facebook.com; Google.com; Sergin Brin, of Google; Larry Page, of Google; Sundar Pichai, CEO of Google; Zazzle.com; Robert Beaver, CEO of Zazzle.com; Cafepress.com; Bob Marino, CEO of Cafepress.com; Fred Durham, of Cafepress.com; Redbubble.com; Barry Newstead, of Redbubble.com; Martin Hopskin, of Redbubble.com; Utica New York Police Dept., and City of Utica, New York, Defendants.

6:22-CV-0982 (GTS/ML)
|
Signed April 18, 2023

**Attorneys and Law Firms**

SHEILA ROBINSON, Plaintiff, Pro Se, 939 Ontario Avenue, Niagara Falls, New York 14301.

**DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

***1** Currently before the Court, in this *pro se* civil rights action filed by Sheila Robinson ("Plaintiff") against the above-captioned individuals and entities ("Defendants"), are (1) United States Magistrate Judge Miroslav Lovric's Report-Recommendation recommending that some of the claims in Plaintiff's Complaint be *sua sponte* dismissed without leave to amend, and that the remaining claims in that Complaint be *sua sponte* dismissed with leave to amend, and (2) Plaintiff's Objections to the Report-Recommendation. (Dkt. Nos. 6, 9.)

After carefully reviewing the relevant filings in this action, the Court finds no error in the Report-Recommendation, clear or otherwise:[1] Magistrate Judge Lovric employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein. To those reasons, the Court adds only two points.

First, even when construed with the utmost of special liberality, Plaintiff's "Objections" fail to assert a *specific* challenge to the Report-Recommendation. (*Compare* Dkt. No. 9 *with* Dkt. No. 6.)[2] As a result, the "challenged portions" of the Report-Recommendation are entitled to only a clear-error review. In any event, even if the Court were to subject those portions of the Report-Recommendation to a de novo review, the Court would find that they survive that review.

***2** Second, rather than wait for the undersigned's ruling on Magistrate Judge Lovric's Report-Recommendation, Plaintiff has attempted to file an Amended Complaint. (Dkt. No. 10.) This litigation practice has complicated matters because, even assuming that Plaintiff had an absolute right to file such an Amended Complaint under Fed. R. Civ. P. 15(a)(1) despite the fact that she had not yet served her Complaint,[3] an amended complaint supersedes an original complaint in all respects.[4] This means that, arguably, Plaintiff's Amended Complaint has partially mooted Magistrate Judge Lovric's Report-Recommendation, which analyzed Plaintiff's *original* Complaint.

Out of a desire for judicial efficiency, the Court is tempted to apply the recommendations in the Report-Recommendation to Plaintiff's Amended Complaint. However, the Court is mindful of the Second Circuit's admonition that a *pro se* plaintiff's request to amend her complaint when a motion to dismiss is pending should be denied only without prejudice, or perhaps stayed, until she has had the benefit of the district court's ruling on the motion to dismiss.[5]

For all of these reasons, the Court has chosen to apply Magistrate Judge Lovric's Report-Recommendation to Plaintiff's original Complaint while deeming Plaintiff's Amended Complaint as a *proposed* Amended Complaint (out of special solicitude to Plaintiff as a *pro se* civil rights litigant), and holding that proposed Amended Complaint in abeyance pending confirmation from Plaintiff that it is indeed the Amended Complaint on which she wishes to proceed.

***3 ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 6) is **ACCEPTED** and **ADOPTED**; and it is further

**ORDERED** that the following claims in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED**: (1) Plaintiff's claims against Utica Police Department, the City of Utica, and Judge Stanton; (2) Plaintiff's claims against the New York State Attorney General and unnamed New York State officials; and (3) Plaintiff's stalking claims, cyberstalking claims, and harassment claims against Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg; and it is further

**ORDERED** that the remaining claims in Plaintiff's Complaint (Dkt. No. 1) **shall be DISMISSED** without further Order of this Court **UNLESS**, within **THIRTY (30) DAYS** of this Report-Recommendation, Plaintiff files an **AMENDED COMPLAINT** that corrects the pleading defects identified in those claims, which are specified as follows: (1) Plaintiff's claims under 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, DeTraglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, Hopskin, Schultz, Vomer, and Sanders; and (2) Plaintiff's defamation claims against Defendants Schultz, Vomer, and Sanders; and it is further

**ORDERED** that, more specifically, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff shall do one of the following two things: (1) notify the Court in writing that her proposed Amended Complaint (Dkt. No. 10) is indeed the Amended Complaint on which she wishes to proceed, or (2) file a revised Amended Complaint; and it is further

**ORDERED** that, upon Plaintiff's fulfillment of one of the conditions set forth in the preceding paragraph (or, in the absence of his fulfillment of either condition, after the passage of thirty days), Plaintiff's operative Amended Complaint shall be referred to Magistrate Judge Lovric for review of its pleading sufficiency pursuant to 28 U.S.C. § 1915(e) (as well as his management of pretrial matters).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2986825

## Footnotes

1 When no objection is made to a report-recommendation (or when only a *general* objection is made to a report-recommendation), the Court subjects that report-recommendation to only a clear-error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear-error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

2 When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c); *see also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

3 Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure provides that "[a] party may amend its pleading once as a matter of course ***within*** ... 21 days after serving it...." Fed. R. Civ. P. 15(a)(1)(A) (emphasis added). Here, Plaintiff never served her Complaint; thus, she is arguably not yet ***within*** the 21-day window in which she may filed an Amended Complaint as a matter of course. *Compare Morris v. New York State Gaming Comm'n*, 18-CV-0384, 2019 WL 2423716, at *4 (W.D.N.Y. March 14, 2019) ("Because Plaintiff never served the original Complaint, the 21-day time limit to file an amended complaint under Rule 15(a)(1)(A) never ***commenced***.") (emphasis added) *with Henderson v. Wells Fargo Bank, NA*, 13-CV-0378, 2015 WL 630438, at *2 (D. Conn. Feb. 13, 2015) ("Fed. R. Civ. P. 15(a) provides that a 'party may amend its pleading once as a matter of course within ... 21 days after serving it.' Because Plaintiff has not yet served Defendant with the complaint, her motion is granted although unnecessary because leave of the Court is not required.").

4 *See Int'lControls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."); 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1476, at 556-57 (2d ed. 1990) ("A pleading that has been amended under Rule 15(a) supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified."); *cf.* N.D.N.Y. L.R. 7.1(a)(4) ("[T]he proposed amended pleading ... will supersede the pleading sought to be amended in all respects.").

5 *See Cresci v. Mohawk Valley Community College*, 693 F. App'x 21, 25 (2d Cir. June 2, 2017) ("The court's criticism of Cresci for failure to submit a proposed amended complaint before learning whether, and in what respects, the court would find deficiencies was unjustified, and the court's denial of leave to replead, simultaneously with its decision that the complaint was defective, effectively deprived Cresci of a reasonable opportunity to seek leave to amend.").

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2026 WL 2606630
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

VALERIE FLORES, Plaintiff,
v.
KENNETH LESTER SMITH, SAMANTHA SUSSEK SMITH, MELISSA JOHNSON SMITH, and ANNA VI WELCH, Defendant.

1:25-cv-01838 (AMN/ML)
|
Filed 09/03/2026

**Attorneys and Law Firms**

APPEARANCES:

VALERIE FLORES, P.O. Box 1110 ACP 5749, Albany, NY 12201, Plaintiff pro se

Valerie Flores, Albany, NY, Pro Se.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci U.S. District Judge

## I. INTRODUCTION

***1** On December 26, 2025, plaintiff *pro se* Valerie Flores ("Plaintiff") commenced this action against Kenneth Lester Smith, Samantha Sussek Smith, Melissa Johnson Smith, and Anna Vi Welch (together, "Defendants"), alleging violations of her rights. Dkt. No. 1 ("Complaint"). Plaintiff also filed a motion for the appointment of counsel. Dkt. No. 3.

On January 5, 2026, United States Magistrate Judge Miroslav Lovric denied Plaintiff's motion for appointed counsel as inappropriate. Dkt. No. 5. On January 7, 2026, this Court ordered an administrative closure because Plaintiff had not paid the filing fee or applied to proceed *in forma pauperis* ("IFP"). Dkt. No. 6. Plaintiff filed a motion to proceed IFP on January 16, 2026, Dkt. No. 8, and the Court ordered the case reopened that same day, Dkt. No. 9.

On February 23, 2026, Magistrate Judge Lovric denied Plaintiff's IFP motion as incomplete. Dkt. No. 10. After Plaintiff filed an amended motion to proceed IFP on March 9, 2023. Dkt. No. 11, Magistrate Judge Lovric again denied Plaintiff's request because Plaintiff's application information required clarification as to her reported income, Dkt. No. 13.

Plaintiff filed a second amended motion to proceed IFP on April 3, 2026. Dkt. No. 14. On July 8, 2026, Magistrate Judge Lovric granted this request and reviewed the Complaint pursuant to 28 U.S.C. § 1915. Dkt. No. 15 ("Report-Recommendation"). Magistrate Judge Lovric recommended that this Court dismiss the Complaint in its entirety, in part without leave to amend and in part with leave to amend. *Id.* at 10.[1] Pursuant to 28 U.S.C. § 636(b)(1), Magistrate Judge Lovric advised that the parties had fourteen days within which to file written objections and that failure to object to the Report-Recommendation within those fourteen days would preclude appellate review. *Id.* On July 20, 2026, Plaintiff submitted written objections. Dkt. No. 16.

For the following reasons, the Court adopts the Report-Recommendation except as to the partial grant of leave to amend.

## II. STANDARD OF REVIEW

This Court reviews *de novo* those portions of a magistrate judge's report-recommendation that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). If no specific objections have been filed, this Court reviews a magistrate judge's report-recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 229 (citing Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition). Similarly, if an objection simply rehashes arguments originally presented to the magistrate judge, this Court reviews the relevant portions of the report-recommendation for clear error. *See id.* at 228-29 & n.6 (collecting cases). Similarly, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [previously] presented to the magistrate judge," the district court reviews a magistrate judge's report-recommendations for clear error. *O'Diah v. Mawhir*, No. 08-cv-322, 2011 WL 933846, at *1 (N.D.N.Y. Mar. 16, 2011) (citations omitted); *accord Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (a "statement, devoid of any reference to specific findings or recommendations to which [the plaintiff] objected and why, and unsupported by legal authority, was not sufficient to preserve" a claim); *Petersen*, 2 F. Supp. 3d at 228-29 & n.6 (collecting cases). "When performing such a 'clear error' review, 'the court need only satisfy itself that there is no clear error on the face of the

record in order to accept the recommendation.' " *Dezarea W. v. Comm'r of Soc. Sec.*, No. 21-cv-1138, 2023 WL 2552452, at *1 (N.D.N.Y. Mar. 17, 2023) (quoting *Canady v. Comm'r of Soc. Sec.*, No. 17-cv-367, 2017 WL 5484663, at *1 n.1 (N.D.N.Y. Nov. 14, 2017)).

***2** "[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2003) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (additional citations omitted). The Second Circuit has held that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id*. (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). That said, "even a *pro se* party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal[.]" *Machicote v. Ercole*, No. 06-cv-13320, 2011 WL 3809920, at *2, (S.D.N.Y. Aug. 25, 2011) (citation omitted); *accord Caldwell v. Petros*, No. 22-cv-567, 2022 WL 16918287, at *1 (N.D.N.Y. Nov. 14, 2022). After appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

## III. DISCUSSION

After review, the Court finds that Plaintiff's objections identify no error in Magistrate Judge Lovric's findings or recommendations. *See generally* Dkt. No. 16.[2] Accordingly, because Plaintiff has not raised any properly preserved objection to the Report-Recommendation, the Court reviews the Report-Recommendation for clear error. *See Petersen*, 2 F. Supp. 3d at 228-29; *Caldwell*, 2022 WL 16918287, at *1.

Magistrate Judge Lovric first recommended that this Court dismiss the Complaint as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i). Dkt. No. 15 at 5-6. Even after construing the Complaint liberally in deference to Plaintiff's *pro se* status, Magistrate Judge Lovric found that "Plaintiff's claims are precisely the type of fanciful or delusional allegations that warrant dismissal under 28 U.S.C. § 1915(e)(2)(B)(i) as factually frivolous." *Id.* at 6 (citing *Gladney v. Pendleton Corr. Facility*, 302 F.3d 773, 774 (7th Cir. 2002) and *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990)).

In the alternative, Magistrate Judge Lovric also recommended that the Court dismiss the Complaint for failure to state a claim upon which relief may be granted. *Id.* Magistrate Judge Lovric explained that while Plaintiff indicated that her claim was brought in part pursuant to 18 U.S.C. § 2261(a), that "is a criminal statute and does not 'confer a private right of action on Plaintiff.' " *Id.* (quoting *Flores v. KW Call Center Services*, 26-cv-0122, 2026 WL 1481648, at *3 (N.D.N.Y. May 27, 2026). And, to the extent that Plaintiff asserts a claim pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 ("FDCPA"), Magistrate Judge Lovric found that the Complaint "fails to allege facts plausibly suggesting that (1) Plaintiff is a person who was the object of efforts to collect a consumer debt, (2) Defendants are debt collectors, or (3) that Defendants engaged in an act or omission in violation of the FDCPA." *Id.* at 7 (citing *Komatsu v. Urban Pathways, Inc.*, 22-CV-9080, 2023 WL 419699, at *9 (S.D.N.Y. Jan. 26, 2023)). As a result, Magistrate Judge Lovric also recommended that, to the extent that Plaintiff had any remaining state law claims, this Court decline to exercise supplemental jurisdiction over such claims. *Id.* at 7-8.

Finally, Magistrate Judge Lovric recommended that this Court not grant leave to amend as to Plaintiff's claims pursuant to 18 U.S.C. § 2261. *Id.* at 9. But regarding Plaintiff's claims pursuant to the FDCPA, Magistrate Judge Lovric found that "it is not clear whether a better pleading would permit Plaintiff to assert a cognizable claim pursuant to the FDCPA" and thus recommended leave to amend out of deference to Plaintiff's *pro se* status. *Id.*

***3** After review, the Court finds no error in the Report-Recommendation, except as to the finding that a better pleading might state a claim as to the FDCPA. The Court finds no indication in the Complaint that Plaintiff's allegations against Defendants involve any debt, debt collectors, or debt collection practices. *See generally* Dkt. No. 1. Together with the finding that Plaintiff's Complaint is frivolous and nonsensical, that weighs heavily in favor of concluding that any opportunity to amend would be futile. The Court therefore dismisses the Complaint in its entirety without leave to amend.

## IV. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that the Report-Recommendation, Dkt. No. 15, is **ADOPTED** except as to its recommendation that Plaintiff be granted leave to amend her claims pursuant to 15 U.S.C. § 1692; and the Court further

**ORDERS** that Plaintiff's Complaint, Dkt. No. 1, be **DISMISSED without prejudice and without leave to amend**; and the Court further

**ORDERS** that the Clerk serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

**All Citations**

Slip Copy, 2026 WL 2606630

## Footnotes

1 Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

2 In her submission, Plaintiff simply states that she objects to Judge Lovric's "most recent order." *Id.* at 1. Plaintiff then proceeds to introduce new factual allegations that appear only tangentially related to her Complaint, as well as a recitation of what appears to be law related to federal appellate jurisdiction. *See id.* at 2-3.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.